No. 15-2382

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

JACK REESE, JAMES CICHANOFSKY,
ROGER MILLER, AND GEORGE NOWLIN,
ON BEHALF OF THEMSELVES AND A SIMILARLY SITUATED CLASS,

*Plaintiffs-Appellees*,

v.

CNH INDUSTRIAL N.V., AND
CNH INDUSTRIAL AMERICA LLC,

*Defendants-Appellants.*

On Appeal from the United States District Court for the
Eastern District of Michigan, No. 04-CV-70592

**BRIEF OF DEFENDANTS-APPELLANTS
CNH INDUSTRIAL N.V., AND
CNH INDUSTRIAL AMERICA LLC**

Bobby R. Burchfield
Nikesh Jindal
Joshua N. Mitchell
KING & SPALDING LLP
1700 Pennsylvania Ave, NW
Washington, DC  20006
Telephone:  (202) 737-0500
Facsimile:  (202) 626-3737
bburchfield@kslaw.com
njindal@kslaw.com
jmitchell@kslaw.com

*Counsel for Defendants-Appellants CNH Industrial N.V.
and CNH Industrial America LLC*

January 13, 2016

## RULE 26.1 DISCLOSURE OF
## CORPORATE AFFILIATIONS AND FINANCIAL INTEREST

Pursuant to Sixth Circuit Rule of Appellate Procedure 26.1, CNH Industrial, N.V. and CNH Industrial America, LLC make the following disclosure:

1.     Is said party a subsidiary or affiliate of a publicly owned corporation?  If yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

       CNH Industrial, N.V., whose stock is publicly traded, is the ultimate parent company of CNH Industrial America LLC.

2.     Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and nature of the financial interest?

       No.

Dated: January 13, 2016                    Respectfully submitted,


                                           /s/ Bobby R. Burchfield
                                           Bobby R. Burchfield
                                             Counsel of Record
                                           Nikesh Jindal
                                           Joshua N. Mitchell
                                           KING & SPALDING LLP
                                           1700 Pennsylvania Ave., NW
                                           Washington, DC  20006
                                           Telephone:  (202) 737-0500
                                           Facsimile:  (202) 626-3737
                                           bburchfield@kslaw.com
                                           njindal@kslaw.com
                                           jmitchell@kslaw.com

*Counsel for CNH Industrial N.V. and CNH Industrial America LLC*

# TABLE OF CONTENTS

RULE 26.1 DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST ........................................................ i

TABLE OF AUTHORITIES ...................................................... iv

STATEMENT REGARDING ORAL ARGUMENT .................................. vi

INTRODUCTION ...................................................................... 1

JURISDICTION .......................................................................... 3

ISSUES PRESENTED ................................................................ 4

STATEMENT OF THE CASE .................................................... 5

    A.    Factual Background .................................................... 5

        1.    The Parties .................................................... 5

        2.    The Pre-1998 Collective Bargaining Agreements ......... 6

        3.    The 1998 CBA and the 1998 Plan ................................ 8

        4.    Changes in the Healthcare Landscape Since 1998 ..... 11

        5.    The 2005 Plan ............................................................ 14

        6.    The Proposed Plan ...................................................... 17

    B.    Procedural History .................................................... 20

        1.    First Summary Judgment and Appeal ........................ 20

        2.    Second Summary Judgment and Appeal ..................... 22

        3.    *Tackett* and the Third Summary Judgment Ruling ........................................................................ 24

        4.    Reconsideration and Summary Judgment for Plaintiffs .................................................................... 25

SUMMARY OF ARGUMENT ...................................................... 28

STANDARD OF REVIEW .......................................................... 31

ARGUMENT ....................................................................... 32

I.    THE PARTIES DID NOT AGREE TO VEST PLAINTIFFS'
      BENEFITS............................................................................ 32

      A.    Because This Court's Earlier Vesting Decision Relied
            Heavily on the *Yard-Man* Inferences, It Did Not
            Survive *Tackett*........................................................ 32

      B.    Rather Than Agreeing To Vest Plaintiffs' Benefits,
            CNH and the UAW Recognized and Agreed That the
            Benefits Were Granted and Governed by Each
            Successive CBA. .......................................................... 35

      C.    The District Court Decision Ignored "the Correct Legal
            Principles" Set Forth in *Tackett* ............................... 40

            1.    *Tackett* Set Forth the "Correct Legal Principles"
                  To Govern Vesting Determinations. ........................ 40

            2.    To Construct an Ambiguity, the District Court
                  Relied on Inferences Repudiated in *Tackett*. .......... 43

            3.    Even If the Contract Were Ambiguous, *Tackett*
                  Instructs Not To Base Lifetime Benefits on
                  Ambiguous Contracts. .................................... 48

II.   THE CHANGES TO THE PLAN PROPOSED BY CNH
      COMPLY WITH THE CRITERIA SET FORTH IN *REESE I*
      AND *REESE II*.................................................................. 49

      A.    The Proposed Benefits Are Reasonably Commensurate
            with the Current Benefits....................................... 51

      B.    The Proposed Changes are "Reasonable in Light of
            Changes in Healthcare."......................................... 58

      C.    The Proposed Changes Are "Roughly Consistent With
            the Kinds of Benefits Provided to Current Employees."...... 61

      D.    The Proposed Plan's Components Are Severable ................ 64

CONCLUSION ................................................................ 66

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby*,
   477 U.S. 242 (1986) ............................................................... 47

*Ayers v. Hudson*,
   623 F.3d 301 (6th Cir. 2010) ............................................... 44

*B.G. ex rel Hawk v. Easton Area Sch. Dist.*,
   725 F.3d 293 (3d Cir. 2013) ................................................ 44

*Int'l Union v. Winters*,
   385 F.3d 1003 (6th Cir. 2004) ............................................ 44

*International Union, UAW v. Yard-Man, Inc.*,
   716 F.2d 1476 (6th Cir. 1983) ...................................... passim

*Litton Fin. Printing Div. v. NLRB*,
   501 U.S. 190 (1991) ............................................................ 41

*M&G Polymers USA, LLC v. Tackett*,
   135 S. Ct. 926 (2015) .................................................... passim

*Noe v. PolyOne Corp.*,
   520 F.3d 548 (6th Cir. 2008) ............................................... 31

*Reese v. CNH America LLC ('Reese I')*,
   574 F.3d 315 (6th Cir. 2009) ......................................... passim

*Reese v. CNH America LLC ('Reese II')*,
   694 F.3d 681 (6th Cir. 2012) ......................................... passim

*Sprague v. General Motors Corp.*,
   133 F.3d 388 (6th Cir. 1998) ......................................... 40, 41

*Tackett v. M&G Polymers USA, LLC*,
   733 F.3d 589 (6th Cir. 2013) ......................................... 57, 64

*United States v. Angel-Guzman*,
   506 F.3d 1007 (10th Cir. 2007) ........................................... 44

*Yolton v. El Paso Tenn. Pipeline Co.*,
   435 F.3d 571 (6th Cir. 2006) ................................. 21, 32, 35

**Statutes**

28 U.S.C. § 1291 (2012) ................................................................. 4

28 U.S.C. § 1331 (2012) ................................................................. 3

29 U.S.C. § 1132 (2012) ................................................................. 4

42 U.S.C. § 300gg-11 (2012) ........................................................ 11

Pub. L. 108-173 ............................................................................ 12

Pub. L. 111-148 ............................................................................ 12

**Other Authorities**

Cong. Budget Office,
    Health-Related Options for Reducing the Deficit (Dec. 2013),
    https://www.cbo.gov/publication/44906/ ............................... 54

Cong. Budget Office,
    Technological Change and the Growth of Health Care Spending (Jan.
    2008), https://www.cbo.gov/publication/41665/ ............................. 13, 54

Katherine Swartz,
    *Cost-sharing: Effects on spending and outcomes*,
    Research Synthesis Report No. 20, The Robert Wood Johnson
    Foundation, Dec. 2010 ........................................................ 58

## STATEMENT REGARDING ORAL ARGUMENT

CNH Industrial, N.V. ("CNH Industrial") and CNH Industrial America LLC ("CNH America," and together with CNH Industrial, "CNH") request oral argument in this case for two reasons. *See* 6th Cir. R. App. P. 34(a). *First*, in the first appeal of this case, this Court relied on inferences derived from *International Union, UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983), to hold the Plaintiffs' retiree health benefits vested for life. *See Reese v. CNH America LLC*, 574 F.3d 315 (6th Cir. 2009) ("*Reese I*"). In *M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 937 (2015), the Supreme Court of the United States "reject[ed] the *Yard-Man* inferences as inconsistent with ordinary principles of contract law." CNH believes oral argument would be helpful to this Court in determining whether the district court correctly interpreted and applied *Tackett* to the undisputed material facts in this case on the vesting issue.

*Second*, if the Court were to agree with Plaintiffs that the benefits are vested, oral argument would assist the Court in determining whether the district court correctly interpreted and applied the rulings in *Reese I* and *Reese v. CNH America LLC*, 694 F.3d 681 (6th Cir. 2012) ("*Reese II*") by rejecting all the changes to Plaintiffs' benefits that CNH proposed.

## INTRODUCTION

This twelve-year-old case concerns Plaintiffs' claim that CNH agreed to fund their health benefits for life.[1]  Notwithstanding forthright instructions in a recent decision by the Supreme Court of the United States and two previous reversals by this Court, the district court has once again entered summary judgment on all issues for Plaintiffs.  First, contrary  to the instructions of the Supreme Court in *M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926 (2015), the district court adhered to its view that the 1998 Collective Bargaining Agreement and Group Benefit Plan created vested, lifetime health benefits for Plaintiffs.  Second, the district court held that CNH is precluded from making any changes to Plaintiffs' benefits, once again misreading this Court's prior decisions in this long-running case.

---

[1]  Since the decision in *Reese v. CNH America LLC*, 694 F.3d 681 (6th Cir. 2012), appellants underwent a corporate reorganization.  Apart from the name changes, the corporate reorganization does not affect this case.  CNH Industrial America LLC, the direct successor of CNH America LLC, continues to pay and be liable for the health benefits at issue here, and CNH Industrial N.V., the successor to CNH Global N.V., continues to be the ultimate parent of CNH Industrial America LLC.

The district court's decision on vesting is erroneous as a matter of law. *Tackett* undercut the basis for the earlier vesting decision in this case. Although recognizing that *Tackett* precludes use of the earlier rules of construction to prove vesting, the district court employed those very same rules of construction to create a contractual ambiguity, and then relied upon unspecified extrinsic evidence to reconfirm the earlier decision that Plaintiffs' health benefits are vested. The district court ignored the fact that Plaintiffs do not receive their benefits in perpetuity under the agreements in effect when they retired, but instead receive their benefits pursuant to the 1998 CBA, even if they retired under the 1990 or 1995 CBAs. Because the benefits were renegotiated and changed in the 1998 agreement, they are by definition not vested. Further, the district court's vesting decision ignored clear rules of contract construction set forth by the Supreme Court in *Tackett*, and its reliance on extrinsic evidence was erroneous.

Even if the district court correctly ruled the health benefits vested, it once again misread this Court's earlier decisions setting forth criteria for CNH to make reasonable changes to those benefits. The district court based its decision solely on its view that the proposed

2

benefits are not "reasonably commensurate" with the benefits Plaintiffs currently receive, but misinterpreted that criterion by failing to consider the ever-improving health benefits Plaintiffs have received and will continue to receive. CNH submitted undisputed evidence that the cost-sharing proposed for Plaintiffs is reasonably commensurate with the enhanced benefits they will receive. The undisputed evidence also shows the proposed benefits are reasonable in light of changes to healthcare, and are equivalent to if not better than the benefits received by current employees and more recent retirees, as well as by retirees of comparable companies. Based on the existing record, reversal of the district court's ruling and entry of summary judgment for CNH are appropriate.

## JURISDICTION

The district court had subject matter jurisdiction over the claims of Jack Reese, Frances Elaine Pidde, James Cichanofsky, Roger Miller, and George Nowlin ("Plaintiffs") against CNH Industrial N.V. and CNH Industrial America LLC under 28 U.S.C. § 1331 (2012), because the claims arise under section 301(a) of the Labor-Management Relations Act of 1947, 29 U.S.C. § 185(a) (2012). DE59:2454 ¶ 2 (Amended

Complaint).  Plaintiffs also purport to invoke section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B) (2012).  DE59:2454 ¶ 3.  The district court granted summary judgment for Plaintiffs and denied summary judgment for CNH on November 9, 2015.  DE450:17040-41 (Order).  CNH timely filed a notice of appeal from the judgment on November 10, 2015.  DE451:17042 (Notice of Appeal).  This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 (2012).

## ISSUES PRESENTED

1.    Does the decision of the Supreme Court in *M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926 (2015), require reversal and entry of judgment in favor of CNH as a matter of law, on the ground that Plaintiffs' health benefits are not vested because (a) Plaintiffs depended on each successive collective bargaining agreement, culminating in the 1998 CBA, to provide benefits to all existing retires, (b) the 1998 CBA contained no express statement vesting retiree health benefits, and indeed contained provisions inconsistent with vesting, and (c) the "correct legal principles" set forth in *Tackett* preclude vesting?

2.    Even if the Plaintiffs' health benefits are deemed to be vested, did the district court err as a matter of law in concluding that the changes proposed by CNH Industrial America LLC were not reasonable, in whole or in part, under the standards articulated by this Court in *Reese v. CNH America LLC*, 574 F.3d 315 (6th Cir. 2009) ("*Reese I*") and *Reese v. CNH America LLC*, 694 F.3d 681 (6th Cir. 2012) ("*Reese II*")?

## STATEMENT OF THE CASE

This Court has twice before considered, reversed, and remanded this case, and is thus familiar with the procedural posture and facts up through its 2012 decision in *Reese II*.  We briefly set forth below the relevant facts and procedural history.

### A.    Factual Background

#### 1.    The Parties

Defendants-appellants CNH Industrial N.V. and CNH Industrial America LLC, formerly known as Case Corporation, manufacture construction and agricultural equipment at several locations in the United States.  Plaintiffs are a class of former CNH employees, all of whom retired after July 1, 1994 and before April 1, 2005, and their

spouses. DE223:8957 (Class Stip. & Order).[2]  Like some, but not all,

CNH manufacturing employees, Plaintiffs were represented in labor

negotiations by the United Automobile, Aerospace, and Agricultural

Workers of America ("UAW").

### 2. The Pre-1998 Collective Bargaining Agreements

Beginning in 1971, the UAW and Case Corporation agreed to a

series of collective bargaining agreements ("CBAs").  Among other

terms, the CBAs incorporated plans under which CNH provided health

insurance to retired employees and their spouses.  *See Reese I*, 574 F.3d

at 318.  These agreements ran for three- or four-year terms.  *See id.*

Until 1998, these agreements provided health benefits on an indemnity

basis rather than under a managed care plan.  *See id.* at 324–25.  Each

of the pre-1998 CBAs specified that "[t]he cost of this coverage is

*currently* fully paid for by the employer." *See e.g.*, DE125-10:4363 (1995

Plan); DE163-5:6915 (1995 Summ. Plan Description) (emphasis added).

On June 2, 1990, the UAW and Case Corporation entered a

similar CBA, scheduled to expire on October 2, 1993. DE125-4:4521.

---

[2]  Citations to the record are in the format **DE123-4:5678-90** for page numbers 5678 to 5690 in Docket Entry 123-4.

That CBA included a Group Benefit Plan ("GBP") that provided health

benefits to eligible retirees as follows:

> Employees who retire under the Case Corporation
> Pension Plan for Hourly Paid Employees, or their
> surviving spouses eligible to receive a spouse's pension
> under the provisions of that Plan, shall be eligible for the
> Group benefits as described in the following paragraphs.

DE129-30:5030 ¶ V(J)(1) (1990 GBP).  The 1990 GBP "r[a]n

concurrently with" the 1990 CBA.  DE125-4:5020 (1990 CBA).  On

November 5, 1993, UAW and Case Corporation agreed to extend the

substantive terms of the 1990 CBA and GBP from October 3, 1993 to

February 5, 1995.  DE125-6:4430 (Extension Agmt.).  In July 2004,

CNH (then called Case Equipment Corporation) became Plaintiffs'

employer as part of a corporate reorganization, *see generally* DE125-7

(Reorg. Agmt.), and prospectively assumed the existing CBA and GBP

executed by the UAW and the former Case Corporation on June 2, 1990,

and extended by the November 5, 1993 agreement.

The 1990 contracts were superseded by a new CBA and GBP in

1995.  The 1995 GBP stated that all employees who retired after July 1,

1994—even those retiring under the 1993 extension—"shall be eligible

for Group benefits as described in the following paragraphs."

7

DE129-31:6295 (1995 GBP).  The new GBP "r[a]n concurrently with" the 1995 CBA.  DE125-9:4525 (1995 CBA).

The 1993 and 1995 CBAs both incorporated Letters of Understanding (the "cap letters") stating, in relevant part, "the average per capita annual cost to the Company of providing medical and related benefits under the [CNH] Group Benefit Plan to retired employees and surviving spouses of deceased employees shall not exceed" specific dollar amounts and that "no covered person shall be required to pay a portion of any excess amount prior to" a specific date.  DE125-6:4438 (Extension Agmt.); DE125-8:4560 (1995 Tent. Agmt.).

### 3.   The 1998 CBA and the 1998 Plan

The 1995 CBA and GBP expired in March 1998.  DE125-9:4527 (1995 CBA).  CNH and the UAW executed a new CBA and GBP in May 1998, with a specified termination date of May 2, 2004.  DE439-6:16808 (1998 CBA).  The 1998 GBP "r[a]n concurrently with" the 1998 CBA. *Id.* at 16806.  Like the 1995 plan, the 1998 GBP explicitly covered all persons who had retired "*after 7/1/94*, or their surviving spouses eligible to receive a spouse's pension."  DE439-3:16688 (1998 GBP) (emphasis added); *see also Reese I,* 574 F.3d at 318 (quoting provision).

8

The 1998 contract also provided that individuals hired after May 18,
1998, would be ineligible for company-provided health care when they
retired.  DE439-3:16689.

The 1998 agreement contained no cap letter,[3] but did include two
pertinent "Letters of Understanding." One addresses "National and
State Health Insurance Initiatives," which

> confirms our understanding that if, during the term of the
> 1998 Collective Bargaining Agreement, any Federal or
> State health security act is enacted or amended to provide
> hospital, surgical, medical, prescription drug, dental
> benefits, vision care, or hearing care for employees,
> retired employees, surviving spouses and dependents,
> which duplicate or may be integrated with the benefits of
> the Group Benefits Plan, then in such event the benefits
> under the [GBP] will be modified so as to integrate or
> eliminate the duplication of such benefits with the
> benefits provided by such Federal or State law.

*Id.* at 16701.[4]  The other, addressing "Cost of Healthcare Coverage,"
states:

---

[3]  If not eliminated, the cap could have become effective during the
term of the 1998 agreements.  DE125-8:4650 (1995 Tent. Agmt.)
(providing that "no covered person [would] be required to pay a
portion of any excess" over the cap before January 1, 1999).

[4]  Pursuant to this provision, effective January 1, 2015, CNH required
Medicare-eligible Plaintiffs to participate in the Medicare Part D
prescription drug program, at no increased cost to the Plaintiffs but
at considerable savings to CNH.  DE423-4 (Burchfield Ltr.).

> During the 1998 contract negotiations the Company and
> the Union agreed that *over the term of the 1998 labor
> agreement* employees and retirees who are enrolled in a
> Company offered HMO, PPO or other plan will not have
> to pay any additional employee contributions above those
> which may be required for enrollment in the Case
> Network Plan (if any).

*Id.* at 16702; *see Reese I*, 574 F.3d at 319, 325 (quoting and discussing

letter).

The 1998 plan covers medically necessary treatments, but unlike

the previous plans it does so through a medical network in a "Preferred

Provider Organization" arrangement. *See* DE439-2:16636-41 (1998

GBP). Plan participants who seek treatment outside the approved

network must pay a $100 per person or $300 per family deductible. *Id.*

at 16640. Non-network costs are subject to an annual out-of-pocket

maximum of $1,000 per person or $2,000 per family. *Id.* Non-network

care is covered at 80% after the deductible. *See id.* at 16641-42. The

1998 plan covers non-network care only up to a maximum lifetime

benefit of $500,000. *Id.* at 16644.[5]

---

Plaintiffs did not object to or take any action in response to this
change.

[5] Because the current plan was offered before March 23, 2010, it is not
subject to the Affordable Care Act's ban on maximum lifetime dollar-
amount benefits. 42 U.S.C. § 300gg-11(a)(1)(A) (2012).

In the network, retirees receive up to a 30-day supply of any prescription drugs, whether generic or brand name, for an out-of-pocket cost at retail of $5. *Id.* at 16659-60. Longer-term supplies of a drug up to 90 days are available by mail, also for $5. *See id.* at 16660. The plan provides no incentive for Plaintiffs to elect equivalent generics over more expensive brand-name drugs. *See id.* at 16659-60.

The 1998 CBA and GBP expired by their terms on May 2, 2004. DE439-6:16808 (1998 CBA). Contrary to prior practice, Plaintiffs were *not* included in the CBAs and GBPs executed in 2005 and 2010. Thus, members of the class currently receive benefits under the 1998 GBP even if they retired while the 1990 GBP (as extended in 1993) or 1995 GBP was in effect.

Although the 1998 CBA and GBP have expired, Plaintiffs' benefits have continued during the twelve year pendency of this litigation. During that time, they have paid no premiums for health benefits and their deductibles and co-payments have not changed.

### 4.    Changes in the Healthcare Landscape Since 1998

In the eighteen years since the 1998 plan was put into place, healthcare technology, costs, and how Americans pay for healthcare

have changed dramatically.  Congress created Medicare Part D, a federal benefit providing prescription drugs to Medicare patients.  *See generally* Pub. L. 108-173.  The Affordable Care Act has dramatically altered the availability and delivery of healthcare.  *See* Pub. L. 111-148.  New drugs and treatments have been developed, increasing the cost of healthcare.  See DE423-22:14909 (Macey Decl.) ("Unlike other sectors of the economy, technological advances in health care generally increase rather than decrease costs.").  Healthcare costs have risen much faster than inflation.  *See, e.g.*, *id.* at 14894 (noting that health insurance cost increases exceeded inflationary increases by an average of 28% over the period between 1991 and 2005 and grew more than four times faster than inflation between 1999 and 2010).  In a 2008 report, the Congressional Budget Office "conclude[d] that roughly half of the increase in health care spending during the past several decades was associated with the expanded capabilities of medicine brought about by technological advances."  *See* Cong. Budget Office, Technological Change and the Growth of Health Care Spending (Jan. 2008) at 12, https://www.cbo.gov/publication/41665/ (cited in Macey Decl., DE423-

22:14908). These expanded capabilities include new drugs, devices, and services. *See* DE423-22:14908 (Macey Decl.).

Even though the cost to Plaintiffs has not changed, the cost to CNH has ballooned. *See* DE423-9:14861 (Historical Pre-65 Med. Costs) (showing that the plan paid nearly $110 million in claims between 2008 and 2012). Plaintiffs have received the benefit of the substantial developments in medical care at no cost to themselves. For example, an analysis of the 25 drugs most used by the Plaintiff class shows that in 2009, charges for drugs among those 25 which were not available in 1998 represented about 24% of the overall drug costs, and by 2012 that figure had climbed to about 31% of the overall drug costs. DE423-14:14873 (Grandfathered Prescription Drug Claims); DE423-22:14909.

Companies have responded to these changes by requiring retirees to share some or all of the increased cost. DE423-22:14895-96. As discussed below, the UAW and CNH agreed to premium payments, as well as higher deductibles and co-payments, for current employees and for persons retiring under the 2005 and 2010 CBAs. The UAW also agreed to a plan with Caterpillar, one of CNH's competitors, that requires its retirees not yet eligible for Medicare to pay a monthly $241

premium.  DE423-22:14921.  The Caterpillar plan imposes deductibles of $600 per individual or $1,200 per family.  *Id.*  It covers in-network services at 80% and out-of-network services at 50% — with no out-of-pocket maximum for out-of-network services.  *Id.*

### 5.   The 2005 Plan

The 1998 CBA and 1998 plan expired on May 2, 2004.  *Reese I*, 574 F.3d at 318.  Beginning in late 2004, CNH and the UAW negotiated a new CBA, and executed it on March 21, 2005.  DE125-17:4476 (2005 CBA).  The CBA includes new health benefits for current employees and for "[e]mployees who retire … on or after December 1, 2004."  DE101-5:3713 (2005 GBP).[6]  Like the 1998 CBA, the 2005 CBA denies retiree health benefits to any employee hired after May 14, 1998.  *Id.*; DE101-6:1 (2005 GBP).  Of great significance here, the UAW refused to bargain over health benefits for Plaintiffs who had already retired.  *See* DE125-43:4329 (UAW Minutes) ("I can understand them going after the 4/01/04 group but we're not going backwards").  Accordingly, unlike the earlier CBAs, the 2005 plan explicitly excludes Plaintiffs.  *See* DE101-5:3713 (2005 GBP).

---

[6]   By agreement of the parties, the retiree class includes persons who retired up to April 1, 2005.  DE223:8957.

The 2005 plan, renewed in the 2010 CBA, requires retirees to pay premiums and increased deductibles of varying amounts in connection with their health benefits. As of 2014, individuals subject to the 2005 plan, but not yet eligible for Medicare, paid monthly premiums of $474 for individual, $949 for individual and spouse, and $1,345 for family coverage. DE423-2:14747 (Coogan Decl.). The 2005 plan charges individuals not eligible for Medicare a deductible of $200 per individual or $400 per family for in-network care, and coinsures in-network care at 85%. DE101-3:3617-20 (2005 GBP). The 2005 plan protects the current retirees with an annual out-of-pocket network maximum of $1,000 per individual and $2,000 per family for healthcare in network. *Id.* at 3617. Enrollees pay a $500 individual or $1,000 family deductible for out-of-network healthcare, which is covered at 65% past that deductible, subject to an annual out-of-pocket maximum of $2,000. *Id.*

Individuals not eligible for Medicare also pay a greater share of prescription drug costs under the 2005 plan than under the 1998 plan. *See id.* at 3621. For a one-month supply of a drug, plan enrollees hired before 2004 pay $10 for generic drugs, $40 for brand-name drugs in the plan formulary, and $60 for non-formulary drugs. *Id.* Prices are twice

that — $20, $80, and $120 — for a 30–90 day supply. *Id.* Later-hired employees pay more — an annual $50 prescription deductible and a 30% copayment, up to $200 for generic drugs, up to $300 for formulary drugs, and 30% of the cost of non-formulary drugs with no maximum. *See id.*

Medicare-eligible plan participants are not bound to a network. *Id.* at 3622. They pay an annual deductible of $250 per individual or $500 per family. *Id.* Healthcare costs are covered at 80% past the deductible, up to an out-of-pocket maximum of $1,500 per person or $3,000 per family. *Id.* at 3622-24. They receive prescription drug coverage through Medicare Part D. *See id.* at 3624 n.** ("Effective January 1, 2007, Prescription coverage is eliminated for all Retirees [and] Surviving Spouses … who are or become eligible for Medicare.").

The 2005 CBA grants covered retirees a $6,000 per year supplemental allowance payment until age 62, and retirees who were employed for at least 30 years receive an annual increase in basic pension benefits of $1,746 per year from age 62 for life. DE450:17024 (Op. & Order). CNH agreed to increase the monthly Medicare Part B reimbursement benefit from $65.50 to $100 beginning at age 65. *Id.*

16

Finally, until expiration of the 2005 CBA in 2011, CNH contributed an average total one-time payment of $16,000 for each retiree (but not for spouses) into a Retiree Medical Savings Account. *Id.*

In 2010, the UAW and CNH agreed to a new collective bargaining agreement effective until April 2016 and containing health benefits materially identical to those provided under the 2005 plan. DE423-2:14743 (Coogan Decl.).[7]

### 6.    The Proposed Plan

CNH seeks to bring Plaintiffs' health benefits into line with those provided to current UAW-represented CNH employees and individuals who have retired from CNH since 2005. It has therefore proposed to offer benefits to Plaintiffs that are materially identical to those provided to CNH's most recent UAW-represented retirees under the 2005 plan. *See generally* DE423-3 (the "proposed plan").

The most striking difference between the proposed plan and the 2005 plan is that Plaintiffs would pay much less than more recent retirees for the same benefits. CNH would not ask retirees to pay any share of the premium cost accrued before the date of plan

---

[7]  As required by the ACA, limits in the 2005 agreement on lifetime benefits for non-network care have been eliminated.

implementation, and thereafter would charge a premium covering only 60% of the prospective year-over-year cost increase.  *See* DE423-22:14905 (Macey Decl.).  This means that CNH will continue to pay 100% of (1) the original 1998 monthly cost of the plan, (2) the total increase in that monthly cost over the period between 1998 and the date the proposed plan is finally implemented, plus (3) 40% of the year-over-year increase from that point forward.  If the plan had become effective in 2014, Plaintiffs not eligible for Medicare would have paid $57.25 per month for coverage under the proposed plan, compared to the $474 individual monthly premium paid by more recent retirees.  DE423-2:14747  (Coogan Decl.).  This represents a savings for each Plaintiff of $5,000 in premiums over the more recent retirees in just the first year. *See id.*  Because Plaintiffs' premiums would increase from their lower base, their premium would remain lower than premiums of more recent retirees in perpetuity.[8]

---

[8]  After the district court granted summary judgment for CNH on September 28, 2015, DE446, CNH began the process of implementing the proposed plan with an effective date of January 1, 2016, with one difference:  for 2016, it proposed *no premium* for those Plaintiffs not yet eligible for Medicare. After the November 9, 2015 reconsideration

Moreover, Medicare-eligible Plaintiffs would pay only $5 per month in the first year of the plan. *Id.* Plaintiffs estimate that by 2019 more than 90% of participants in the proposed plan will be eligible for Medicare, and that by 2032 all but thirteen participants — younger spouses of CNH retirees — will be Medicare eligible. DE426-3:15644 (Lynne Dep.).[9] Thus, by 2032, all Plaintiff retirees, and virtually all eligible spouses, will pay an expected monthly premium of $132. *See* DE423-11:14867 (Future Expected Payments). If healthcare costs continue to increase at the historical trend, the premium for those few participants not eligible for Medicare will be $1,455. *Id.* The healthcare cost trends of the last few decades are, however, likely unsustainable, and recent studies indicate that the Affordable Care Act may be helping to temper healthcare-cost escalation. DE423-22:14914-15 (Macey Decl.).

---

ruling, DE450, CNH elected to leave the current plan in place pending this appeal.

[9]  Any person not yet Medicare eligible in 2032 — 28 years after the 1998 plan expired in 2004 — would have been 37 years old or younger in 2004, too young to retire from CNH.

The proposed plan offers the same deductibles, the same coverage, and the same out-of-pocket maximums for both in-network and out-of-network care that the UAW agreed to in the 2005 plan. *Compare* DE101-3:3617-20 (2005 GBP), *with* DE423-3:14763-67 (Draft GBP). Similarly, Medicare-eligible Plaintiffs would have the same benefits under the proposed plan that post-2004 Medicare-eligible retirees get under the 2005 plan. *Compare* DE101-3:3621-23 *with* DE423-3:14767-69. Plaintiffs ineligible for Medicare are subject to the 2005 prescription plan, and would pay $10 for generic, $40 for branded formulary, and $60 for branded non-formulary drugs. DE423-3:14784. Medicare-eligible retirees will (like recent retirees) receive prescription drugs through Medicare Part D. *See id.*

The proposed plan also makes improvements to the 2005 plan required by the Affordable Care Act, such as eliminating the maximum lifetime benefit for non-network care. *Compare* DE101-3:3617 *with* DE423-3:14767.

### B.   Procedural History

#### 1.   First Summary Judgment and Appeal

This case spans twelve years, four substantive rulings by the district court, and two prior rulings by this Court. Throughout the

20

twelve years since the 1998 contract expired in 2004, CNH has continued to pay fully for Plaintiffs' health benefits.

The litigation began in February 2004, when CNH filed a complaint for declaratory judgment in Milwaukee, Wisconsin near the plant where Plaintiffs worked, and Plaintiffs filed a complaint in Detroit, Michigan. After a forum fight, *see Reese I*, 574 F.3d at 320, Plaintiffs' complaint proceeded, seeking (1) a declaratory judgment that the contracts required CNH to provide lifetime healthcare benefits, (2) an injunction preventing CNH from changing their benefits, and (3) damages. DE1:6; *see also Reese I*, 574 F.3d at 319. In August 2007, the district court granted summary judgment in favor of Plaintiffs, holding their benefits vested and unalterable. DE213, DE214, & DE227. CNH appealed. DE228.

On appeal, this Court affirmed the ruling on vesting, relying on *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571 (6th Cir. 2006), which had applied the Sixth Circuit's long-standing inferences in favor of vesting to Case Corporation's earlier contracts. *Reese I*, 574 F.3d at 321, 323. Even though it held the benefits vested, however, the Court also held that it would be contrary to "the 1998 CBA, extrinsic evidence

provided by the parties[, and] common sense" to prevent CNH from
making reasonable modifications to the plan. *Id.* at 327. The Court
wrote: "That is why the CBA—unless it says otherwise—should be
construed to permit modifications to benefit plans that are 'reasonably
commensurate' with the benefits provided in the 1998 CBA, 'reasonable
in light of changes in health care' and roughly consistent with the kinds
of benefits provided to current employees." *Id.* at 326 (citation omitted).
This Court remanded the case to the district court to determine "how
and in what circumstances CNH may alter [the Plaintiffs' health]
benefits." *Id.* at 327.

### 2.    Second Summary Judgment and Appeal

On remand, CNH proposed moving the Plaintiffs into the benefit
plan negotiated and agreed by CNH and the UAW in 2005, and
presented evidence that those changes were reasonable. *See* DE271 &
exhibits. Rather than respond to this evidence, however, Plaintiffs
"relitigated several questions [this Court] had already decided, moving
for summary judgment on the ground that CNH lack[ed] the ability to
modify any benefits, save at the approval of the union that once
represented them." *Reese II*, 694 F.3d at 685. The district court again

granted summary judgment to the Plaintiffs, ruling that none of the proposed changes were allowable.  DE304; DE316.

On the second appeal, this Court held that "[t]he plaintiffs and the district court misread" its first opinion.  *Reese II*, 694 F.3d at 685.  It reiterated that CNH was authorized to alter the benefits "*on its own*, not as part of a new collective-bargaining process." *Id.*  After noting that the district court had failed to complete the main task *Reese I* had assigned it — to "take evidence and to decide in the first instance the legal question whether CNH's proposed modifications were reasonable" — it considered deciding the case on the existing record, citing the unfairness of prolonging the dispute when doing so "risk[ed] mooting the economic stakes for" CNH.  *Id.* at 684-85.  Nevertheless, this Court chose to remand again to the district court to consider the three criteria set forth in *Reese I*, 574 F.3d at 326, and gave additional guidance for consideration of those criteria.  *Reese II*, 694 F.3d at 685-86.

After more discovery, the parties again moved for summary judgment and briefed their arguments in mid- and late 2014.  DE419, DE423.

### 3. *Tackett* and the Third Summary Judgment Ruling

In January 2015, a week before argument on the cross motions for summary judgment, the Supreme Court decided *M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926 (2015), which unanimously rejected all inferences developed in *Yard-Man* and its progeny that this Court had relied on in *Reese I.* Based on *Tackett,* CNH again moved for summary judgment on the ground that the *Tackett* decision abrogated the earlier vesting decision. DE438, DE439.

On September 28, 2015, the district court granted CNH's motion for summary judgment based on *Tackett.* DE445:16912 ("Constrained by the Supreme Court's decision, the Court has no choice but to grant Defendants' second summary judgment motion."). Rejecting Plaintiffs' primary argument that the benefits are vested because the agreement "ties" eligibility for health benefits to receipt of pension benefits, the court reasoned, "language tying mere *eligibility* for contribution-free benefits to receipt of pension benefits, as opposed to language tying the *duration* of contribution-free benefits to receipt of pension benefits, no longer supports the conclusion that parties intended to create lifetime benefits." DE445:16932 (emphasis added). The district court could

24

discern no "clear manifestation of intent, evinced in the language of the contract" that the parties "intended to confer lifetime benefits." *Id.* at 16935. Because the benefits were not vested, it concluded that all other issues, including the reasonableness of CNH's proposed changes, were moot. *Id.* at 16912.

### 4. Reconsideration and Summary Judgment for Plaintiffs

On November 9, 2015, after Plaintiffs moved for reconsideration of the September 28 decision, DE447, the district court determined that it had committed "palpable error" by granting summary judgment for CNH. DE450:16997. Relying (over CNH's objection) on Justice Ginsburg's concurrence in *Tackett*, the court concluded that it had erred in "construing an ambiguous writing to create no lifetime promise." *Id.* at 17001 n.1. Language "tying" eligibility for healthcare to receipt of a pension, coupled with the absence of specific durational limits on retiree healthcare benefits, it said, interjected ambiguity into the CBA. *Id.* at 17002-03. Referring to its earlier decision, but without specifying which extrinsic evidence it found persuasive in resolving the purported ambiguity, the court ruled that the "extrinsic evidence supports a

finding that the parties intended to grant Plaintiffs vested, lifetime retiree health insurance coverage." *Id.* at 17006.

The district court then examined whether CNH's proposed health benefit changes were consistent with the criteria set forth in *Reese I* and *II*. It rejected all the changes based on its view that the benefits proposed for the Plaintiff retirees are not "reasonably commensurate" with the benefits provided by the 1998 CBA. The Court focused on total projected costs payable of $21,615 (premiums, deductibles, and copayments) in 2032 by the thirteen class members who would not then be eligible for Medicare. The court declined to "ignore these unlucky thirteen retirees [*sic*, spouses]," *id.* at 17021 n.7; *see* footnote 9 above. With regard to Medicare eligible retirees, the court focused on the total cost of $7,017 per retiree, purportedly representing 74.9% of the costs of the benefits, compared to 25.1% to be paid by CNH, a calculation that neglects the substantial amount of Medicare paid by the Government. The court concluded that the plan "drastically increases retiree costs with no meaningful mitigating benefit." *Id.* at 17022. The court did not mention the substantial improvements in medical care that are implicit

in the increasing costs payable by the Plaintiffs, CNH, and the Government.

The district court also emphasized benefits outside the healthcare plan provided by CNH to its post-2004 retirees, like increased pension payments and short-term contributions to a Retiree Medical Savings Account. *Id.* at 17023-27. Nevertheless, even taking account of these payments to recent retirees, the district court concluded that the "benefits available to Plaintiffs under the proposed plan are roughly consistent with the kinds of benefits provided to current employees." *Id.* at 17028 (quotation marks omitted).

Finally, the district court declared that the parties had provided it with "little insight on healthcare trends" and declined to make a decision whether the proposed plan was reasonable in light of the changes to healthcare. *Id.* at 17036-37.

The court then rejected all of CNH's proposed changes, placing decisive weight on the first *Reese* factor and declaring the proposed benefits were not reasonably commensurate with Plaintiffs' current benefits, and that only a "strong showing by CNH on the remaining elements of the *Reese* framework" would overcome the shift of costs to

27

Plaintiffs. *Id.* at 17037-38. Because, it said, CNH had "failed to make such a showing," it concluded that CNH's changes to the plan were not reasonable. *Id.* at 17038-39.

Finally, the court declined to consider whether any of CNH's proposed modifications to the plan, taken separately, were reasonable, stating, "It is not the role of a court to write or rewrite a healthcare plan." *Id.* at 17039. The district court granted the motion for reconsideration, and entered summary judgment in favor of the Plaintiffs on all issues. *Id.* at 17040.

CNH promptly and timely appealed. DE451.

## SUMMARY OF ARGUMENT

This Court's decision in *Reese I* affirming the district court's vesting decision was grounded firmly in the rules of contract construction set forth in *International Union, UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983) and its progeny. In particular, this Court emphasized "the centrality of the tying rationale in *Yolton's* merits determination," 574 F.3d at 323, as well as the absence of a specific clause limiting the duration of the retiree health benefits. In *Tackett*, the Supreme Court rejected the rules of contract interpretation set forth

28

in *Yard-Man* and its progeny, so the vesting decision in this case must be revisited.

Freed from the constraints of *Yard-Man*, this Court can focus on the plain language and structure of the pertinent contracts. Most important, Plaintiffs do not all derive their benefits from the contract in effect when they retired, but rather from the 1998 CBA, which explicitly continued and changed the benefits provided to individuals who had retired under the 1990 and 1995 CBAs. Breaking prior practice, Plaintiffs were not included in the 2005 and 2010 CBAs, so their benefits ended when the 1998 CBA expired in May 2004. Other provisions of the 1998 CBA, such as the Letter of Understanding promising that Plaintiffs would pay no premium only for the duration of the 1998 agreement, further undermine the claim for vested benefits. In addition, the rules of contract construction set forth in *Tackett* require far more than is present here to find vesting of benefits. Finally, the district court's resort to extrinsic evidence ignored the CBA's integration clause as well as this Court's ruling in *Reese I*. *See* 574 F.3d at 326.

29

Even if, contrary to the contract language, this Court were to find Plaintiffs' benefits vested, the undisputed record confirms that the changes proposed by CNH comply with all three criteria set forth in *Reese I* and elaborated in *Reese II*. The district court correctly ruled that the "benefits available to Plaintiff's under the proposed plan are 'roughly consistent with the kinds of benefits provided to current employees.'" DE450:17028. Although the district court was more equivocal on the second criterion, regarding changes to healthcare, ruling that it "does not weigh strongly in favor of either side," *id.* at 17039, the record is compelling that since 1998, healthcare technology and quality have improved markedly, increasing costs and leading most employers to implement the types of cost-sharing proposed by CNH here.

The district court rejected all of the proposed changes based solely on its view that the benefits were not "reasonably commensurate" with Plaintiff's' current benefits. The district court misread this criterion, however, by focusing exclusively on the comparative costs to the retirees under the current plan versus the proposed plan, without taking into account the progressively improving benefits made available to the

Plaintiffs.  It also failed to take into account that the cost-sharing is, in fact, reasonably commensurate with the improvements in benefits. Finally, the district court ruled that the package of benefit changes failed to meet the criteria set forth by this Court, but refused to consider whether individual components of the package met those criteria.  Accordingly, the district court erred in interpreting and applying this Court's reasonableness criteria in *Reese I* and *II*.

## STANDARD OF REVIEW

"This court reviews a district court's grant of summary judgment *de novo*.  Likewise, *de novo* review applies to questions of contract interpretation."  *Noe v. PolyOne Corp.*, 520 F.3d 548, 551 (6th Cir. 2008) (citation omitted).  Under *de novo* review, this Court is empowered to review the now complete record, reverse, and enter judgment for CNH, bringing "[t]his long-running dispute … to an end."  *Reese II*, 694 F.3d at 685.

## ARGUMENT

## I. THE PARTIES DID NOT AGREE TO VEST PLAINTIFFS' BENEFITS.

### A. Because This Court's Earlier Vesting Decision Relied Heavily on the *Yard-Man* Inferences, It Did Not Survive *Tackett*.

When this Court ruled in *Reese I* that Plaintiffs' benefits are vested, it gave determinative weight to the rules of contract construction set forth in *Yard-Man* and its progeny. For example, the Court observed that the *Yard-Man* inferences provide at least "a nudge in favor of vesting in close cases," 574 F.3d at 321, and also relied on its prior decision in *Yolton v. El Paso Tennessee Pipeline Co.*, 435 F.3d 571 (6th Cir. 2006).[10] This Court concluded:

> Like *Yolton*: this case involves a CBA; it involves a health-care benefits plan with identical language [to *Yolton*] concerning entitlement to benefits upon retirement; it ties eligibility for health benefits to eligibility for a pension; it does not contain a specific durational clause while other benefits provisions in the CBA contain such clauses …; and above all it concerns employees who worked in virtually identical circumstances … to the *Yolton* employees before each group retired.

---

[10]  *Yolton* rejected requests by the employers to overrule or limit *Yard-Man*. 435 F.3d at 579-80 ("There is no need to revise, reconsider, or overrule *Yard-Man*."). *Yolton* relied on a number of *Yard-Man* rules to find vesting. *Id.*

574 F.3d at 323.  The Court emphasized "the centrality of the tying rationale in *Yolton*'s merits determination and in cases before and since."  *Id.*

In *Tackett*, the Supreme Court unanimously and emphatically rejected each of these rationales.  The Court began by reviewing the congressional decision in ERISA to mandate vesting of pension benefits, but not to mandate vesting of welfare benefits such as retiree health benefits.  This decision by Congress leaves employers "large leeway to design disability and other welfare benefit plans as they see fit," without "unduly discourag[ing] employers from offering [welfare benefit] plans in the first place."  135 S. Ct. at 933.  Following this important discussion of congressional policy, the Court reiterated the principle that "[w]e interpret collective-bargaining agreements, including those establishing ERISA plans, according to ordinary principles of contract law, *at least where those principles are not inconsistent with federal labor policy*."  *Id.* (emphasis added).

Before reviewing the *Yard-Man* line of decisions, the Court recognized that the Sixth Circuit "has long insisted that its *Yard-Man* inferences are drawn from ordinary contract law."  *Id.* at 933-34.  It

then reviewed the reasoning of *Yard-Man* and the numerous rules created over three decades in decisions following it.  After reviewing *Yard-Man* itself, the Supreme Court discussed additional rules of construction that had evolved from *Yard-Man*, including holdings — of particular importance here — that a general durational clause "'says nothing'" about the duration of benefits, and that provisions tying eligibility for retiree health benefits to receipt of pension benefits indicate that retiree health benefits are vested.  *Id*. at 934-35 (citation omitted).

Then, contrary to the Sixth Circuit's insistence, the Supreme Court ruled that the *Yard-Man* "inferences conflict with ordinary principles of contract law."  *Id*. at 933; *see also id*. at 935 ("We disagree … that the inferences applied in *Yard-Man* and its progeny represent ordinary principles of contract law"); *id*. at 936 ("the Court of Appeals [in *Tackett*] misapplied other traditional principles of contract law").  In particular, decisions requiring that a CBA "include a specific durational clause for retiree health care benefits to prevent vesting" "distort the text of the agreement and conflict with the principle of contract law that the written agreement is presumed to encompass the

whole agreement of the parties." *Id.* at 936.  Twice, the Court rejected

the rule that tying of health benefit eligibility to receipt of a pension

suggests vesting: first in Part III.B, following its recitation of the *Yard-*

*Man* rules, *id.* at 935, and second, in Part III.C, in remanding for

application of "the correct legal principles," *id.* at 937.  Thus, *Tackett*

leaves no doubt that this Court's vesting decision in *Reese I* was based

on invalid rules and must be reconsidered.[11]

### B.    Rather Than Agreeing To Vest Plaintiffs' Benefits, CNH and the UAW Recognized and Agreed That the Benefits Were Granted and Governed by Each Successive CBA.

 The plain language of the collective bargaining agreements at

issue here defeats vesting.  When retiree health benefits are vested,

"someone already retired under a particular CBA continues to receive

the benefits *provided therein* despite the expiration of the agreement

itself."  *Yolton*, 435 F.3d at 581 (emphasis added).  Here, the CBAs and

GBPs unambiguously show that the retirees were *not* receiving their

benefits under the CBA in effect when they retired.  Rather, beginning

---

[11]  The district court recognized that "this Court and the Sixth Circuit previously relied on inferences repudiated in *Tackett* when concluding that Plaintiffs are entitled to vested retiree healthcare benefits."  DE450:2.

in 1998, all members of the Plaintiff class have received their benefits pursuant to the 1998 CBA and GBP.  Plaintiffs do not and cannot dispute this point; whether they retired under the 1993 extension, under the 1995 CBA, or under the 1998 CBA, Plaintiffs receive their benefits under the 1998 CBA and GBP.  Rather than benefits vesting upon retirement, Plaintiffs' benefits have depended on renegotiation in each sequential contract.

This point is made in the clear language of the contracts.  The 1995 GBP replaced the 1990 plan (as extended by letter agreement in 1993), and applied to all post-July 1, 1994 retirees, even those who had retired before the 1995 agreement became effective.  DE129-31:6291 (1995 GBP).  Similarly, the 1998 GBP, which replaced the 1995 GBP, superseded the earlier agreements, providing health benefits to all post-July 1, 1994 retirees, even those who had retired under the 1990 or 1995 plans.  DE129-32:6403 (1998 GBP).  The 1998 GBP states:

> Employees who retire under the Case Corporation Pension Plan for Hourly Paid Employees *after 7/1/94*, or their surviving spouses eligible to receive a spouse's pension under the provisions of that Plan, shall be eligible for the Group Benefits as described in the following paragraphs.

*Id.* (emphasis added); *see Reese I*, 574 F.3d at 318 (quoting provision).

Thus, as the negotiators recognized in 1995 and 1998, the prior

agreements did not continue, but expired according to their terms,

along with the benefits provided to then-existing retirees.  Only by

including the existing retirees in each subsequent agreement did the

UAW provide for their continued benefits.  The benefits were "re-upped"

agreement to agreement; they were not vested.  Thus, when this class of

retirees was omitted from the 2005 CBA and GBP, their benefits

expired.  The benefits have continued since the 1998 contracts expired

in 2004 not by virtue of contractual obligation, but in recognition of this

ongoing litigation.

This Court recognized in *Reese I* that "[t]he 1998 CBA not only set

the rules for employees who retired during the next six years of that

CBA; it also *reset* the rules for employees who retired after July 1, 1994,

which is inconsistent with the notion that the 1990 and 1995 CBAs …

created unalterable, irreducible health benefits."  574 F.3d at 324

(emphasis in original).  Although this Court in *Reese I* was constrained

by the ruling in *Yolton* and other *Yard-Man* precedents to hold the

37

benefits vested, *Tackett* removes that constraint and mandates recognition as a matter of law that the benefits were *never* vested.

This conclusion is bolstered by other provisions in the 1998 GBP.[12] As this Court has noted, the 1998 GBP moved the existing retirees from an indemnity plan into a managed care plan. *Reese I*, 574 F.3d at 324-25. The letter regarding "National and State Health Insurance Initiatives" appended to the 1998 GBP, also made clear that benefits were subject to change. *See* DE439-3:16701; *Reese II*, 694 F.3d at 684 (referring to letter). The "Cost of Healthcare Coverage" letter appended to the 1998 GBP guaranteed that retirees would not pay "any additional employee contributions" *only* "over the term of the 1998 labor

---

[12] The Summary Plan Descriptions ("SPD") of the 1998 Group Benefit Plan, which were reviewed and approved by the UAW, DE125-3:4473 (Haas Decl.), also confirm that Plaintiffs' benefits were not vested for life. As noted by this Court in *Reese I*, the SPD warned that "[a]n amendment or *termination* of the … benefit plans may affect … the coverage[]" of retirees. 574 F.3d at 323 (emphasis in original) (citing DE125-20:4368). Although this Court previously held that this reservation of rights language was not sufficient to overcome the *Yard-Man* inferences, *id.* at 323, the Court can, after *Tackett,* recognize that the 1998 CBA has expired and give effect to the SPD.

agreement." *See Reese I,* 574 F.3d at 325 (quoting letter, internal

quotation marks omitted).[13]

Thus, with the heavy thumb of *Yard-Man* inferences removed, the

plain language of the contracts demonstrates that Plaintiffs' benefits

expired with each CBA and GBP unless the parties agreed to continue

them, that the negotiating parties never viewed the benefits as vested

or unchangeable from agreement to agreement, and that the

agreements contemplated both cost-shifting and adaptation to changes

in government programs.

---

[13] The CBAs that CNH assumed in June 1994 and entered into with
the UAW in February 1995 incorporated letters of understanding
that retiree health benefits were *not* guaranteed to be free forever.
The cap letters first stated that "the average per capita annual cost
to the Company of providing medical and related benefits under the
Case Group Benefit Plan to retired employees and surviving spouses
of deceased employees shall not exceed" specific dollar amounts.
DE125-6:4438 (Extension Agmt.); DE125-8:4650 (Tent. Agmt.).  They
continued that "no covered person shall be required to pay a portion
of any excess amount prior to" a specific date.  *Id.*  Thus, if the
benefits became too expensive *and* the letters were not changed in
future negotiations, then Plaintiffs' benefits would no longer be free.
This is inconsistent with Plaintiffs' claim of vested benefits for life.
In their 1998 CBA, CNH and UAW agreed to replace the cap letters
with the Cost of Healthcare Coverage Letter.

### C.  The District Court Decision Ignored "the Correct Legal Principles" Set Forth in *Tackett*

Tackett certainly repudiated the rules favoring vesting set forth in *Yard-Man* and its progeny, but it did much more.

#### 1.  *Tackett* Set Forth the "Correct Legal Principles" To Govern Vesting Determinations.

The unanimous Supreme Court decision in *Tackett* contrasted the Sixth Circuit's requirement of a "clear manifestation of intent before *conferring*" a collectively-bargained benefit with its more generous rule for deeming a collectively-bargained benefit *vested*.  135 S. Ct. at 936-37 (emphasis added).  It then further contrasted the generous rules for deeming *collectively-bargained benefits* vested with the Sixth Circuit's own rule for judging vesting of *non-collectively-bargained benefits*, which holds that "'an employer's commitment to vest benefits is not to be inferred lightly … [t]he intent to vest must be stated in clear and express language.'" *Id.* at 937. (quoting *Sprague v. General Motors Corp.*, 133 F.3d 388, 400 (6th Cir. 1998)).  Just three sentences later, the Court wrote: "we have already recognized that 'a collective-

40

bargaining agreement [may] provid[e] *in explicit terms* that certain benefits continue after the agreement's expiration.'" *Id.*[14]

The district court dismissed this quotation of *Sprague* as merely "underscor[ing] *Yard-Man's* deviation from ordinary principles of contract law," but *not* as endorsing the rule in *Sprague*.  DE450:17000 (quoting *Tackett*, 135 S. Ct. at 937).  But if *Sprague* "underscored *Yard-Man's deviation* from ordinary principles of contract law," that must mean that *Sprague* (in contrast to *Yard-Man*) *did* set forth "ordinary principles of contract law."  And since the Supreme Court was clear that vesting decisions must be made based on "ordinary principles of contract law" (so long as consistent with national labor policy), the conclusion seems clear that the "ordinary principle[] of contract law" set

---

[14] The Court quoted *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 207 (1991) (modifications in original, emphasis added).  In the quoted passage, the Court was addressing whether employees laid off after expiration of the CBA had a right to enforce their seniority protections in the expired CBA; the Court held that those protections did *not* survive.  The district court and Justice Ginsburg cited other language from *Litton* related to an arbitration clause that *did* survive termination.  DE450:16999-7000.  If the Court had intended to quote this other language from *Litton*, or from other decisions, it would have done so.

forth in *Sprague* is applicable to collectively-bargained contracts as
well.

Further, by contrasting this Court's treatment of vesting for non–
collectively bargained plans with its treatment of vesting for collectively
bargained plans and flatly rejecting the latter, the plain message is that
the Sixth Circuit erred by distinguishing the two situations.  The only
reasonable reading is that, having *repudiated* the rules of interpretation
set forth in *Yard-Man* for collectively-bargained plans, the Supreme
Court *approved* the rules set forth in *Sprague*.

In any event, *Tackett* also emphasized the "traditional principle
that 'contractual obligations will cease, in the ordinary course, upon
termination of the bargaining agreement.'"  135 S. Ct. at 937.  Here, the
CBA and GBP ended on May 2, 2004.  DE439-4:16755 ("the group
insurance plan agreed to between the parties will run concurrently with
this Agreement and is hereby made a part of this Agreement"); *id.* at
16757 ("This Agreement … shall continue in full force and effect
through May 2, 2004").  Further, "[a] court[] should not construe
ambiguous writings to create lifetime promises," *Tackett*, 135 S. Ct. at
936, and "when a contract is silent as to the duration of retiree benefits,

a court may not infer that the parties intended those benefits to vest for life," *id.* at 937.

These inter-related principles — cessation of benefits in the ordinary course when the CBA expires, rejection of both *silence* and *ambiguity* as a basis for lifetime benefits, and the requirement of a "clear manifestation of intent" to vest expressed in "clear and express language" — mean that Plaintiffs must point to explicit language in the contract to prove vesting. This principle of contract construction reflects common sense. If the parties truly agree that a benefit will last for life, then they should be clear about it. In the absence of such express language agreeing to vesting in the 1998 CBA, the district court erred by failing to enter judgment for CNH on the vesting issue.

### 2. To Construct an Ambiguity, the District Court Relied on Inferences Repudiated in *Tackett*.

The district court misunderstood the import of *Tackett,* asserting incorrectly that *Tackett* "did not create new rules for construing collective bargaining agreements." DE450:16998. To the contrary, the Supreme Court intended the rules it set forth to have effect, as shown by its remand of *Tackett* to the Sixth Circuit for application of "the correct legal principles." 135 S. Ct. at 937.

The district court acted contrary to these instructions from the Supreme Court.  First, it improperly relied upon rules of construction derived from *Yard-Man* — the "tying" analysis and the absence of a specific durational limit on retiree health benefits—to create an "ambiguity" in the contract.[15]

In *Tackett*, however, the Supreme Court twice addressed, and twice rejected, the notion that contractual language "tying" eligibility for health benefits to eligibility provided a basis for vesting.  135 S. Ct. at 935, 937.  It did so first in its review of general rules of contract construction that have grown out of *Yard-Man*.  *Id.* at 935.  It did so

---

[15] The district court found support in Justice Ginsburg's concurring opinion in *Tackett*, particularly for the proposition that benefits may be vested even when the agreements do not unambiguously so provide.  *See* DE450:16999.  As this and other circuits have explained, a concurring opinion that is not necessary to form a majority carries no weight.  *See Int'l Union v. Winters*, 385 F.3d 1003, 1011-12 (6th Cir. 2004) (rejecting concurring opinion's reading of the majority); *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010) (similar).  "When an individual justice's vote is not needed to form a majority, the meaning of [the] majority opinion is to be [determined *from*] *the opinion itself*."  *B.G. ex rel Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 310 (3d Cir. 2013) (en banc) (emphasis added; internal quotation marks omitted).  The "gloss" that an individual concurrence "chooses to place upon [that opinion] is not authoritative."  *Id.* (internal quotation marks omitted).  *See also United States v. Angel-Guzman*, 506 F.3d 1007, 1012 n.3 (10th Cir. 2007) (similar).

44

again in the final section of the Opinion when it specifically rejected this Court's reliance on the tying analysis in *Tackett*.

Further, the language of the GBP defeats the district court's "tying" analysis. As quoted in *Reese I*, the 1998 CBA states that "employees who retire under the Case Corporation Pension Plan for Hourly Paid Employees after 7/1/94 … shall *be eligible* for" health care benefits. 574 F.3d at 318 (emphasis added). This language plainly speaks to "eligibility" for health care benefits, not duration. Even Justice Ginsburg's non-authoritative concurrence does not support using this language as evidence of vesting. *See* 135 S. Ct. at 938 ("a provision stating that retirees **'will receive'** health-care benefits if they are *'receiving* a monthly pension' is *relevant* to this examination.") (emphasis added). "Will receive if receiving" is fundamentally different from "eligible for."[16]  The eligibility language here merely ensures that

---

[16] In its September 28, 2015 decision granting summary judgment to CNH, the district court recognized that "courts should not rely on language tying *eligibility* for contribution-free healthcare benefits to the receipt of pension benefits [as evidence of intent to vest]…. This language … speaks to how retirees become eligible to *start receiving* free healthcare benefits, not the *amount of time they remain entitled* to those benefits." DE445:16931-32 (emphasis in original). Thus, the

45

Plaintiffs who retire *during the agreement* and are eligible for a pension will receive health benefits *until expiration of the agreement*. It says nothing about the duration of health benefits beyond the term of the CBA.

The district court also reasoned that provisions limiting the duration of other benefits, and the failure to include a specific durational limit for retiree health benefits, created an ambiguity. DE450:17003-04. Again, *Tackett* rejected this reasoning. *Compare* 135 S. Ct. at 934 (stating Sixth Circuit rule that benefits vest without a specific durational clause) *with id.* at 936 (rejecting the rule as "distort[ing] the text of the agreement"). Moreover, the Supreme Court emphasized "the traditional principle that 'contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement," *id.* at 937 (citation omitted). Indeed, as a matter of logic the absence of a specific durational limit for retiree health benefits confirms that those benefits remain subject to the general limit; it does not mean that they are subject to *no limit*, and thus endure forever.

---

tying language here "no longer supports the Court's determination that the parties intended to confer lifetime benefits." *Id.* at 16933.

46

Third, the district court noted that the 2005 GBP required persons retiring after December 1, 2004 to make contributions and viewed this fact as suggesting that Plaintiffs' benefits were vested. DE450:17005. As shown (Part I.B.) however, the 2005 agreement broke from the pattern by *not* including the prior retirees. Rather than suggesting that the Plaintiffs' benefits are *vested*, the failure to include them in the 2005 plan shows that their benefits *terminated*.

In short, the district court correctly recognized that these repudiated *Yard-Man* rules cannot *prove* vesting. But then it subverted the Supreme Court's intent by using those very inferences as *sufficient evidence of vesting to create an ambiguity*. If these *Yard-Man* rules are insufficient to prove vesting — and they are — then they are also insufficient to overcome the undisputed facts set forth above that defeat vesting. *Cf Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986) (party opposing summary judgment must come forward with admissible evidence sufficient to prove element of its case).

### 3.  Even If the Contract Were Ambiguous, *Tackett* Instructs Not To Base Lifetime Benefits on Ambiguous Contracts.

Having inappropriately divined an ambiguity, the district court's ruling that health benefits are vested further flouts the Supreme Court's instructions that (i) "courts should not construe ambiguous writings to create lifetime benefits," 135 S. Ct. at 936, (ii) "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement," *id.* at 937 (citation omitted), and (iii) "when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life," *id.* at 937.

Even if there were an ambiguity, and even if (contrary to the instruction of *Tackett*) an ambiguity could support vesting, the district court erred by relying on extrinsic evidence.  Remarkably, the court did not specify which extrinsic evidence it found persuasive.  DE450:17006 ("the extrinsic evidence supports a finding that the parties intended to grant Plaintiffs vested, lifetime retiree health insurance coverage.").  Whatever extrinsic evidence the court relied on, the resort to such evidence was contrary to the integration clause in the 1998 CBA.  *See* DE439-4:16757 ("This Agreement disposes of any and all bargaining

48

issues, whether or not presented during negotiations, except with respect to the processing of grievances as provided in Article VII").  It was also contrary to this Court's decision in *Reese I*, which determined as a matter of law that the extrinsic evidence cited was insufficient to support lifetime, unchangeable benefits.  574 F.3d at 326.

For all these reasons, the record in this case demonstrates as a matter of law that Plaintiffs' benefits are not vested.  The district court's decision holding the benefits vested must be reversed, and judgment entered for CNH on the vesting issue.

## II. THE CHANGES TO THE PLAN PROPOSED BY CNH COMPLY WITH THE CRITERIA SET FORTH IN *REESE I* AND *REESE II*.

Even if, notwithstanding *Tackett*, this Court were to conclude that the benefits are vested, the changes proposed by CNH are consistent with the criteria set forth in *Reese I* and *Reese II*.  *Reese I* remanded to consider whether changes were "'reasonably commensurate' with the benefits provided in the 1998 CBA, 'reasonable in light of changes in health care' and roughly consistent with the kinds of benefits provided to current employees." 574 F.3d at 326. In *Reese II*, this Court

elaborated on these criteria by setting forth seven subsidiary inquiries. *See* 694 F.3d at 685-86.

Although the district court concluded that "the benefits available to Plaintiffs under the proposed plan are 'roughly consistent with the kinds of benefits provided to current employees,'" DE450:17028, and that the inquiry regarding changes to healthcare "does not weigh strongly in favor of either side," *id.* at 17039, it rejected each proposed change based on the first criterion — reasonably commensurate with the benefits provided under the 1998 CBA — which it said "weighs strongly in favor of rejecting the proposed changes," *id.* at 17038.  In the district court's view, even though the benefits provided by the proposed plan are roughly consistent with Plaintiffs' current benefits, the extent of cost shifting made the proposed benefits so inferior to the current plan that this first element alone precluded any of the proposed changes, either as a package or individually. *Id.* at 17039-40.

The district court erred as a matter of law in two fundamental respects.  *First*, it misconstrued the first criterion.  Whereas this Court instructed the court to inquire whether the proposed *benefits* were "reasonably commensurate with the benefits provided in the 1998

50

CBA," the district court focused solely on the comparative *costs* to the retirees under the current plan and the proposed plan, without taking into account the progressively improving benefits being made available to the Plaintiffs.  It also failed to take account of evidence showing that the benefits have, in fact, improved over time and that future cost increases are correlated with the value of further improvements in health care.  In other words, the portion of costs that CNH is asking the Plaintiffs to pay bears a reasonable relation to the improvements in the benefits going forward.  *Second*, the district court erred by declining to consider whether any elements of the proposed changes were proper, even though this Court has previously reviewed and approved individual elements of proposed plans rather than rejecting the entire package of changes.

### A.    The Proposed Benefits Are Reasonably Commensurate with the Current Benefits.

The district court misinterpreted and misapplied the first criterion.  It  focused exclusively on the increased cost to the retirees under the proposed plan, but did not consider the ever improving benefits that Plaintiffs have received and will continue to receive.  As this Court observed in *Reese II*, "healthcare benefits—*what is provided*

51

*and what it costs*—have not been remotely static in modern memory."

694 F.3d at 683 (emphasis added).  It continued:

> The reason has little to do with traditional causes of inflation and more to do with the expansion of the benefit: the remarkable growth in modern life-saving and comfort-improving medical procedures, devices and drugs. New and better medical procedures arise while others become obsolete. And it is the rare medical innovation that costs *less* than the one it replaces.

*Id.*  This Court then correctly observed:

> Retirees, quite understandably, *do not want lifetime eligibility for the medical-insurance plan in place on the day of retirement, even if that means they would pay no premiums for it.*  They want eligibility for *up-to-date medical insurance plans, all with access to up-to-date medical procedures and drugs*…. [B]eneficiaries want something more than a fixed, unalterable bundle of services; they want coverage to account for new and better, yet likely more expensive, procedures and medications than the ones in existence at retirement.

*Id.* at 683-84 (emphasis added). The clear point is this: "reasonably commensurate" must take into account both increases in what retirees pay and the improved benefits they get.

Against this background, the district court plainly erred in asserting that the proposed plan "drastically increases retiree costs with no meaningful mitigating benefit." DE450:17021-22.  Based on this error, it concluded that "[t]he first element of *Reese*'s reasonableness

framework weighs strongly in favor of rejecting the proposed changes, so much so that the Court believes a strong showing by CNH on the remaining elements of the *Reese* framework would be necessary to tilt the balance in favor of approving the proposed changes." *Id.* at 17038.

The district court looked at only one side of the coin, assuming that the retirees should receive ever improving benefits at no increased cost to themselves. This view is directly contrary to the "Cost of Healthcare Coverage" letter that guaranteed no cost shifting only through the end of the 1998 CBA in 2004—12 years ago. *See Reese I*, 574 F.3d at 325. Indeed, this Court was fully aware when it decided *Reese I* and *Reese II* that the plan changes would involve cost-shifting, so the mere fact of cost-shifting should not be determinative. Further, the district court ignored undisputed evidence in the record showing that prescription drug costs have increased dramatically, driven in large measure by the introduction of drugs not even available in 1998. These new drugs now account for 32% of the total cost of drugs used by the class. DE423-22:14909. The same is true for medical procedures.[17]

---

[17] Plaintiffs did not contest the evidence regarding prescription drug cost increases, but did contend that a similar analysis of new medical

The health benefits Plaintiffs receive now, and the benefits they will receive in the future, are significantly better than the ones they received in 1998.

Rather than require Plaintiffs to shoulder the entire cost of future price increases, CNH's proposal would require them to shoulder only 60% of the cost increases, while CNH would pay the rest. According to a 2008 CBO study, "roughly half" of increased healthcare costs are due to such improvements. *See* Cong. Budget Office, Technological Change and the Growth of Health Care Spending (Jan. 2008) at 12, https://www.cbo.gov/publication/41665/ (attributing "roughly half of the increase in health care spending during the past several decades" to "expanded capabilities of medicine brought about by technological advances"); *see also* Cong. Budget Office, Health-Related Options for Reducing the Deficit (Dec. 2013) at 1, https://www.cbo.gov/publication/44906/ (calling "new medical technologies and services" a "key" factor in increased healthcare costs).

---

procedures was flawed because the medical procedure codes have changed from 1998 to the present. Plaintiffs cannot dispute, however, that medical advances are largely driving the increase in health care costs. *See* 2008 and 2013 CBO studies cited in the following text.

Especially since Plaintiffs have received free care since the 1998 plan expired twelve years ago, a 60/40 split going forward — "roughly half" — for the enhanced benefits is "reasonably commensurate."

Moreover, the district court focused inordinately on costs well into the future for a few individuals not then eligible for Medicare. DE450:17021 n.7. The court was unwilling to "ignore these unlucky thirteen retirees [*sic*, spouses] in its reasonableness analysis." DE450:17021. Indeed, the court apparently based its determination that the increase in out-of-pocket costs — from $596 in total costs under the current plan to $21,615 under the proposed plan in 2032 — would be "drastic," and not "reasonably commensurate" based solely on those thirteen individuals.

Apart from its focus on a very small subset of the class—young spouses of retirees, not retirees themselves (*see* footnote 9 above)—the court again failed to take account of the enhanced benefit for those individuals. It also failed to give any weight to the "average per-beneficiary cost *to CNH*" under each plan, or "how fast … *CNH's per-beneficiary costs* [are] likely to grow under each" plan, as instructed by *Reese II*, 694 F.3d at 685-86 (emphasis added). Under the proposed

plan, CNH would continue to shoulder all the current baseline premium costs (including inflation from 1998 through the time the changes are implemented), plus 40% of the increased premium cost from the date of implementation forward. For pre-Medicare retirees, CNH's costs are projected to increase from $17,935 under the current plan today to $24,570 under the proposed plan in 2032, still much more than the thirteen persons remaining in the plan are projected to pay in 2032.

With regard to Medicare eligible retirees, the court emphasized that the costs in 2032 would be $417 per year projected under the current plan versus $7,017 projected under the proposed plan. The court's analysis once again neglects that the UAW agreed to these charges for recent retirees, as well as the enhanced health benefits retirees will receive with the cost increases.

And in evaluating the relative costs of the plan for Medicare-eligible Plaintiffs, the district court considered only the portion of costs payable in 2032 by the individuals (74.9%) and by CNH (25.1%), but failed to consider that the proposed plan would shift substantial costs to the federal government. The percentage of the individual Plaintiff's

share out of the entire cost — Plaintiff, CNH, and the Government — is much lower.

This court has previously rejected the notion that increased costs for the retirees, standing alone, render a proposed plan not reasonably commensurate with an existing plan.  In *Tackett v. M&G Polymers USA, LLC*, 733 F.3d 589, 600-01 (6th Cir. 2013), *vacated and remanded on other grounds*, 135 S. Ct. 926 (2015), this Court approved as satisfying the three *Reese* criteria the following changes:  (1) a 150% increase in prescription drug copayments, (2) a $75 increase in prescription drug deductibles, and (3) a 700% increase — from $500 to $4,000 — in out-of-pocket maximum payments.  *Id.* at 601.  Despite those changes, this Court affirmed the district court's factual finding, after trial, that the changes were reasonably commensurate under the *Reese* factors.  *See id.*  Likewise here, the mere shift of costs to the retirees does not preclude the changes.[18]

_____

[18] Plaintiffs speculated in the district court that these higher costs for services might drive class members to "forgo needed medical services, delay necessary care, [or] not take prescription drugs as prescribed."  DE419:14062 (Pls.' Summ. J. Mot.).  But they presented no probative evidence other than self-serving declarations, and had no answer to the statistics showing that usage under the more

**B.      The Proposed Changes are "Reasonable in Light of Changes in Healthcare."**

The district court criticized this criterion, but ultimately concluded that "[t]his element does not weigh strongly in support of either side." DE450:17039. In fact, the proposed plan easily meets this test.

Healthcare has "not been remotely static in modern memory," *Reese II*, 694 F.3d at 683, and at no time has that been more true than in the last two decades. Costs have risen much faster than the pace of inflation, creating an unsustainable trend both at the national level and for private companies providing healthcare. *See* DE423-22:14913-14. In part to reverse that trend, the government has introduced sweeping reforms to public and private health insurance. *See id*. And, as shown (Part II.A. above), patients receive the benefits of advancing medical technology.

---

expensive 2005 plan is in some cases *higher* than usage under the less expensive 1998 plan. DE423-22:14913 (Macey Decl.). Further, publicly available research shows no direct connection between cost-sharing and adverse health outcomes. *See* Katherine Swartz, *Cost-sharing: Effects on spending and outcomes*, Research Synthesis Report No. 20, The Robert Wood Johnson Foundation, Dec. 2010, pp. 11–16 (cited at DE423-22:14911); DE423-22:14910–11.

Employers have responded to the increasing costs of healthcare by shifting some of the increasing costs to the recipients of the better care. They do so — as CNH has done — through employee premiums and increased point-of-service costs like deductibles and copayments. And in this case, the fact that the costs have increased significantly compared to the 1998 plan is a testament to the fact that this litigation has dragged on for more than a decade.

Here, because the proposed plan would require retiree contributions amounting to only 60% of the *prospective* change in healthcare costs, CNH would continue to shoulder the baseline cost as of 1998, cost increases up to the implementation of the proposed plan, and 40% of all prospective cost increases.

The UAW agreed to these proposed terms *twice* (in 2005 and in 2010) for current employees and more recent retirees. This alone demonstrates that the cost-sharing in the proposed plan is a reasonable response to changes in healthcare. Further, the UAW recently agreed to a plan similar to CNH's proposed plan with CNH's competitor Caterpillar, confirming that CNH's proposed plan reflects a reasonable response to changes in the healthcare market. Indeed, Caterpillar

retirees pay higher premiums, have higher deductibles, and face higher out-of-pocket maximums than Plaintiffs would face under the proposed plan. *Compare* DE432-2:14747 & DE423-3:14765-67 (1998 GBP), *with* DE423-22:14921 (Macey Decl.). Further, CNH covers its retirees' in-network medical costs at 85% versus 80% covered by Caterpillar. *Compare* DE423-3:14765-67, *with* DE423-22:14921.[19]

Moreover, a Towers Watson survey of nearly nine hundred employers showed that CNH's proposed plan was less expensive for beneficiaries, provided lower deductibles and out-of-pocket maximums, and offered a higher co-insurance rate than benefits provided to employees by 75% of comparable companies. DE423-22:14926.[20] The

---

[19] The district court discounted the Caterpillar plan because it resulted from a "unique and contentious bargaining atmosphere and protracted negotiations between the union and Caterpillar." DE450:17031. But even absent the contentious atmosphere, the UAW *twice agreed* to the plan that CNH is proposing here, indicating that the UAW recognizes that the terms are reasonable.

[20] The district court agreed with Plaintiffs that the Towers Watson survey, as well as comparable data for AT&T, General Motors, Ford, U.S. Steel, Goodyear, and the federal judiciary were irrelevant to this inquiry, yet Plaintiffs submitted only one example (John Deere) of an employer with a better plan for retirees. *See* DE419:14067-68 (Pls.' Summ. J. Mot.) (disputing the usefulness of this inquiry and discussing only the Deere plan); DE420-9 (Deere plan excerpts).

proposed plan's benefits are more generous than those available to federal employees in the district court's district, and more generous than Medicare. *Id.* at 14053-55. CNH's proposed plan is reasonable in light of the changes to healthcare. *Reese I*, 574 F.3d at 326.

Plaintiffs argued in the district court that the proposed plan was unreasonable because it was less generous than the best plan Plaintiffs could find, the managed plan offered by John Deere. DE419:14067-68. But of course this Court imposed no requirement that CNH offer Plaintiffs the best plan, only that it offer a reasonable one. *See Reese I*, 574 F.3d at 326. It has met that burden.

## C. The Proposed Changes Are "Roughly Consistent With the Kinds of Benefits Provided to Current Employees."

The third criterion in *Reese I* is whether the benefits are "roughly consistent with the kinds of benefits provided to current employees." *Reese I*, 574 F.3d at 326. Here, the health benefits under the proposed plan are more than "roughly consistent" — they are parallel to but better than those negotiated and agreed to by UAW in 2005 and 2010. Indeed, the district court concluded that "the benefits available to Plaintiffs under the proposed plan are 'roughly consistent with the

kinds of benefits provided to current employees,'" DE450:17028, and "it appears that the two classes of retirees are in roughly similar positions in terms of their healthcare situation," *id*. at 17038.

The differences between the proposed plan and the 2005 plan are those mandated by the passage of the Affordable Care Act, all of which improve on the 2005 plan, like the elimination of maximum lifetime benefits and coverage of the children of plan enrollees up to age 26. Further, even though the proposed plan imposes some cost sharing on Plaintiffs, they will still pay significantly less than current retirees for the same benefits.  DE423-2:14747 (Coogan Decl.).  For example, in the first year of the proposed plan, Plaintiffs would be expected to pay less than $700 in total premiums, while retirees under the 2005 plan will pay approximately $5,700 for the same coverage.  *Id.*

Plaintiffs do not dispute that the proposed plan tracks the 2005 plan.  Instead, they point to benefits CNH provided to its post-2004 retirees *outside* the healthcare plan, like a higher pension and a one-time contribution to a health savings account, that have nothing to do with the healthcare benefits provided by the proposed plan.  Those considerations play no role in the analysis directed by this Court in

*Reese I* or *Reese II*.  Each of the three criteria set forth in *Reese I*, 574 F.3d at 326, and each of the subsidiary questions set forth in *Reese II*, 694 F.3d at 685-86, focus on the *healthcare benefits* provided, not on other aspects of compensation.  It is undisputed that the "benefits" provided—medical, surgical, prescription drug—would be exactly the same for Plaintiffs as for recent retirees.  It is the same plan.  And, Plaintiffs' expert witness agreed that the quality of care in the *proposed* plan would be the same as the quality of care in the *current* plan. DE423-23:14934 (Draft SPD).

The district court appeared to deem this other compensation relevant, and speculated that a hypothetical retiree could possibly accrue as much as $135,000 in total value over 20 years.  *Id.* at 17026. Even if those other payments were relevant, the district court concluded that these additional payments do little more than offset the higher amount the post-2004 employees will pay to receive the same benefits as the Plaintiffs.  *See* DE450:17028.

The Court made no corresponding calculation of the greater costs a post-2005 retiree would pay.  During the eleven years since the 2005 CBA, Plaintiffs have continued to receive premium-free health care,

63

while the more recent retirees have paid monthly premiums as well as
higher deductibles and copayments. While recent retirees received, on
average, a one-time payment in their Retiree Medical Savings Accounts
of $16,000 per retiree (but *not* for spouses or other dependents), their
premium cost alone in 2014 was over $5,000 in one year higher than the
proposed plan, not accounting for the other higher charges.  The
additional $34.50 per month in Medicare Part B reimbursement was to
"offset the loss of CNH-sponsored prescription drug coverage," and does
not take account of premiums the recent retirees have paid since 2005
for their Medicare Part D prescription drug coverage.  The increased
pension rate will benefit each retiree differently depending on years of
service and age of retirement, DE450:17024-25, and again is unlikely to
fully offset the greater premiums paid by recent retirees.

### D.   The Proposed Plan's Components Are Severable

CNH has proposed a carefully balanced and integrated package
that makes only reasonable changes to Plaintiffs' health benefits.  In
two separate bargaining cycles, the UAW agreed to that very package of
benefits and cost sharing for current employees and recent retirees.
The entire package meets this Court's criteria.

If, however, this Court should determine that any component of the proposed plan is unreasonable, it may reject that individual component. *Tackett*, 733 F.3d 600–01 (considering individual benefits and costs separately); *see also* DE450:17039-40 (declining to sever plan but not ruling that the district court lacked authority to do so). And, like the 1998 plan, the parties clearly contemplated that the 2005 plan would be severable when they made it effective through an agreement that contained a severability provision. *See* DE439-4:16756 (1998 plan); DE125-17:4478 (2005 plan).

Importantly, when this Court remanded in *Reese I*, it directed the district court "to decide how and in what circumstances" — not *whether* — "CNH may alter such benefits." 574 F.3d at 327. And, in remanding the case in *Reese II*, the Court reiterated that the benefits described in the "1998 CBA … remain subject to reasonable modification." 694 F.3d at 686. Again, the district court has misread the instructions.

The district court's refusal even to consider whether to sever the portions of the plan it found unreasonable left the plan frozen at the 1998 levels with *no* changes, even though this Court in *Reese I*

65

specifically held that CNH and the UAW never agreed that the benefits would be irreducible into perpetuity.  *See* 574 F.3d at 325.  Coupled with the extreme delay in this litigation already, which "not only favors just one party [Plaintiffs], but also risks mooting the economic stakes of the case for the other party [CNH]," *Reese II*, 694 F.3d at 685, this refusal even to consider individual changes was unjust and erroneous.

## CONCLUSION

For the foregoing reasons, CNH Industrial N.V. and CNH Industrial America LLC respectfully urge the Court to reverse the district court's grant of summary judgment in favor of Plaintiffs on the vesting issue and remand the case for entry of judgment in favor of CNH Industrial N.V. and CNH Industrial America LLC on the vesting issue.  Alternatively, CNH Industrial N.V. and CNH Industrial America LLC urge the Court to reverse the district court's  grant of summary judgment in favor of Plaintiffs on the reasonableness of the proposed changes, and remand the case for entry of judgment in favor of CNH Industrial N.V. and CNH Industrial America LLC allowing them to implement the changes as proposed.

Dated: January 13, 2016          Respectfully submitted,

                                 /s/ Bobby R. Burchfield
                                 Bobby R. Burchfield
                                  Counsel of Record
                                 Nikesh Jindal
                                 Joshua Mitchell
                                 KING & SPALDING LLP
                                 1700 Pennsylvania Ave., NW
                                 Washington, DC  20006
                                 Telephone:  (202) 737-0500
                                 Facsimile:  (202) 626-3737
                                 bburchfield@kslaw.com
                                 njindal@kslaw.com
                                 jmitchell@kslaw.com

*Counsel for CNH Industrial N.V. and CNH Industrial America LLC*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 13,046 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. (32)(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in fourteen-point Century Schoolbook.

Dated: January 13, 2016          /s/ Bobby R. Burchfield
                                 Bobby R. Burchfield
                                   Counsel of Record
                                 Nikesh Jindal
                                 Joshua Mitchell
                                 KING & SPALDING LLP
                                 1700 Pennsylvania Ave., NW
                                 Washington, DC  20006
                                 Telephone:  (202) 737-0500
                                 Facsimile:  (202) 626-3737
                                 bburchfield@kslaw.com
                                 njindal@kslaw.com
                                 jmitchell@kslaw.com

*Counsel for CNH Industrial N.V. and CNH Industrial America LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of January, 2016, I caused the foregoing Brief to be filed with the Court electronically using the CM/ECF system, which will send a notification to all counsel of record, effecting service on them.  *See* 6th Cir. R. 25(f)(1)(A).

/s/ Bobby R. Burchfield
Bobby R. Burchfield
 Counsel of Record
KING & SPALDING LLP
1700 Pennsylvania Ave., NW
Washington, DC  20006
Telephone:  (202) 737-0500
Facsimile:  (202) 626-3737
bburchfield@kslaw.com

ADDENDUM - CASE No. 15-2382
Designation of Relevant District Court Documents

| DOC. # | DOC. NAME | PAGE IDs |
|---|---|---|
| 1 | Compl. | 1-9 |
| 59 | Amended Compl. | 2453-2461 |
| 101-5 | Mot. to Modify Class Def'n Ex. A Part 4 – GBP | 3695-3714 |
| 101-6 | Mot. to Modify Class Def'n; Ex. A Part 5 – GBP | 3675-3694 |
| 125-3 | Defs.' Summ. J. Mot. Ex. A – Haas Decl. | 4469-4473 |
| 125-4 | Defs.' Summ. J. Mot. Ex. A – Tab 1 1990 CBA | 4517-4521 |
| 125-6 | Defs.' Summ. J. Mot. Ex. A – Tab 3 Ext. Agmt. | 4429-4443 |
| 125-7 | Defs.' Summ. J. Mot. Ex. A – Tab 4 Reorg. Agmt. | 4307-4317 |
| 125-8 | Defs.' Summ. J. Mot. Ex. A – Tab 5 1995 Tent. Agmt. | 4644-4650 |
| 125-9 | Defs.' Summ. J. Mot. Ex. A – Tab 6 1995 CBA | 4522-4527 |
| 125-10 | Defs.' Summ. J. Mot. Ex. A – Tab 7 1995 GBP | 4357-4363 |
| 125-17 | Defs.' Summ. J. Mot. Ex. A – Tab 12 2005 CBA | 4474-4479 |
| 125-18 | Defs.' Summ. J. Mot. Ex. A – Tab 13 2005 GBP | 4528-4557 |
| 125-20 | Defs.' Summ. J. Mot. Ex. A – Tab 15 2000 SPD | 4366-4375 |
| 125-43 | Defs.' Summ. J. Mot. Ex. X – UAW 2004 Mins. | 4326-4334 |
| 129-30 | Pls.' Summ. J. Mot. Ex. 38 – 1990 GBP | 4987-5059 |
| 129-31 | Pls.' Summ. J. Mot. Ex. 39 – 1995 GBP | 6214-6325 |
| 129-32 | Pls.' Summ. J. Mot. Ex. 40 – 1998 GBP | 6330-6427 |
| 163-5 | Defs.' Resp. to Pls. Summ. J. Mot. Ex. C – Summ. Plan Description (SPD) | 6849-6915 |
| 213 | Op. & Order Den. Summ. J. | 8857-8868 |
| 214 | Op. & Order Granting Summ. J. | 8869-8892 |
| 223 | Stip. & Order Clarifying Class Def'n | 8956-8962 |
| 227 | Judgment for Pls. | 8969-8971 |
| 271-[1-5] | Defs.' Mot. for Approval of Reasonable Changes to Pls.' Healthcare Benefits | 9785-9957 |
| 304 | Op. & Order Den. Mot. for Approval of Reasonable Changes & Granting Summ. J. | 11626-11650 |
| 316 | Judgment for Pls. | 11724-11727 |
| 419 | Pls. Summ. J. Mot. | 14016-14077 |
| 420-9 | Pls. Summ. J. Mot. Ex. S – Excerpts from Deere Benefit Plan | 14537-14549 |
| 423 | Defs.' Summ. J. Mot. | 14708-14741 |
| 423-2 | Defs.' Summ. J. Mot. Ex. A – Coogan Decl. | 14744-14748 |

ADDENDUM - CASE No. 15-2382
Designation of Relevant District Court Documents

| DOC. # | DOC. NAME | PAGE IDs |
|---|---|---|
| 423-3 | Defs.' Summ. J. Mot. Ex. A Ex. 1 – 2013 Draft SPD | 14749-14839 |
| 423-4 | Defs.' Summ. J. Mot. CNH Summ. J. Mot. Ex. A Ex. 2 – Burchfield-Radtke, Brault Ltr. (Mar. 11, 2014) | 14840-14842 |
| 423-9 | Defs.' Summ. J. Mot. Ex. B Ex. 4 – Historical Pre-65 Medical Costs | 14860-14861 |
| 423-11 | Defs.' Summ. J. Mot. Ex. B Ex. 6 – Future Expected Per Capita Payments | 14865-14867 |
| 423-14 | Defs.' Summ. J. Mot. Ex. B Ex. 9 – Grandfathered Prescription Drug Claims | 14872-14873 |
| 423-22 | Defs.' Summ. J. Mot. Ex. B App. A – Macey Decl. | 14890-14930 |
| 423-23 | Defs.' Summ. J. Mot. Ex. D – Lynne Dep. (excerpts) | 14931-14940 |
| 426-3 | Defs.' Resp. Pls. Summ. J. Mot. Ex. 2 – Lynne Dep. (excerpts) | 15632-15667 |
| 438 | Defs.' Summ. J. Mot. | 16600-16602 |
| 439 | Defs.' Br. Supp. Summ. J. | 16603-16618 |
| 439-2 | Defs.' Br. Supp. Summ. J. Ex. A Part 1 – 1998 GBP | 16620-16660 |
| 439-3 | Defs.' Br. Supp. Summ. J. Ex. A Part 2 – 1998 GBP | 16661-16710 |
| 439-4 | Defs.' Br. Supp. Summ. J. Ex. B Part 1 – 1998 CBA | 16711-16758 |
| 439-6 | Defs.' Br. Supp. Summ. J. Ex. B. Part 2 – 1998 CBA | 16802-16851 |
| 445 | Op. & Order Granting Summ. J. to Defs. | 16910-16936 |
| 446 | Judgment for Defs. | 16937 |
| 447 | Pls.' Mot. for Recons. | 16938-16974 |
| 450 | Op. & Order Granting Mot. for Recons. & Summ. J. to Pls. | 16996-17041 |
| 451 | Notice of Appeal | 17042-17044 |