Case 15-2382

---

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

---

**Jack Reese; Frances Elaine Pidde; James Cichanofsky; Roger Miller; George Nowlin;** and **Ronald Hitt**,

Plaintiffs/Appellees,

v.

**CNH Industrial America, LLC;** and **CNH Industrial N.V.**,

Defendants/Appellants.

---

On Appeal from the United States District Court
for the Eastern District of Michigan

---

**BRIEF AMICUS CURIAE OF WHIRLPOOL CORPORATION IN
SUPPORT OF DEFENDANTS / APPELLANTS**

---

Douglas A. Darch
Alexis Hawley
Baker & McKenzie LLP
300 East Randolph Street
Suite 5000
Chicago, IL 60601
(312) 861-8000 (tel)
Douglas.Darch@bakermckenzie.com

*Attorney for Amicus Curiae*

# TABLE OF CONTENTS

**Page**

DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST .......................................................................... VI

STATEMENT OF INTEREST OF AMICUS CURIAE ........................................ 1

ARGUMENT ................................................................................................. 2

I.    THE REESE "REASONABLENESS" INQUIRY SURVIVES *TACKETT* ............................................................................................ 2

II.   ORDINARY CONTRACT INTERPRETATION RULES REQUIRE CLEAR AND EXPRESS LANGUAGE TO VEST RETIREE BENEFITS FOR LIFE AT FIXED, UNALTERABLE LEVELS ............... 4

    A.    ERISA Public Policy Requires A Clear & Express Standard ............. 5

    B.    A Clear & Express Standard Is Aligned With The Evolving Nature of Healthcare Benefits ............................................................ 7

III.  A CLEAR, EXPRESS, AND UNMISTAKABLE WAIVER STANDARD IS REQUIRED BY NATIONAL LABOR POLICY ............. 9

    A.    ERISA Confers A Federal, Statutory Right To Amend Or Terminate Welfare Benefit Plans ................................................... 10

    B.    National Labor Policy Requires Waiver Of A Statutory Right Through Collective Bargaining to Be Clear And Unmistakable ....... 12

    CONCLUSION ....................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aleman v. Chugach Support Servs., Inc.*,
  485 F.3d 206 (4th Cir. 2007)............................................................14

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
  475 U.S. 643 (1986)............................................................13

*Cent. Penn. Teamsters Pension Fund v. McCormick Dray Line, Inc.*,
  85 F.3d 1098 (3d Cir. 1996)............................................................13

*Chiles v. Ceridian Corp.*,
  95 F.3d 1505 (10th Cir. 1996)............................................................15

*Control Servs. Inc.*,
  303 N.L.R.B. 481 (1991) ............................................................13

*E. Tenn. Baptist Hosp. v. NLRB*,
  6 F.3d 1139 (6th Cir. 1992)............................................................14

*Gable v. Sweetheart Cup Co.*,
  35 F.3d 851 (4th Cir. 1994)............................................................11, 15

*Heheman v. E.W. Scripps Co.*,
  661 F.2d 1115 (6th Cir. 1981)............................................................15

*Inter-Modal Rail Emp. Ass'n v. Atchison, Topeka & Santa Fe Ry.*,
  520 U.S. 510 (1997)............................................................6, 11

*Jocek v. Nationwide Mut. Fire Ins. Co.*,
  No. 64827, 1994 Ohio App. LEXIS 2608 (Ohio Ct. App. June 16,
  1994) ............................................................7

*Joyce v. Curtiss-Wright Corp.*,
  171 F.3d 130 (2d Cir. 1999)............................................................11

*Kendall v. U.S. Dismantling Co.*,
  485 N.E.2d 1047 (Ohio 1985)............................................................7

*Lingle v. Norge Div. of Magic Chef, Inc.*,
  486 U.S. 399 (1988)......................................................................13

*Livadas v. Bradshaw*,
  512 U.S. 107 (1994)......................................................................13

*Local 1199 v. Pepsi-Cola Gen. Bottlers, Inc.*,
  958 F.3d 1331 (6th Cir. 1992)......................................................15

*Local 18 v. Detroit Newspaper Agency*,
  283 F.3d 779 (6th Cir. 2002)........................................................15

*Local 65-B v. NLRB*,
  572 F.3d 342 (7th Cir. 2009)........................................................14

*Loskill v. Barnett Banks, Inc.*,
  289 F.3d 734 (11th Cir. 2002)......................................................11

*M&G Polymers USA, LLC v. Tackett*,
  524 U.S. ___, 135 S. Ct. 926, 190 L. Ed. 2d 809 (2015) ..........passim

*Marine Eng'gs Beneficial Ass'n v. GFC Crane Consultants, Inc.*,
  331 F.3d 1287 (11th Cir. 2003)....................................................14

*Maytag Corp. v. UAW*,
  687 F.3d 1076 (8th Cir. 2012)........................................................2

*Metropolitan Edison Co. v. NLRB*,
  460 U.S. 693 (1983)...................................................... 6, 12, 13, 15

*Moore v. Metropolitan Life Insurance Co.*,
  856 F.2d 488 (2d Cir. 1988)...........................................................6

*Reese v. CNH America, LLC*,
  694 F.3d 681 (6th Cir. 2012)......................................................3, 8

*Reese v. CNH America LLC*,
  574 F.3d 315 (6th Cir. 2009)..................................................passim

*Reese v. CNH Industrial N.V.*,
  No. 04-cv-70592, 2015 U.S. Dist. LEXIS 151421 (E.D. Mich.
  Nov. 9, 2015)..........................................................................passim

*Regis Assocs. v. Rank Hotels (Mgmt.), Ltd.*,
    894 F.2d 193 (6th Cir. 1990)...............................................................6

*Ross v. Rail Car Am. Group Dis. Income Plan*,
    285 F.3d 735 (8th Cir. 2002)...........................................................11

*Ryan v. Commodity Futures Trading Comm'n*,
    125 F.3d 1062 (7th Cir. 1997)...........................................................2

*Sengpiel v. B.F. Goodrich Co.*,
    970 F. Supp. 1322 (N.D. Ohio 1997) ...............................................6

*Tackett v. M&G Polymers USA, LLC*,
    733 F.3d 589 (6th Cir. 2013), *vacated on other grounds* 135 S. Ct.
    926 (2015) .........................................................................................3

*UAW v. Skinner Engine Co.*,
    188 F.3d 130 (3d Cir. 1999)...............................................11, 12, 15

*UAW v. Yard-Man*,
    716 F.2d 1476 (6th Cir. 1984)...................................................1, 3, 4

*Vallone v. CNA Fin. Corp.*,
    375 F.3d 623 (7th Cir. 2004)...........................................................11

*Wise v. El Paso Nat. Gas Co.*,
    986 F.2d 929 (5th Cir. 1993)......................................................11, 15

*Wright v. Universal Maritime Service Corp.*,
    525 U.S. 70 (1998)........................................................................6, 13

*Zino v. Whirlpool Corp.*,
    No. 11-cv-1676, 2014 U.S. Dist. LEXIS 132318 (N.D. Ohio Sept.
    19, 2014).........................................................................................1, 2

*Zino v. Whirlpool Corp.*,
    No. 11-cv-1676, 2015 U.S. Dist. LEXIS 147614 (N.D. Ohio. Oct.
    30, 2015)............................................................................................1

*Zino v. Whirlpool Corp.*,
    No. 11-cv-1676, 2015 U.S. Dist. LEXIS 173484 (N.D. Ohio. Dec.
    31, 2015)............................................................................................1

**STATUTES**

Employee Retirement Income Security Act ("ERISA" ...................................passim

National Labor Relations Act ("NLRA") ........................................................ 12, 14

**OTHER AUTHORITIES**

BLACK'S LAW DICTIONARY 620 (8th ed. 2004) ...................................................... 10

Federal Rule of Appellate Procedure 29.................................................................. 1

Federal Rule of Appellate Procedure 26.1.............................................................. vi

## DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST

Pursuant to Sixth Circuit Rule of Appellate Procedure 26.1, Whirlpool Corporation makes the following disclosure:

1.    Is said amicus curiae a subsidiary or affiliate of a publicly owned corporation?  If, "Yes," list below the identity of the parent corporation affiliate and the relationship between it and the named amicus curiae:

No.

2.    Is there a publicly owned corporation, not a party to the appeal, that has financial interest in the outcome?  If, "Yes," list the identity of such corporation and the nature of the financial interest:

Yes.  Whirlpool Corporation, the amicus curiae herein, is a defendant in a lawsuit pending in the Northern District of Ohio, *Zino v. Whirlpool Corp.*, No. 11-cv-1676, in which a class of formerly union-represented retirees and their surviving spouses claim they were promised a specified level of healthcare benefits for life. This Court's decision in the instant case will impact the outcome of the *Zino* litigation and thus Whirlpool's potential liability.

## STATEMENT OF INTEREST OF AMICUS CURIAE[1]

This Amicus Brief is submitted in support of Appellant CNH Industrial America, LLC.  Amicus Whirlpool Corporation ("Whirlpool") seeks reversal of the Eastern District of Michigan's decision in *Reese v. CNH Industrial N.V.*, No. 04-cv-70592, 2015 U.S. Dist. LEXIS 151421 (E.D. Mich. Nov. 9, 2015) in light of the Supreme Court's decision in *M&G Polymers USA, LLC v. Tackett*, 524 U.S. ___, 135 S. Ct. 926, 190 L. Ed. 2d 809 (2015).

Whirlpool is a defendant in a case in which four subclasses of formerly union-represented retirees claim they were promised a specified level of healthcare benefits for life.  Following the first phase of a bifurcated trial, the district court in *Zino* found, based on principles adopted by this Circuit in *UAW v. Yard-Man*, 716 F.2d 1476 (6th Cir. 1984) and its progeny, that plaintiffs were entitled to lifetime healthcare benefits.  *See Zino v. Whirlpool Corp.*, No. 11-cv-1676, 2014 U.S. Dist. LEXIS 132318 (N.D. Ohio Sept. 19, 2014).  Later, following post-*Tackett* motions to reconsider filed by both parties, the district court upheld its prior finding of lifetime, vested benefits for the *Zino* retirees.  *See Zino v. Whirlpool Corp.*, No. 11-cv-1676, 2015 U.S. Dist. LEXIS 147614 (N.D. Ohio. Oct. 30, 2015); *Zino v.*

---

[1]  Appellant consented to the filing of this amicus brief, but Appellees did not.  Whirlpool has moved for leave to file this brief.  *See* Fed. R. App. P. 29(b).  No counsel for a party authored this brief in whole or in part; no counsel or party made a monetary contribution intended to fund the preparation or submission of this brief; and no person other than amici or their counsel made a monetary contribution to the preparation or submission of this brief.  *Id.* R. 29(c)(5).

1

*Whirlpool Corp.*, No. 11-cv-1676, 2015 U.S. Dist. LEXIS 173484 (N.D. Ohio. Dec. 31, 2015).

Whirlpool has an obvious interest in the outcome of *Reese*, as it will affect the ongoing *Zino* litigation.  Furthermore, Whirlpool and its former subsidiary, Maytag Corporation, have litigated the vesting issue in two different jurisdictions and under two different vesting standards.  *See Maytag Corp. v. UAW*, 687 F.3d 1076 (8th Cir. 2012); *Zino*, 2014 U.S. Dist. LEXIS 132318.  Whirlpool is thus uniquely positioned to share its insights on *Tackett*'s impact on this Circuit's vesting law.  As such, Whirlpool submits the following amicus brief.  *See Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1063 (7th Cir. 1997) ("An amicus brief should normally be allowed . . . when the amicus has an interest in some other case that may be affected by the decision in the present case . . . or when the amicus has unique information or perspective that can help the court.").

## ARGUMENT

## I.    THE *REESE* "REASONABLENESS" INQUIRY SURVIVES *TACKETT*

Under current Sixth Circuit law, the retiree healthcare benefit "vesting" analysis consists of three separate inquiries:  (1) whether retiree benefits are vested for life; (2) whether retiree benefits are vested at fixed and unchangeable levels; and (3) if retiree healthcare benefits are not vested at fixed levels and, therefore, subject to change, whether the employer's proposed modifications are reasonable.

2

*See Reese v. CNH Am. LLC*, 574 F.3d 315, 326 (6th Cir. 2009) ("*Reese I*"); *Reese v. CNH Am. LLC*, 694 F.3d 681, 684 (6th Cir. 2012) ("*Reese II*"); *Tackett v. M&G Polymers USA, LLC*, 733 F.3d 589, 601 (6th Cir. 2013), *vacated on other grounds* 135 S. Ct. 926, 937 (2015).  This Court should hold that the dual vesting inquiry and the reasonable change analysis adopted in *Reese I* survive the Supreme Court's *Tackett* decision.

In *Reese I*, this Court concluded – relying on (now-invalidated) contract interpretation principles set forth in *Yard-Man* and its progeny – that the CBAs at issue granted lifetime healthcare benefits to retirees.  574 F.3d at 322-23.  This Court, however, proceeded to evaluate whether those benefits were subject to change employing an analysis validated by the unanimous *Tackett* Court.  It held that unless the applicable CBA said otherwise, employers may modify lifetime retiree healthcare benefits, so long as the proposed changes are "reasonable in light of changes in health care" and "roughly consistent with the kinds of benefits provided to current employees."  574 F.3d at 326.  This Court adopted this approach based in large measure on the public policy underlying ERISA, which also served as a basis for the *Tackett* Court's opinion.  *See* 574 F.3d at 326 (the conclusion that retiree benefits were subject to change "makes sense . . . within the broader context of ERISA, which contemplated just this sort of flexibility"); 135 S. Ct. at 933 (observing that employers have "large leeway to design . . . welfare

3

plans as they see fit" and noting the importance of enforcing such plans "as written") (internal citations and quotations omitted).

While *Tackett* jeopardizes *Reese I*'s finding of lifetime, vested benefits, the Supreme Court's decision should not disturb *Reese I*'s holding that vested benefits may be subject to reasonable change. Indeed, neither *Yard-Man* nor its progeny influenced this Court's finding that retiree healthcare benefits may be reasonably altered. Rather, consistent with *Tackett*, this Court applied ordinary contract interpretation rules to examine the language of the parties' agreement and ascertain whether such language precluded reasonable changes. *See* 574 F.3d at 325 ("[N]othing in the text of the [contract] said that health-care coverage would be fixed and irreducible into perpetuity . . . ."); *id.* at 326 ("That is why the CBA – unless it says otherwise – should be construed to permit reasonable modifications to benefits plans . . . ."). *Cf. Tackett*, 135 S. Ct. at 937 ("[C]ontractual obligations will cease in the ordinary course upon termination of the bargaining agreement.") (citations omitted). This Court, therefore, should hold that the three-part *Reese* analysis survives *Tackett*.

## II. ORDINARY CONTRACT INTERPRETATION RULES REQUIRE CLEAR AND EXPRESS LANGUAGE TO VEST RETIREE BENEFITS FOR LIFE AT FIXED, UNALTERABLE LEVELS

As noted above, *Tackett* instructed lower courts to utilize "ordinary principles of contract interpretation" when evaluating whether a collective

4

bargaining agreement creates a right to vested retiree healthcare benefits. 135 S. Ct. at 933. The *Tackett* opinion also signaled that "ordinary principles of contract interpretation" require contracts to contain clear and express language vesting retiree benefits. *See, e.g.*, *id.* at 937 (vesting may occur if the CBA includes "***explicit*** terms that certain benefits continue after the agreement's expiration") (emphasis added).

This Court should find that that a "clear and express" standard applies to both vesting inquiries under *Reese*. In other words, in order to "vest" retiree healthcare benefits, the parties must adopt clear and express language demonstrating their intent (1) that such benefits outlast the expiration of the contract and endure for the life of the retiree and (2) that such benefits remain fixed and unchangeable. The clear and express standard is consistent with ERISA public policy considerations, ordinary principles of contract interpretation, and the evolving nature of healthcare benefits.

### A.    ERISA Public Policy Requires A Clear & Express Standard

ERISA's plain language and legislative history make clear that Congress intentionally omitted welfare benefit plans from ERISA's automatic vesting provisions. *Tackett*, 135 S. Ct. at 933; *Reese I*, 574 F.3d at 321. Congress deliberately granted employers the right to modify or terminate welfare benefits in order to incentivize employers to offer such plans. *Tackett*, 135 S. Ct. at 933;

*Reese I*, 574 F.3d at 326-27.  In *Moore v. Metropolitan Life Insurance Co.*, 856 F.2d 488, 492 (2d Cir. 1988), the Second Circuit summarized the policy underlying Congress' decision:

> Automatic vesting was rejected because the costs of such plans are subject to fluctuating and unpredictable variables . . . . [M]edical insurance must take account of inflation, changes in medical practice and technology, and increases in the costs of treatment independent of inflation.  These unstable variables prevent accurate predictions of future needs and costs.

*See also Inter-Modal Rail Emp. Ass'n v. Atchison, Topeka & Santa Fe Ry.*, 520 U.S. 510, 515 (1997) (noting that "[t]he flexibility an employer enjoys to amend or eliminate its welfare plan is not an accident"); *Sengpiel v. B.F. Goodrich Co.*, 970 F. Supp. 1322, 1335 (N.D. Ohio 1997) (noting ERISA's "public policy rationale" of limiting "welfare benefit plan regulation").

Clearly then, an employer's ability to modify, alter or terminate welfare benefits is an interest protected by federal public policy.  Ordinary principles of contract law require that in order to waive a matter of public policy, the waiver must be clear and express.  *See, e.g.*, *Metro. Edison Co. v. NLRB*, 460 U.S. 693, 708 (1983) (CBA's waiver of statutorily-protected right must be "explicitly stated" or "clear and unmistakable"); *Wright v. Universal Maritime Serv. Corp.*, 525 U.S. 70, 80 (1998) (CBA's waiver of judicial forum for federal discrimination claims must be clear and unmistakable); *Regis Assocs. v. Rank Hotels (Mgmt.), Ltd.*, 894 F.2d 193, 195 (6th Cir. 1990) ("Although the [statutory] right to remove can be

6

waived, . . . such waiver must be clear and unequivocal."); *Kendall v. U.S. Dismantling Co.*, 485 N.E.2d 1047, 1051 (Ohio 1985) (public policy dictates that waiver of employer immunity under worker's compensation laws be express); *Jocek v. Nationwide Mut. Fire Ins. Co.*, No. 64827, 1994 Ohio App. LEXIS 2608, at *6-8 (Ohio Ct. App. June 16, 1994) (requiring "express" waiver of public policy right to insurance policy coverage equal to liability coverage).  Given the important public policy considerations underlying the ERISA right to modify or change welfare plans, this Court should hold that ordinary contract principles require waiver of this right occur via clear and express language.

**B.    A Clear & Express Standard Is Aligned With The Evolving Nature of Healthcare Benefits**

The clear and express standard is especially appropriate in the context of changes to healthcare benefits.  Healthcare benefits, by their very nature, are constantly in flux.  As this Court has observed, it serves neither employers nor employees to fix retiree healthcare benefits at the time of retirement:

> The rub for retirees and employers alike is that healthcare benefits--what is provided and what it costs--have not been remotely static in modern memory.  The reason has little to do with traditional causes of inflation and more to do with the expansion of the benefit: the remarkable growth in modern life-saving and comfort-improving medical procedures, devices and drugs. New and better medical procedures arise while others become obsolete. And it is the rare medical innovation that costs *less* than the one it replaces. Retirees, quite understandably, do not want lifetime eligibility for the medical-insurance plan in place on the day of retirement, even if that means they would pay no premiums for it. They want eligibility for

7

up-to-date medical-insurance plans, all with access to up-to-date medical procedures and drugs. Whatever else vesting in the healthcare context means, all appear to agree that it does not mean that beneficiaries receive a bundle of services fixed once and for all. Companies want the freedom to change health-insurance plans. And beneficiaries want something more than a fixed, unalterable bundle of services; they want coverage to account for new and better, yet likely more expensive, procedures and medications than the ones in existence at retirement.

*Reese II*, 694 F.3d at 683-84.

Professor Mark Hall (whose curriculum vitae and expert report are attached) echoed this rationale: "[e]mployment-based medical benefits are not static. They change regularly in response to changes in health care delivery systems, health insurance models, tax laws, accounting rules, health care and health insurance regulations, labor market conditions, and general economic conditions." Exhibit 1, August 1, 2012 Report of Mark Hall at 3. Indeed, in the last ten years alone, there have been two major legislative overhauls changing how retiree medical insurance is provided: (1) the Medicare Prescription Drug, Improvement & Modernization Act, which introduced Medicare Part D and expanded retiree prescription drug coverage and (2) the Patient Protection & Affordable Care Act, which created health insurance exchanges and will eventually close the Medicare Part D coverage gap. *Id.*

Given the ever-changing nature of healthcare, courts should require clear and express language in contracts that allegedly "fix" retiree healthcare benefits.

8

Absent clear language demonstrating an employer forfeited the federally-protected right to modify benefits and agreed to vest benefits at unalterable levels, employers should not be precluded from revising contractually-created plans and modernizing their healthcare delivery systems. As Congress recognized, the freedom to alter benefit plans acts as an incentive to employers to provide such plans in the first place. Even more important, however, this flexibility enables employers to strike the necessary balance of offering contemporary healthcare benefits on a sustainable and cost-effective basis.

As *Tackett* cautioned, courts should not construe ambiguous writings to create lifetime obligations. 135 S. Ct. at 936. This warning applies with even greater force to contracts that allegedly confer unalterable, lifetime retiree healthcare benefits. These contracts, and the benefits they provide, must be susceptible to ongoing modification, otherwise retirees would be denied access to state-of-the-art treatments and employers would be unable to take advantage of more cost-effective healthcare coverage solutions.

## III.   A CLEAR, EXPRESS, AND UNMISTAKABLE WAIVER STANDARD IS REQUIRED BY NATIONAL LABOR POLICY

Through its analysis, the *Tackett* Court signaled that ordinary principles of contract interpretation require courts to evaluate agreements in the context of the laws and policies that govern them. *See* 135 S. Ct. at 936 (rejecting *Yard-Man*'s theory that retiree healthcare benefits are a type of deferred compensation as

9

"contrary to Congress' determination otherwise" under ERISA).  The Court explicitly recognized that the interpretation of negotiated welfare plans implicates ERISA and must comport with federal labor policy.  *Id.* at 933 ("When [CBAs] create pension or welfare benefit plans, those plans are subject to the rules established in ERISA."); *id* ("We interpret [CBAs], including those establishing ERISA plans, according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy.").

Thus, when interpreting CBAs for an intent to vest retiree healthcare benefits beyond contract termination, courts must take into consideration the rights and obligations created by ERISA as well as national labor policy.  Taken together, these considerations compel the conclusion (as was reached in *Reese I*) that the parties' intent to vest retiree healthcare benefits at fixed and unchangeable levels must be conveyed in clear and express language. [2]

### A.    ERISA Confers A Federal, Statutory Right To Amend Or Terminate Welfare Benefit Plans

In *Tackett*, the Supreme Court recognized that while ERISA applies stringent vesting requirements to employee pension plans, the statute expressly and deliberately excludes health and welfare plans from these strictures.  135 S. Ct. at

---

[2]  As used throughout this brief, the words "clear", "express", and "unmistakable" are considered synonymous.  *See* BLACK'S LAW DICTIONARY 620 (8th ed. 2004) (defining term "express" as "[c]learly and unmistakably communicated").

933 ("[E]mployers . . . are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans.") (citations omitted).

By exempting welfare plans from its vesting rules, ERISA grants plan sponsors the unfettered, statutory right to terminate or modify such plans and to discontinue or decrease any benefits provided thereunder. Indeed, both the Supreme Court and several federal appellate courts have characterized an employer's ability to terminate or modify welfare benefits plans as a "right" granted under ERISA. *See, e.g.*, *Atchison*, 520 U.S. at 515; *Joyce v. Curtiss-Wright Corp.*, 171 F.3d 130, 133 (2d Cir. 1999); *UAW v. Skinner Engine Co.*, 188 F.3d 130, 138 (3d Cir. 1999); *Gable v. Sweetheart Cup Co.*, 35 F.3d 851, 855 (4th Cir. 1994); *Wise v. El Paso Nat. Gas Co.*, 986 F.2d 929, 937 (5th Cir. 1993); *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 637 n.8 (7th Cir. 2004); *Ross v. Rail Car Am. Group Dis. Income Plan*, 285 F.3d 735, 741 (8th Cir. 2002); *Loskill v. Barnett Banks, Inc.*, 289 F.3d 734, 737 (11th Cir. 2002).

The ERISA right to terminate or modify welfare benefit plans, however, is not absolute. An employer may waive that right via contract, *see* 520 U.S. at 515 ("[U]nless an employer contractually cedes its freedom, . . . it is generally free under ERISA, for any reason at any time, to adopt, modify, or terminate [its] welfare plan.") (internal citations and quotations omitted), provided it does so

11

through clear and express language.  *See Tackett*, 135 S. Ct. at 937; *Sprague*, 133 F.3d at 400; *Skinner*, 188 F.3d at 138.

As discussed below, national labor policy, federal labor law, and ordinary rules of contract interpretation all dictate that an employer's waiver of its ERISA rights to amend or terminate welfare benefits or, conversely, its agreement to vest retiree healthcare benefits beyond contract expiration at fixed, unalterable levels must occur through clear, express, and unmistakable language.  135 S. Ct. at 937.

### B.     National Labor Policy Requires Waiver Of A Statutory Right Through Collective Bargaining to Be Clear And Unmistakable

The clear and express standard comports with a deeply-embedded and well-established national labor policy:  namely, that waiver of a statutory right through the collective bargaining process must be expressed in clear and unmistakable language.  The genesis of this policy is found in the Supreme Court's decision in *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693 (1983).  There, the Court found a labor agreement did not permit disparate treatment because it did not contain a *clear and unmistakable* waiver of the statutory prohibition against discrimination in the National Labor Relations Act ("NLRA").  The Court held:

> We will not infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is "explicitly stated."  More succinctly, the waiver must be clear and unmistakable.

12

460 U.S. at 708.  *See also Livadas v. Bradshaw*, 512 U.S. 107, 125 (1994) (noting that if a union purported to bargain away a member's state law rights, such waiver "would . . . have to be clear and unmistakable"); *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 409 n.9 (1988) (noting that waiver of state-law rights must be through "clear and unmistakable evidence"); *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 656 (1986) (parties must "clearly and unmistakably" agree to submit question of arbitrability to arbitrator); *Control Servs. Inc.*, 303 N.L.R.B. 481, 484 (1991) ("The waiver of a statutory right will not be inferred from general contract language; such waivers, instead, must be clear and unmistakable.") (citing *Metropolitan Edison*, 460 U.S. at 708).

The Supreme Court applied the same clear and unmistakable standard to the waiver of a federal statutory right through collective bargaining in *Wright v. Universal Maritime Service Corp.*, 525 U.S. 70 (1998).  There, the Court decided whether a CBA's arbitration clause operated to waive an employee's statutory right to bring federal employment discrimination claims in a judicial forum.  The Court held that the clear and unmistakable waiver standard applied, notwithstanding that the right at issue was a procedural, as opposed to a substantive, one.

In keeping with *Metropolitan Edison* and *Wright*, the appellate courts have applied a clear and unmistakable standard to the waiver of federal statutory rights through collective bargaining.  *See, e.g., Cent. Penn. Teamsters Pension Fund v.*

13

*McCormick Dray Line, Inc.*, 85 F.3d 1098, 1109 (3d Cir. 1996) (ERISA right to collect delinquent monies); *Aleman v. Chugach Support Servs., Inc.*, 485 F.3d 206, 216 (4th Cir. 2007) (right to judicial forum for Title VII claims); *E. Tenn. Baptist Hosp. v. NLRB*, 6 F.3d 1139, 1144 (6th Cir. 1992) (confidentiality defense to union request for information under NLRA); *Local 65-B v. NLRB*, 572 F.3d 342, 351 (7th Cir. 2009) (right to bargain over conduct rules and performance standards); *Marine Eng'gs Beneficial Ass'n v. GFC Crane Consultants, Inc.*, 331 F.3d 1287, 1293 (11th Cir. 2003) (right to terminate labor agreement); *Local Union 1395*, 797 F.3d at 1032 (right to sympathy strike).

It is thus well-settled under federal common law that waiver of a federal statutory right via collective bargaining must be conveyed in clear and unmistakable terms. Plainly then, in order for an employer to relinquish its ERISA rights to change or terminate welfare plans through collective bargaining and commit to providing lifetime retiree benefits at fixed, unalterable levels, the parties must adopt clear, express and unmistakable language conveying the intention to do so. This standard, which has been adopted elsewhere by the Supreme Court and by the Third, Fourth, Fifth, and Tenth Circuits in the context of retiree benefits, is aligned with national labor policy and comports with the intent of ERISA. This Court, therefore, should adopt and apply a clear and express standard both when interpreting CBAs for an intent to vest retiree healthcare benefits for life and when

interpreting CBAs for an intent to make the level of benefits unalterable. *See* 460 U.S. at 708; *Skinner*, 188 F.3d at 139; *Gable*, 35 F.3d at 855; *Wise*, 986 F.2d at 937-38; *Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1515 (10th Cir. 1996).[3]

## CONCLUSION

For all of the above reasons, Whirlpool requests that this Court (1) hold the three-part vesting analysis adopted in *Reese* survives *Tackett* and (2) reverse the Eastern District of Michigan's decision in *Reese v. CNH Industrial N.V.*, No. 04-cv-70592, 2015 U.S. Dist. LEXIS 151421 (E.D. Mich. Nov. 9, 2015) and hold that ordinary rules of contract interpretation require clear and express language in a collective bargaining agreement to waive an employer's ERISA-protected rights to modify or terminate welfare plans and to vest retiree healthcare benefits for a retiree's lifetime at fixed, unalterable levels.

**Dated: January 20, 2016**          Respectfully submitted,

          /s/ Douglas A Darch
          Douglas A. Darch
          BAKER & MCKENZIE LLP
          300 East Randolph St., Suite 5000
          Chicago, Illinois 60601, USA
          (312) 861-8000 (tel)
          Douglas.Darch@bakermckenzie.com
          *Attorney for Amicus Whirlpool Corporation*

---

[3] In fact, to displace the default rule that contractual obligations ordinarily cease upon termination of the agreement, the Sixth Circuit has consistently required express language indicating that benefits survive contract expiration. *See Local 18 v. Detroit Newspaper Agency,* 283 F.3d 779, 787 (6th Cir. 2002); *Local 1199 v. Pepsi-Cola Gen. Bottlers, Inc.*, 958 F.3d 1331, 1334 (6th Cir. 1992); *Heheman v. E.W. Scripps Co.*, 661 F.2d 1115, 1118-19 (6th Cir. 1981).

15

## CERTIFICATE OF TYPE-VOLUME COMPLIANCE

Whirlpool Corporation's ("Whirlpool") concurrently-filed amicus brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 3,658 words, excluding the of the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii). Whirlpool's amicus brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief been prepared in a proportionally spaced typeface using Microsoft 2010 in fourteen point Times New Roman.

s/Douglas A. Darch
Douglas A. Darch

## PROOF OF SERVICE

I hereby certify that the foregoing **BRIEF AMICUS CURIAE OF WHIRLPOOL CORPORATION IN SUPPORT DEFENDANTS / APPELLANTS** was filed on January 20, 2016, using the Court's Electronic Case Filing system, which automatically generates and sends by email a Notice of Docket Activity to all registered attorneys participating in this case.


s/Douglas A. Darch
Douglas A. Darch

# EXHIBIT 1

CONFIDENTIAL

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH ZINO, JR., DONALD R. HINER, and ROGER N. KNOP, on behalf of themselves and all other persons similarly situated, | ) ) ) ) | |
| | ) | Case No. 11-C-1676 |
| Plaintiffs, | ) ) | |
| | ) | Judge Benita Y. Pearson |
| v. | ) | |
| | ) | |
| WHIRLPOOL CORPORATION, WHIRLPOOL CORPORATION GROUP BENEFIT PLAN FOR RETIREES | ) ) ) | |
| | ) | |
| Defendants. | ) ) ) | |

## REPORT OF MARK HALL - AUGUST 1, 2012

# TABLE OF CONTENTS

**Page**

I.    BACKGROUND AND QUALIFICATIONS ................................................................. 1

II.   OPINION ........................................................................................................ 2

III.  ANCILLARY OPINIONS.................................................................................... 2

IV.   BASIS AND REASONS FOR OPINIONS AND ANCILLARY OPINIONS ............ 3

      A.   Trends in Retiree Health Insurance................................................... 3

      B.   Current Availability of Retiree Health Insurance Benefits ............... 4

      C.   Levels of Retiree Health Insurance Benefits .................................... 5

V.    FACTS AND DATA REVIEWED IN FORMING OPINIONS AND
      ANCILLARY OPINIONS..................................................................................... 7

VI.   PRIOR EXPERT TESTIMONY ......................................................................... 10

VII.  COMPENSATION TO BE PAID FOR STUDY AND TESTIMONY ..................... 10

CONFIDENTIAL

## I.     BACKGROUND AND QUALIFICATIONS

My name is Mark Hall.  I have been retained by the law firm of Baker & McKenzie LLP, attorneys for Defendants Whirlpool Corporation and Whirlpool Corporation Group Benefit Plan for Retirees ("Whirlpool"), in the lawsuit *Zino, et al. v. Whirlpool, et al.*, Case No. 11-1676 (N.D. Ohio 2011).

I am the Fred and Elizabeth Turnage Professor of Law and Public Health at Wake Forest University, where I have been a tenured full professor since 1993 in both the School of Law and in the Division of Public Health Sciences at the School of Medicine.  I have also been an adjunct professor in the Schools of Business since 1993, and I was the founding director of the University's Center for Bioethics, Health and Society.

My B.A. degree is from Middle Tennessee State University, and my law degree is from University of Chicago.  I completed a post-graduate fellowship in health care finance at Johns Hopkins University, during which I studied for six months at the Health Insurance Association of America.

I have been a professor of health law and public policy since 1985, during which time I have also taught or researched at Duke University, University of Pennsylvania, University of British Columbia, University of Houston, Seton Hall Law School, University of North Carolina, and Arizona State University.  Prior to teaching, I practiced health care law with Bondurant Mixson & Elmore in Atlanta, and I clerked for Chief Judge Godbold of the Fifth and Eleventh Circuit Federal Courts of Appeals.

During my academic career, I have received the Distinguished Health Law Teacher's Award from the American Society of Law, Medicine and Ethics, an Investigator in Health Policy Research award from the Robert Wood Johnson Foundation, the James C.H. Anderson Memorial Award from the Actuarial Education and Research Fund for research on health insurance regulation, and the Spence Kimball Jr. Prize for Best Article of the Year in the Journal of Insurance Regulation -- among other distinctions.  I serve on the editorial boards of the Journal of Health Politics, Policy & Law, and Milbank Quarterly (a leading health policy journal).

I have served as an advisor or reviewer for the U.S. Senate Finance Committee, the U.S. Department of Health and Human Service (DHHS), the National Academies of Science, the National Institutes of Health, the U.S. Health Services Research Administration, the Blue Cross and Blue Shield Association, the Health Insurance Association of America, among many other national health policy organizations, as well as advising similar institutions in North Carolina and several other states.  I also regularly review academic manuscripts for leading publishers, such as Duke University Press, Harvard University Press, Oxford University Press, the *American Journal of Public Health*, *JAMA* (Journal of the American Medical Association), the *New England Journal of Medicine*, among others.

Relating specifically to retiree health insurance, I have advised the U.S. Center for Consumer Information and Insurance Oversight (which is part of DHHS) about the impact of the Affordable Care Act on Taft-Hartley Multi-employer Health Benefit Plans.  Also, I served on an expert advisory board commissioned by the Andrew W. Mellon Foundation to study retiree

medical benefits for university professors. And, I researched and published an article in Health Affairs in 2010 regarding the early retiree reinsurance program in the new Affordable Care Act.

In the academic positions I have held for over twenty years, I study health care law and public health, with a particular focus on health insurance markets and regulation. I have authored over a dozen books related to this field of study, and over 150 academic articles or chapters, including many published with the nation's best journals and presses, as well as several in specialized journals such as *Benefits Quarterly* and the *Journal of Insurance Regulation.*

I have directed several major research grants to study health insurance markets and regulation, from the National Institutes of Health, the U.S. Agency for Healthcare Research and Quality, Robert Wood Johnson Foundation, and the Commonwealth Fund, among other funders. In this empirical, social science research, I regularly interview employer health benefits managers, health insurance agents, health insurance executives, and government regulators of health insurance. I also regularly read and survey academic and trade press articles and public policy research reports relating to employee health benefits.

For additional detail regarding my background and qualifications, as well as a list of the publications I have authored in the past 10 years, please see my Curriculum Vitae, attached hereto as Exhibit A.

## II.     OPINION

Based on the facts and data I have reviewed in preparing this report, the medical benefits being offered to Hoover retirees in 2013 – both pre-Medicare and Medicare retirees – are, on the whole, as generous as, or more generous than, the retiree medical benefits (if any) provided by roughly three quarters of all larger employers (those with several hundred or more workers) nationally.

## III.    ANCILLARY OPINIONS

Employers frequently change their medical benefits, including those for retirees, to adapt to changing market, economic, and regulatory conditions. Changes observed nationally usually occur in all major geographic and industry sectors.

For elderly people on Medicare, only about a third have access to employer-sponsored private insurance, and about a third have no supplemental coverage. Most employers no longer sponsor retiree coverage, and about a third of retirees who continue to have access to employer-sponsored health plans have to pay the entire premium cost to join the company plan.

When employers do subsidize retiree medical benefits, retirees usually have to pay a substantial portion of the premium. Also, the retiree coverage that employers offer increasingly requires substantial cost-sharing by patients, in the form of significant deductibles or co-insurance.

Many employers offering retiree medical benefits cap the amount that they contribute to this coverage, and an increasing number are adopting account-based or "defined-contribution"

CONFIDENTIAL

plans, which let retirees apply their employer's subsidy to whatever source and type of coverage they choose.

## IV.    BASIS AND REASONS FOR OPINIONS AND ANCILLARY OPINIONS

### A.    Trends in Retiree Health Insurance

Employment-based medical benefits are not static. They change regularly in response to changes in health care delivery systems, health insurance models, tax laws, accounting rules, health care and health insurance regulations, labor market conditions, and general economic conditions. This dynamic of ongoing change, evolution and adaptation in employer-based medical benefits permeates all industrial sectors, geographic regions, employer sizes, and workforce structures.

Relating specifically to retiree medical benefits, changes are being driven over the past five years by the following recent major developments in the economic, regulatory, and health policy environment: the 2008 recession, the 2006 Medicare Modernization Act (which created Medicare Part D prescription drug benefits among other improvements), new accounting rules that require employers to calculate and report future retiree benefit liabilities, and improved tax-sheltered vehicles such as HSAs and VEBAs.

In 2005 the U.S. Government Accountability Office summarized that private employers "have used various strategies to limit overall benefit cost growth, usually requiring retirees to pay more for coverage and thus contributing to an overall erosion in the value and availability of coverage. . . . For example, many plan sponsors have increased cost sharing through increased copayments, coinsurance, and premium shares; restricted eligibility for benefits based on retirement or hiring date; implemented financial caps or other limits on plan sponsors' contributions to coverage; and made changes to prescription drug benefits, such as creating tiered benefit structures and increasing retiree out-of-pocket contributions." The government report continues: "Of the 12 Fortune 500 plan sponsors we interviewed [in 2004-2005], 8 had implemented capped contributions or other limits on retiree health spending."

In 2006 alone, a third of large private employers increased retiree cost-sharing for pre-Medicare retirees, and 24% did so for Medicare retirees in a single year – according to a national survey of 502 private employers with more than 1000 workers that offer retiree medical benefits (Kaiser Family Foundation and Hewitt Associates).

Private sector trends in how retiree benefits are changing are similar across the country and across different industrial sectors and workforce structures. These national trends are not unique to geographic regions, or to particular private industries, or to whether workforces are unionized.

According to a 2011 survey of 248 employers (almost all of which are private) that provide retiree medical benefits (Towers Watson), 47% have changed their plan design for pre-Medicare retirees, and 37% have done so for Medicare retirees. Another 29% were considering making changes for both groups in 2012 or 2013.

According to a nationally representative survey in 2011 of 553 larger employers (more than 500 workers, mostly private sector) (Mercer), 36% have reduced or terminated pre-Medicare retiree medical benefits for active workers or current retirees, and 42% have done so for Medicare

CONFIDENTIAL

retiree benefits.   The parallel percentages in the Midwest were 30%/36%, and among manufacturing firms, 58%/58%.

The Patient Protection and Affordable Care Act of 2010 is expected to drive even more change in retiree medical benefits, due to the following new provisions: filling the "donut hole" in the Medicare Part D prescription drug benefits plan; the availability of subsidized individual coverage for people under 65 through the new insurance exchanges; taxing the federal subsidy that employers receive for providing drug benefits to Medicare retirees; and an excise tax on "Cadillac" high-cost plans.

According to a 2010 survey of 245 private companies that offer retiree medical benefits (Hewitt Associates), 61% were planning to reevaluate such benefits in the next year or two in response to health care reform, and 28% had already begun making or evaluating changes to their retiree medical benefits.   Of the 112 companies planning to alter their drug benefits for Medicare retirees, 35% favored changing to a defined contribution (fixed dollar) approach.   A defined contribution approach was also favored by about half of the companies planning to change their benefits for pre-Medicare retirees.

## B.       Current Availability of Retiree Health Insurance Benefits

According to the National Compensation Survey conducted in 2011 by the Bureau of Labor Statistics, 17% of pre-Medicare retirees, and 15% of Medicare retirees, have access to retiree medical benefits.   For manufacturing workers, these percentages were 24%/21% (for access to retiree medical benefits pre- and post-Medicare).   In the East North Central region, the percentages were 19%/18%.   For retirees from firms with 100 or more workers, 28%/25%.   For union workers, 41%/35%.   Differences between the national average and these subgroups are statistically significant.

According to U.S. Census data, in 2010 Medicare covered 93% of people over 65.   Among these, 57% also had some type of private insurance – about half from employers and half individually-purchased.   Ten percent of elderly Medicare members were also on Medicaid.   The remaining 33% of the elderly on Medicare had no supplemental coverage (but some portion of these are enrolled in Medicare Advantage plans that contain supplemental elements).

These national percentages are similar in Ohio.   In 2010, 94% of Ohioans 65 and older were covered by Medicare.   Of these, 58% also had private insurance -- 37% through an employer-based plan, and 21% purchased individually.   Six percent of elderly Ohioans on Medicare were also on Medicaid.   The remaining 36% had no supplemental coverage.

The portion of elderly people on Medicare with supplemental coverage varies moderately by household income.   Nationally, 41% of Medicare elderly in households with income less than $25,000 lacked any supplemental coverage in 2010.   A similar portion (42%) of this group had private insurance, of which 15% was employer-sponsored.   For elderly Medicare members in households with more than $25,000 income, 30% lacked any supplemental coverage.   Most of the remainder (64%) had private insurance, of which 35% was employer-based.

CONFIDENTIAL

According to a nationally representative survey in 2011 of 562 employers with 500 or more workers (Mercer), 39% of employers offered a health plan for pre-Medicare retirees, and 29% for Medicare retirees. However, a third of these firms required retirees to pay their entire premium cost to join the company plan. An additional 5-6% of employers provided a subsidy to assist retirees with purchasing their own health coverage, not sponsored by the employer.

According to a nationally representative survey in 2011 of 1,300 public and private employers with 200 or more workers (Kaiser Family Foundation and Health Research & Educational Trust), 26% of these larger firms offered medical benefits to retirees. This national percentage is similar to and statistically the same as the percentages in the Midwest (23%) and for manufacturing firms (19%), but higher than in firms with at least some union members (44%).

Among these larger firms with some retiree medical benefits, 29% offered those benefits only to early (non-Medicare) retirees, and not to Medicare retirees. This national percentage is similar to and statistically the same as the percentages in the Midwest (28%) and for manufacturing firms (22%).

## C.    Levels of Retiree Health Insurance Benefits

Mercer, the world's largest human resources consulting firm, conducts an annual survey of employee benefits that is nationally representative (random, stratified sample weighted for various characteristics based on national and regional averages). About 2000 firms are surveyed, 96% of which are in the private sector. About a quarter of the firms are in the Midwest, and about a quarter are manufacturing firms. In 2011, the survey included 562 larger firms (with 500 or more workers) that offer pre-Medicare retiree medical benefits, and 417 firms that offer Medicare retiree benefits. Among these larger employers with retiree medical benefits, the 2011 survey reported:

- 21% include high-deductible plans in their offerings to pre-Medicare retirees

- For single coverage, 84% require workers to pay some or all of the cost of pre-Medicare coverage, and 82% require this for Medicare retirees. For manufacturing firms, 93% require both types of retirees to contribute to the premium cost.

- In the approximately 175 plans where employers and workers share the cost of retiree health coverage, the workers contribute an average of 36% of the pre-Medicare premium cost, and 38% of the Medicare premium, for single coverage. In 2011, this amounted to $372 and $228 per month, respectively. The percentages for dependent coverage are similar, amounting to monthly employee costs of $748 pre-Medicare and $456 Medicare-eligible.

- 24% of larger employers cap their contribution to retiree medical coverage, and 32% of manufacturing firms do so.

- Unless noted otherwise, national percentages and averages are similar to those in the Midwest region, and in the manufacturing sector.

**CONFIDENTIAL**

Based on a nationally representative government survey of 23,620 employers in 2006, those that provided retiree medical benefits paid only 39% on average of the premium cost for pre-Medicare retirees, and 53% on average of the premium cost for Medicare retirees (Zawacki 2009).

Based on a government survey of 1,772 manufacturing firms nationally, in 1999 the 408 firms that offered medical benefits to retirees paid 48% of the premium cost for single coverage and 48% of the premium for family coverage (Zawicki 2003).

Based on a nationally representative government survey of 25,735 employers, in 2003 employers with retiree medical benefits paid the following amounts on average for each retiree for the entire year (Zawacki 2006):

- for single coverage:
  - $207 by manufacturing and mining companies
  - $196 by unionized companies
  - $189 for companies in the Midwest
  - $181 for companies in the Northeast

- for family coverage
  - $418 by manufacturing and mining companies
  - $484 by unionized companies
  - $456 for companies in the Midwest
  - $427 for companies in the Northeast

In 2012, the average monthly cost for Medicare Part D prescription drug coverage is about $30.

In 2012, the average enrollee in a Medicare Advantage plan pays a monthly premium of $32, down from $44 in 2010. Over half (56 %) are in plans with no premiums. The remaining 44% of Medicare Advantage enrollees pay a monthly average of $80, in 2012.

According to a 2011 national survey of 248 employers (almost all of which are private) that provide retiree medical benefits (Towers Watson), 46% of those that subsidize these benefits have set a cap on the subsidy, including 40% whose caps apply to legacy retirees as well as current workers. A third of the surveyed employers offer high-deductible health plans with health savings accounts for pre-Medicare retirees, and another 20% were considering doing so in the next two years.

A 2012 national survey of 512 employers with more than 1000 workers (95% of which are private and 24% of which are manufacturers) reported that 59% of those that subsidize retiree health insurance have placed a cap on how much they will pay for pre-Medicare retirees, and 48% cap their subsidies for Medicare retirees (Towers Watson/National Business Group on Health). Fifteen percent of these large employers with Medicare retiree benefits have converted their subsidy to a retiree health account.

A 2006 national survey of 502 private employers with more than 1000 workers that offer retiree medical benefits reported that 46% cap their contribution for pre-Medicare retirees and 50% do

CONFIDENTIAL

so for Medicare retirees (Kaiser Family Foundation and Hewitt Associates). Both groups of new retirees contributed an average of 41% of the total premiums.

In a random national survey of 670 public and private employers that offered retiree medical benefits in 2007, the out-of-pocket limits for Medicare retirees were $3000 or more for 56% of the employers, and the limit was $5000 or more for 19% of employers (Gabel et al.).

In 2012, about half of all Medicare Advantage enrollees were in plans with out-of-pocket limits of $3400 or less for in-network services. The other half were in plans with limits up to $6,700.

The IBEW and the National Electrical Contractors Association (NECA) have established a welfare benefits trust fund that offers medical benefits for retirees. Several dozen IBEW Locals subscribe to one or more of the seven IBEW/NECA plan options. In 2012, the annual deductibles for in-network single coverage in these plans range from $200 to $1000. The annual out-of-pocket maximums in these plans, including deductibles, range from $1850 to $4000 – for single coverage in-network.

I conducted an internet search for summary plan descriptions of retiree medical benefits offered by, or covering, IBEW Locals across the country, and reviewed the first dozen plans I was able to locate dated 2008 or later (the past five years). Their out-of-pocket annual maximums (including deductibles) for single in-network coverage ranged from $1200 to $5000. These out-of-pocket maximums were $2500 or higher in 5 of the 16 coverage options offered by these dozen IBEW trusts and employers.

## V.    FACTS AND DATA REVIEWED IN FORMING OPINIONS AND ANCILLARY OPINIONS

In preparing this report, I conducted literature and internet searches for credible sources of information related to these issues, and I reviewed and synthesized the reports, articles, surveys and data that I located. These sources include:

Bohn, K., Petertil, J. P., & Yamamoto, D. H. (2010). *2010 Retiree group benefits boot camp,* Society of Actuaries

Born, P. H. & Zawacki, A. M. (2003). *Manufacturing firms' decisions regarding retiree health insurance* Center for Economic Studies, http://www2.census.gov/ces/wp/2003/CES-WP-03-14.pdf.

Born, P. H. & Zawacki, A. M. (2006). Manufacturing firms' decisions regarding retiree health insurance. *Benefits Q., 22,* 34-44.

Buchmueller, T., Johnson, R. W., & Lo Sasso, A. T. (2006). Trends in retiree health insurance, 1997-2003. *Health.Aff.(Millwood.), 25,* 1507-1516.

Bureau of Labor Statistics U.S. Department of Labor (2012). *Employee benefits in the United States - March 2012,* http://www.bls.gov/news.release/pdf/ebs2.pdf.

CONFIDENTIAL

Cancelosi, S. E. (2011). The bell is tolling: retiree health benefits post-health reform. *The Elder Law Jounral, 19,* 1-53.

Costello, A. (2010). *Part D employer retiree drug subsidy: inception, implementation and issues* International Society of Certified Employee Benefit Specialists, http://www.iscebs.org/Resources/BQ/Pages/BQExecutiveSummaries2010.aspx.

Diamond, F. (2010). Can defined contribution rescue retiree coverage? *Manag.Care, 19,* 50-52.

Fronstin, P. (2005). *The impact of the erosion of retiree health benefits on workers and retirees.* Employee Benefit Research Institute, http://www.ebri.org/pdf/briefspdf/0305ib.pdf.

Gabel, J., Whitmore, H., & Pickreign, J. (2008). *Survey of retiree health benefits, 2007: a chartbook.* The Commonwealth Fund, http://www.commonwealthfund.org/usr_doc/Gabel_surveyretireehltbenef2007_1171_cha rtpack.pdf?section=4039.

Grudzien, L. (2006). The great vanishing benefit, employer provided retiree medical benefits: the problem and possible solutions. *The John Marshall Law Review, 39,* 785-825.

Hewitt Associates (2010). *Employers' initial reaction to health care reform: retiree strategy survey,* http://www.aon.com/attachments/Employers_Initial_Reaction_to_HC_SC.pdf.

Kaiser Family Foundation (2011). *Medicare Part D data spotlight: a first look at Part D plan offerings in 2012,* http://www.kff.org/medicare/upload/8126.pdf.

Kaiser Family Foundation (2012). *Medicare advantage 2012 data spotlight,* http://www.kff.org/medicare/upload/8323.pdf.

Kaiser Family Foundation and Health Research & Educational Trust (2011). *Employer health benefits 2011 summary of findings,* http://ehbs.kff.org/pdf/8226.pdf.

Kaiser Family Foundation and Hewitt Associates (2005). *Prospects for retiree health benefits as Medicare prescription drug coverage begins: findings from the Kaiser/Hewitt 2005 survey on retiree health benefits,* http://www.kff.org/medicare/upload/7439.pdf.

Kaiser Family Foundation and Hewitt Associates (2006). *Retiree health benefits examined: findings from the Kaiser/Hewitt 2006 survey on retiree health benefits,* http://www.kff.org/medicare/upload/7587.pdf.

Medicare Payment Advisory Commission (2011). *A data book: health care spending and the Medicare program,* http://www.medpac.gov/documents/Jun11DataBookEntireReport.pdf.

**CONFIDENTIAL**

Mercer (2011). *National survey of employer-sponsored health plans: 2011 survey report*.

Rappaport, A. M., Wojcik, S., & Baxter, M. (2011). *The impact of health care reform on older workers, retirees and employers.* International Society of Certified Employee Benefit Specialists, http://www.iscebs.org/Resources/BQ/Pages/BQExecutiveSummaries2011.aspx.

Society of Actuaries (2007). *Key findings and issues: health and long-term care risks in retirement,* http://www.soa.org/search.aspx?go=True&q=2007+survey+report&page=1&pagesize=1 0&or=True.

Solis, H. L. & Hall, K. (2011). *National compensation survey: employee benefits in the United States, March 2011.* U.S. Bureau of Labor Statistics, http://www.bls.gov/ebs/benefits/2011/ebbl0048.pdf.

Sperling, K. L. & Shapira, O. R. (2011). *Here it comes: defined contribution health care.* International Society of Certified Employee Benefit Specialists, http://www.iscebs.org/Resources/BQ/Pages/BQExecutiveSummaries2011.aspx.

Towers Watson (2011). *Health care changes ahead survey report,* http://www.towerswatson.com/assets/pdf/5622/TW-survey-report_HC-Changes-Ahead_101411.pdf.

Towers Watson/International Society of Certified Employee Benefit Specialists (2012). *Redefining retiree medical strategy: employer actions in a post-reform environment,* http://www.towerswatson.com/assets/pdf/4634/Towers-Watson-ICEBS-2011.pdf.

Towers Watson/National Business Group on Health (2012). *Performance in an era of uncertainty,* http://www.towerswatson.com/assets/pdf/6556/Towers-Watson-NBGH-2012.pdf.

U.S. Census Bureau, Current Population Survey, *2011 Annual Social and Economic Supplement,* http://www.census.gov/cps/data/.

U.S. Government Accountability Office (2005). *Retiree health benefits: options for employment-based prescription drug benefits under the Medicare modernization act,* http://www.gao.gov/new.items/d05205.pdf.

U.S. Government Accountability Office (2007). *Employer-sponsored health and retirement benefits: efforts to control employer costs and the implications for workers,* http://www.gao.gov/assets/260/258406.pdf.

Weller, C. E., Wenger, J., & Gould, E. (2004). *Health insurance coverage in retirement: the erosion of retiree income security.* Economic Policy Institute.

Wiatrowski, W. J. (2003). *Retiree health care benefits: data collection issues.* Bureau of Labor Statistics, http://www.bls.gov/opub/cwc/cm20030711ar01p1.htm.

CONFIDENTIAL

Zawacki, A. (2006). *Using the MEPS-IC to study retiree health insurance.* Center for Economic Studies, http://www2.census.gov/ces/wp/2006/CES-WP-06-13.pdf.

Zawacki, A. M., Eibner, C., & Zimmerman, E. M. (2009). Older workers' access to employer-sponsored retiree health insurance, 2000-2006. *Journal of Labor Research, 30,* 350-364.

In addition to the sources identified above, attached to this Report as Exhibit B are additional documents that I reviewed to summarize and support my opinion and ancillary opinions.  I have not yet prepared the Exhibits that I may use to summarize or support my opinions at trial.  I will provide these Exhibits in a supplemental report.

## VI.    **PRIOR EXPERT TESTIMONY**

I have never testified in any case as an expert at trial or by deposition.

## VII.   **COMPENSATION TO BE PAID FOR STUDY AND TESTIMONY**

As compensation for my services rendered to Whirlpool, I am being paid the following:

- Four hundred dollars ($400.00) per hour for all research and preparation of this Report.

- Two hundred dollars ($200.00) per hour for any travel associated with my services to Whirlpool.

- Eight hundred dollars ($800.00) per hour for any expert testimony provided at trial.

**CONFIDENTIAL**

**Signature**

I declare, under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.


Signed this 1st day of August, 2012

*Mark A. Hall*

Mark Hall

# EXHIBIT A

# Mark A. Hall

**ADDRESS:**   Wake Forest University
School of Law and School of Medicine
Winston-Salem, NC  27109-7206
336/758-4476  FAX 336/758-4496  E-mail hallma@wfu.edu

**EDUCATION:**

University of Chicago Law School - J.D. 1981
- Graduated with highest honors and Order of the Coif.
- Associate Editor, University of Chicago Law Review.
- Awarded Jerome N. Frank Prize for second student article.

Johns Hopkins School of Public Health, Robert Wood Johnson Health Finance Fellowship, 1991-92.

**EMPLOYMENT:**

Fred D. and Elizabeth L. Turnage Professor of Law and Public Health, Wake Forest University School of Law and School of Medicine, and Associate in Management, Babcock School of Management.  I've been at Wake Forest since 1993.  My primary research and teaching interests are in health care law and public policy, and health insurance regulation.  I have also taught courses on contracts, torts, administrative, insurance, and nonprofit law. See the last two pages for more information.

Founding Director, Center for Bioethics, Health & Society, and co-director, the Masters degree program in Bioethics, Wake Forest University, 2009-present.

Visiting Researcher, University of Melbourne, April 2011.

Visiting Scholar, Univ. British Columbia Faculty of Law, April 2009.

Visiting Research Scholar, Duke University Law School, Spring 2001.

Visiting Professor, University of Houston, January 1999.

Visiting Professor, University of Pennsylvania, Spring 1998.

Distinguished Health Law Scholar in Residence, Seton Hall Law School, Nov. 1995.

Visiting Professor, Univ. North Carolina, Chapel Hill, Summer 1990

Visiting Scholar, Vermont Law School, summers of 1986, 1988, 1989, 1991.

Professor of Law, Arizona State Univ., 1989 to 1993; Assoc. Prof., 1985 to 1989.

Research Fellow, Health Insurance Association of America, Jan. 1991 - Aug. 1991.

Associate, Bondurant Mixson & Elmore, Atlanta 1982-1985.  I practiced hospital law and

1

was active in pro bono work for the ACLU and for death row inmates.

Law clerk, Hon. John C. Godbold, Chief Judge, 11th and 5th Circuits Court of Appeals, 1981-82.

## PROFESSIONAL AWARDS AND ACTIVITIES:

Established Investigator in Clinical Sciences Award, Wake Forest Univ., 2012.

Fellow, Hastings Center, 2010 – present

Member, Advisory Board to Dept. Health & Human Services on Consumer-Owned Health Insurance Co-Ops, 2011-2012.

Distinguished Health Law Teacher's Award, Am. Society of Law, Medicine and Ethics, 2009

Advisory Task Force on Implementing Health Insurance Exchanges, North Carolina, 2010-2011

Investigator in Health Policy Research, Robert Wood Johnson Foundation, 2005-2008

Member, American Law Institute, 2005 - present.

Board of Editors, *Journal of Health Politics Policy and Law*, 2005 - present.

Editorial Board, *Milbank Quarterly,* 2001-present

Editorial Advisory Board, *Health Care Law & Policy* (SSRN journal)

Co-Director and Founder, Master of Arts in Bioethics Program, Wake Forest University President, Law & Medicine Section of the American Assoc. of Law Schools, 1993.

Editor-in-Chief, *Jurimetrics Journal of Law, Science and Technology*, 1989-1991.

Member:  American Society of Law, Medicine and Ethics; AcademyHealth (formerly Association for Health Services Research); American Health Lawyers Association.

Member, Board of Visitors, Middle Tennessee State University Honors College, 2007-present.

Manuscript or Proposal Reviewer for:  Aspen Publishers; Duke Univ. Press; Harvard Univ. Press; Oxford Univ. Press; Jossey-Bass Press; Am. J. Pub. Health; Health Affairs; Health Services Research; Inquiry; JAMA; J. Health & Social Behavior; Medical Care; Milbank Q.; New England Journal of Medicine, Journal of Health Politics, Policy and Law; Health Affairs; Jurimetrics; Am. J. Hum. Genetics; J. L. Med. & Ethics; Annals of Health Law; Institute of Medicine; National Institutes of Health; Robert Wood Johnson Foundation;

2

**Mark A. Hall**

AcademyHealth HSR Impacts Award; J. Health & Social Behavior; Social Science & Medicine.

## RESEARCH INTERESTS:

I work at the intersection of health law and public policy, with a focus on economic, regulatory, and institutional issues. At present, my major projects include:

Health Insurance Markets and Regulation. Since 1990, I have investigated the effects of a host of regulatory and public policy responses to structural changes occurring in the health insurance market. Recent studies include health insurance exchanges, public reinsurance, and risk adjustment.

Safety-Net Access for the Uninsured. Despite comprehensive insurance reforms, tens of millions will remain uninsured. This project explores the cost, adequacy and public policy of providing the uninsured direct access to care through safety-net programs and providers.

Consumer-Driven Health Care. I am reassessing the fundamentals of health care law and ethics from the perspective of patients paying for much or all of the costs of care out of pocket, rather than through insurance. Focal issues include informed consent, medical malpractice, insurance coverage denials, and medical ethics.

## PUBLICATIONS:

**Books**
THE HEALTH CARE SAFETY NET IN A POST-REFORM WORLD. first editor with Sara Rosenbaum (Rutgers Univ. Press, forthcoming 2012).

HEALTH CARE LAW AND ETHICS IN A NUTSHELL, with I.M. Ellman & D. Orentlicher (3rd ed.) (West 2011).

HEALTH CARE LAW AND ETHICS (7th ed., 2007) (Aspen), with M. Bobinski, & D. Orentlicher. I am the lead author for this casebook, which is the oldest in the field.

MEDICAL LIABILITY AND TREATMENT RELATIONSHIPS (2nd ed., Aspen 2008), with M. Bobinski, & D. Orentlicher (softbound edition based on *Health Care Law and Ethics*).

BIOETHICS AND PUBLIC HEALTH LAW (2nd ed., Aspen 2008), with D. Orentlicher & M. Bobinski (softbound edition based on *Health Care Law and Ethics*).

THE LAW OF HEALTH CARE FINANCE AND ORGANIZATION (2nd ed., Aspen 2008), with M. Bobinski, & D. Orentlicher (softbound edition based on *Health Care Law and Ethics*).

MEDICAL LIABILITY AND TREATMENT RELATIONSHIPS (Aspen 2005), with M. Bobinski, & D. Orentlicher (softbound edition based on *Health Care Law and Ethics*).

3

**Mark A. Hall**

BIOETHICS AND PUBLIC HEALTH LAW (Aspen 2005), with M. Bobinski, & D. Orentlicher (softbound edition based on *Health Care Law and Ethics*).

THE LAW OF HEALTH CARE FINANCE AND ORGANIZATION (Aspen 2005), with M. Bobinski, & D. Orentlicher (softbound edition based on *Health Care Law and Ethics*).

HEALTH CARE LAW AND ETHICS (6th ed., 2003) (Aspen), with M. Bobinski, & D. Orentlicher.

HEALTH CARE LAW AND ETHICS IN A NUTSHELL, with I.M. Ellman & D. Strouse (2nd ed.) (West 1999) (Japanese translation published by Prof. Kunihiko Yoshida, School of Law, Hokkaido University).

HEALTH CARE LAW AND ETHICS (5th ed., 1998) (Aspen), with Wm. Curran (deceased), M. Bobinski, & D. Orentlicher.  Reviewed in *J. Leg. Med.*

MAKING MEDICAL SPENDING DECISIONS  (Oxford Univ. Press, 1997).  Reviewed in *U. Mich. Law Rev.* and *J. Health Politics, Policy & Law*.

HEALTH CARE CORPORATE LAW: MANAGED CARE (Aspen 1996) with Wm. Brewbaker.

HEALTH CARE CORPORATE LAW: FACILITIES AND TRANSACTIONS (Aspen 1996), with Wm. Brewbaker.

THE CHARITABLE TAX EXEMPTION  (Westview Press 1995), with John C. Colombo. Reviewed in *Exempt Org. Rev.*

REFORMING PRIVATE HEALTH INSURANCE (American Enterprise Institute 1994), *excerpted in* K. Wing, et al. eds., *The Law and American Health Care* 1153-59 (1998) (Foundation Press casebook).

HEALTH CARE CORPORATE LAW: FINANCING AND LIABILITY (Aspen 1994).

HEALTH CARE CORPORATE LAW: FORMATION AND REGULATION (Aspen 1993).

HEALTH CARE LAW, FORENSIC SCIENCE, AND PUBLIC POLICY, with Wm. J. Curran & D.H Kaye (Little, Brown, 4th ed. 1991).

HEALTH CARE LAW AND ETHICS IN A NUTSHELL, with I.M. Ellman (West 1989).

Teachers' Manuals (ten in all) for HEALTH CARE LAW AND ETHICS casebook series  (Aspen, 1991, 1998, 2003, 2005, 2008)

**Law and Public Policy Articles and Chapters**   (first or sole authored unless noted otherwise)

**Mark A. Hall**

Constitutional Mortality: Precedential Effects of Striking the Individual Mandate, forthcoming, L. & Contemp. Prob. (2012).

Regulating Stop-Loss Coverage May be Needed to Deter Self-Insuring Small Employers from Undermining Market Reforms, 31 Health Aff. 316-323 (Feb. 2012).

Commerce Clause Challenges to Health Care Reform, 159 U. Penn. L. Rev. 1825-1872 (2011), http://www.pennumbra.com/issues/pdfs/159-6/Hall.pdf .

The Factual Bases for Constitutional Challenges to Federal Health Insurance Reform, 38 No. Ky. L. Rev. 457 (2011)

Getting to Universal Coverage with Better Safety-Net Programs for the Uninsured, 36 J. Health Politics Pol'y & L. 521-26 (2011).

Risk Adjustment Under the Affordable Care Act: Issues and Options, 20 Kan. J. L. & Pub. Pol'y 222-36 (2011).

Individual Versus State Constitutional Rights Under Health Care Reform, 42 Ariz. St. L. J. 1233-43 (2011).

Approaching Universal Coverage with Better Safety Net Programs for the Uninsured, 11 Yale J. Health Policy, Law & Ethics 9-19 (2011).

Constitutional Challenges to Compulsory Insurance:  A Guide through the Gauntlet.  41(2) Hastings Center Rep.  14-15 (March 2011).

The Sausage-making of Insurance Reform, 41(1) Hastings Center Rep. 9-10 (Jan. 2011).

Rethinking Safety-Net Access For The Uninsured, 364 New Eng. J. Med. 7 (2011).

Health Care Reform--What Went Wrong On The Way To The Courthouse, 364 New Eng. J. Med. 295 (2011).

Paying for Individual Health Insurance Through Tax-Sheltered Cafeteria Plans.  47 Inquiry 252-61 (2010), first author with Amy B. Monahan.

Clearing Out the Underbrush in Constitutional Challenges to Health Insurance Reform.  364 New Eng. J. Med. 793 (2011), http://www.nejm.org/doi/full/10.1056/NEJMp1101252 .

Legal Methods, in J. Sugarman & D. Sulmasy, eds., Methods in Medical Ethics (2d ed. 2010), with Nancy King.

Government-Sponsored Reinsurance, 19 Ann. Health L. 465-78 (2010).

**Mark A. Hall**

Lessons from Credit Bureaus for Improving the Market for Electronic Medical Records, 44(3) J. Consumer Aff. 546-556 (2010), second author with Craig Richardson & Zagros Madjd-Dadjadi.

Biobanking, Consent, and Commercialization in International Genetics Research: The Type 1 Diabetes Genetics Consortium (T1DGC), 7 Clinical Trials S33-S45 (2010), with Nancy M.P. King, Letitia H. Perdue, et al.

Quality Regulation in the Information Age: Challenges for Medical Professionalism, in *Medical Professionalism in the New Information Age* (2010), second author with Kristin Madison.

The Three Types of Reinsurance Created By Federal Health Reform. 29 (6) Health Aff. 1168-1172 (2010).

Property, Privacy, and the Pursuit of Integrated Electronic Medical Records, *in* The Fragmentation of U.S. Health Care: Causes and Solutions, E. Elhauge ed. (2010).

Property, Privacy, and the Pursuit of Integrated Electronic Medical Records, 95 Iowa L. Rev., 95 Iowa L. Rev. 631 (2010), http://www.uiowa.edu/~ilr/issues/ILR_95-2_Hall.pdf

After Insurance Reform: An Adequate Safety Net Can Bring Us to Universal Coverage. 39 (6) Hastings Center Rep. 9-10 (Nov. 2009).

The Constitutionality of Mandates to Purchase Health Insurance, 37 J. L. Med. Ethics 38-50 (2009), available at http://ssrn.com/abstract=1334955.

When Patients Say No (To Save Money): An Essay on the Tectonics of Health Law. 41 Conn. L. Rev. 743-80 (2009), with **Error! Reference source not found.**. http://works.bepress.com/mark_hall/2/

The Patient Life: Can Consumers Direct Health Care? 35 Am. J. L. & Med. 7-65 (2009), 2nd author with **Error! Reference source not found.**. http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1099054

The Legal and Historical Foundations of Patients as Medical Consumers, 96 *Georgetown L. J.* 583-597 (2008). http://www.georgetownlawjournal.org/issues/pdf/96-2/Hall.PDF . Reprinted in Asifa Begum, *Medical Treatment and Law* (Icfai University Press, India) (2010).

Patients as Consumers: Courts, Contracts, and the New Medical Marketplace, 106 *Mich. L. Rev.* 643-690 (2008), with Carl E. Schneider. http://www.michiganlawreview.org/archive/106/4/hallschneider.pdf

Systematic Content Analysis of Judicial Opinions, 96 *Cal. L. Rev.* 63-122 (2008), with

**Mark A. Hall**

Ronald F. Wright, http://papers.ssrn.com/sol3/papers.cfm?abstract_id=913336

Paying For What You Get And Getting What You Pay For: Legal Responses To Consumer-Driven Health Care, 69(4) *Law & Contemp. Prob.* 159 (Autumn 2006).

Rethinking Professional Ethics In The Cost-Sharing Era, 6(4) *Am. J. Bioethics* W17-W22 (2006), second author with G. Caleb Alexander & John Lantos.

Researching medical trust in the United States, 20 *J. Health Organization Mgt.* 456-467 (2006).

Rethinking Health Law, 41 *Wake Forest L. Rev.* 341 (2006), with Carl Schneider and Lois Shepherd.

The History and Future of Health Care Law: An Essentialist View, 41 *Wake Forest L. Rev.* 347 (2006).

Insurance and Genetic Discrimination, in Neil F. Sharpe & Ronald F. Carter, eds. *Genetic Testing: Care, Consent, and Liability* 156-162 (Wiley-Liss, New York, 2005).

The Role of State Regulation in Consumer-Driven Health Care, 31 *Am. J. L. & Med.* 395-418 (2005), with Timothy S. Jost, *reprinted in* Furrow et al., *Health Law: Cases, Materials and Problems* (6th ed. 2008) .

Reviving Managed Care with Health Savings Accounts, 24(6) *Health Affairs* 1490-1500 (Nov/Dec 2005), with Clark C. Havighurst.

The "Death" of Managed Care: A Regulatory Autopsy, 30 J. *Health Politics Policy & Law* 427-452 (2005).

Can You Trust a Doctor You Can't Sue?, 54(2) *Depaul L. J.* 303-13 (2005).

A Corporate Ethic of "Care" in Health Care, 3 *Seattle J. Soc. Justice* 417 (2004).

Where Is The "There" In Health Law? Can It Become A Coherent Field? 14 *Health Matrix* 101-5 (2004), with Carl Schneider.

Measuring Patients' Trust In Physicians When Assessing Quality Of Care, 23(4) *Health Affairs* 124-132 (July 2004), with David Thom and Gregory Pawlson.

Caring, Curing and Trust: A Response to Gatter, 39 *Wake Forest L. Rev.* 447 (2004).

State Regulation of Medical Necessity: The Case of Weight-Reduction Surgery, 53 *Duke L. J.* 653-672 (2003).

The Impact of Blue Cross Conversions on Accessibility, Affordability, and The Public

**Mark A. Hall**

Interest, 81 *Milbank Q.* 509-42 (2003), with Chris Conover.

The Scope and Limits of Public Health Law, 46 *Perspect. Biology Med.* S199-S209 (2003).

Ideology and Trust:  A Reply to Bloche, 55 *Stanford L. Rev.* 955-967 (2003).

The Management of Conflict Over Health Insurance Coverage, with G.F. Anderson, in *The Privatization of Health Care Reform* (M. Gregg Bloche ed., Oxford University Press 2003).

What If You Could Sue Your HMO? Managed Care Liability Beyond the ERISA Shield, 47 *St. L. U. L. J.* 235-98 (2003), with Gail B. Agrawal.

Trust, Law & Medicine, 55 *Stanford L. Rev.* 463-527 (2002), *reprinted in* 9 *J. Nursing Law* 33 (2003).

Discrimination in Insurance: Experience in the United States, in *Encyclopedia of the Human Genome* (2003).

The Ethics and Empirics of Trust, in Wm. Bondeson & James Jones, eds., *The Ethics of Managed Care: Professional Integrity and Patient Rights* (Kluwer, 2002).

Market Failures and the Evolution of State Regulation of Managed Care, 65 *L. & Contemp. Prob.* 169 (Autumn 2002), with Frank A. Sloan.

The Theory and Practice of Disclosing HMO Physician Incentives, 65 *L. & Contemp. Prob.* 207 (Autumn 2002).

Of Magic Wands and Kaleidoscopes: Fixing Problems in the Individual Market, 21(6) *Health Aff.* 12 (Nov. 2002).

Measuring Medical Practice Patterns, 37 *Wake Forest L. Rev.* 779 (2002), with R. Anderson, et al.

HIPAA's Small-Group Access Laws: Win, Loss or Draw?  22 *Cato J.* 71 (2002).

Genetic Enhancement, Distributive Justice, and the Goals of Medicine, 39 *San Diego L. Rev.* 669-682 (2002).

How Disclosing HMO Physician Incentives Affects Trust, 21(2) *Health Aff.* 197 (March 2002).

Two Cheers for Employment-Based Health Insurance, 2 *Yale J. Health Pol'y L. & Ethics* 23-57 (2002), with David A. Hyman.

Arrow on Trust, 26 *J. Health Politics Pol'y & L.* 1131 (2001).

**Mark A. Hall**

Trust in Physicians and Medical Institutions: What is it, Can it be Measured, and Does it Matter?, 79 *Milbank Q.* 613 (2001), with Elizabeth Dugan, Beiyao Zheng, & Aneil Mishra.

Reinsurance Pools for Small-Group Health Insurance. *J. Ins. Reg.* Summer 2001 (with Janice Lawlor).

HIPCs, MEWAs, and Association Health Plans: A Guide for the Perplexed. *Health Aff.,* Jan. 2001 (with Elliot Wicks and Janice Lawlor).

The Structure and Enforcement of Health Insurance Rating Reform. 37 *Inquiry* 376-88 (2001).

Health Insurance Purchasing Cooperatives: Performance and Prospects. *Milbank Q.,* Dec. 2000 (with Elliot Wicks).

Disclosure of Physician Incentives: Do Practices Meet Purposes? 19 *Health Aff.,* 156 (July 2000).

Agents' Behavior under Health Insurance Market Reforms. 18 *J. Ins. Reg.* 341 (2000), with Craig Richardson. Winner of the Spence Kimball Jr. Prize for Best Article of the Year.

The Role of Independent Agents in the Success of Health Insurance Market Reforms. 78 *Milbank Q.* 23 (2000).

An Evaluation of New York's Health Insurance Reform Law. 25 *J. Health Politics Policy & Law* 71 (2000).

An Evaluation of Vermont's Health Insurance Reform Law. 25 *J. Health Politics Policy & Law* 101 (2000).

The Geography of Health Insurance Regulation: A Guide to Identifying, Exploiting, and Policing Market Boundaries. 19(2) *Health Affairs* 173 (2000).

Genetic Privacy Laws and Patients' Fear of Discrimination by Health Insurers: The View from Genetic Counselors, 28 *J.L. Med. & Ethics* 245, with Stephen Rich.

The Competitive Impact of Small Group Health Insurance Reform Laws. 32 *Univ. Michigan J. Law Reform* 685 (1999).

Legal Rules and Industry Norms: The Impact of Laws Restricting Health Insurers' Use of Genetic Information, 40 *Jurimetrics* 93 (1999), *reprinted in* Lori B. Andrews, et al., eds., *Genetics: Ethics, Law and Public Policy* (2002 and 2006) (West casebook).

State Strategies to Reduce the Growing Numbers of People without Health Insurance. 22(3) *Regulation* (1999), with Frank Sloan and Chris Conover.

9

**Mark A. Hall**

Restricting Insurers' Use of Genetic Information: a Guide to Public Policy.  3 *No. Am. Actuarial J.* 34 (1999).  Chosen for the James C.H. Anderson Memorial Award from the Actuarial Education and Research Fund.

Referral Practices under Capitation, in *Ethical Challenges in Managed Care: A Casebook* (K. Gervais, et al. eds. 1999).

Public Choice and Private Insurance, 1998 *Ill. L. Rev.* 501.

The Ethics of Managed Care, 28 *Cumb. L. Rev.* 287 (1998), with Rbt. A Berenson (lead article in a symposium, with four commentaries in response).

A Theory of Economic Informed Consent, 31 *Ga. L. Rev.* 511 (1997).

Insurers' Use of Genetic Information, 37 *Jurimetrics J.* 13 (1996).

Insurance Regulation of Providers that Bear Risk, 22 *Am. J. L. & Med.* 361-87 (1996), with Allison Overbay, *reprinted in* John H. Robinson, et al., eds., *A Health Law Reader: An Interdisciplinary Approach* (1999).

Judicial Protection of Managed Care Consumers: An Empirical Study of Insurance Coverage Disputes, 26 *Seton Hall L. Rev.* 1055-68 (1996), with T.R. Smith, M. Naughton & A. Ebbers.

Physician Rationing and Agency Cost Theory, in R. Spece, et al. eds., *Conflicts of Interest in Clinical Practice and Research* 228-50 (1996).

Liberal and Communitarian Ethics of Insurance Selection, in R. Misbin, et al. eds., *Health Care Crisis: The Search for Answers?* 94-111 (1995).

Rationing Health Care at the Bedside, 69 *NYU L. Rev.* 693-780 (1994), *reprinted in* Lars Noah, *Law, Medicine & Medical Technology* 994 (2d ed. 2007) (Foundation Press casebook).

The Problems with Rule-Based Rationing, 19 *J. Med. & Philo.* 315-32 (1994), *reprinted in* 17 *Int'l Bioethics & Phil. Med.* 623-31 (1996).

The Ethics of Health Care Rationing, 8 *Pub. Aff. Q.* 33-50 (1994).

Managed Competition and Integrated Health Care Delivery Systems, 29 *Wake Forest L. Rev.* 1-14 (1994).

Is Community Rating Essential to Managed Competition? (1994) (AEI Press).

The Role of Insurance Purchasing Cooperatives in Health Care Reform, 3 *Kan. J. L. Pub. Pol'y* 95-105 (1994).

10

**Mark A. Hall**

Redefining the Terms of Health Insurance to Accommodate Varying Consumer Risk Preferences, 20 *Am. J. L. & Med.* 187-201 (1994), with Ira M. Ellman.

Health Insurance: Community-Rating or Experience-Rating?, 2 *Responsive Comm'y* 79-82 (1994).

Informed Consent to Rationing Decisions. 71 *Milbank Q* 645-68 (1993).

Health Insurers' Assessment of Medical Necessity, with G.F. Anderson. 140 *U. Pa. L. Rev.* 1637-1712 (1992), *reprinted in* Rand E. Rosenblatt, et al., *Law and the American Health Care System* (1997) (Foundation Press casebook).

The Political Economics of Health Insurance Market Reform. 11 *Health Aff.* 108-124 (summer 1992).

The Adequacy of Hospital Reimbursement Under Medicaid's Boren Amendment, 13 *J. Leg. Med.* 205 (1992).

The Donative Theory of the Charitable Tax Exemption, with J.D. Colombo. 52 *Ohio St. L. J.* 1379-1476 (1992), *reprinted in* J. Fishman & S. Schwarz, *Nonprofit Organizations* 344 (2nd ed. 2000) (Foundation Press casebook), and in N. Cafardi & J. Cherry, *Tax Exempt Organizations: Cases and Materials* 97 (2d ed. 2008) (LexisNexis casebook).

The Future of Tax-Exemption for Non-Profit Hospitals and Other Health Care Providers, 2 *Health Matrix* 1 (1992), with John C. Colombo, *reprinted in* K. Wing, et al. eds., *The Law and American Health Care* 1153-59 (1998) (Aspen Press casebook).

The Charitable Status of Nonprofit Hospitals:  Towards a Donative Theory of Tax Exemption, with J.D. Colombo.  66 *U. Wash. L. Rev.* 340-41 (1991), *reprinted in*  J. Fishman & S. Schwarz, *Nonprofit Organizations* 367 (1995) (Foundation Press casebook).

The Defensive Effect of Medical Practice Policies in Malpractice Litigation, 54 *L. & Contemp. Prob.* 119-46 (Spring 1991).

Health Care Cost Containment and the Stratification of Malpractice Law, 30 *Jurimetrics J.* 501-08 (1990).

The Medical Malpractice Standard under Health Care Cost Containment, 17 *L. Med. & Health Care* 347-62 (1989).

Institutional Control of Physician Behavior: Legal Barriers to Health Care Cost Containment, 137 *U. Pa. L. Rev.* 431-536 (1988), *excerpts reprinted in* Janet L. Dolgin & Lois L. Shepherd, *Bioethics and the Law* (Aspen, 2005).

The Unlikely Case in Favor of Patient Dumping, 28 *Jurimetrics J.* 389-97 (1988).

**Mark A. Hall**

Making Sense of Referral Fee Statutes, 13 *J. Health Pol. Pol'y & L.* 623-32 (1988).

The Jurisdictional Nature of the Time to Appeal, 21 *U. Ga. L. Rev.* 299-427 (1986).

Rate Appeals under Medicare's New Prospective Payment System:  Reflections on the Meaning of 'Prospectivity,' 38 *U. Fla. L. Rev.* 407-47 (1986).

Hospital and Physician Disclosure of Patient Crimes, 62 *U. Det. L. Rev.* 145-182 (1985).

Intergovernmental Cooperation and the Transfer of Powers, *U. Ill. L. Rev.* 775 (1981).

Common Carriers under the Communications Act, 48 *U. Chi. L. Rev.* 409 (1981).

Lawful Domicile under ' 212(c) of the Immigration and Nationality Act, 47 *U. Chi. L. Rev.* 771 (1980).

**Medical and Science Journals (most are peer-reviewed)**

The Costs and Adequacy of Safety Net Access for the Uninsured in Genesee County, Michigan, 23 J. Health Care Pool & Underserved 327-338 (2012), first author with Linda Hamacher and James M. Johnson.

Not So Fast — Jurisdictional Barriers to the ACA Litigation, New Eng. J. Med., Oct. 5, 2011.   2nd author with Tim Jost.

Model Safety-Net Programs Could Care for the Uninsured at One-Half the Cost of Medicaid or Private Insurance, 20 Health Aff. 1698-1707 (Sept. 2011), first author with A.S. Jones & W. Hwang.

Access to Care Provided by Better Safety Net Systems for the Uninsured: Measuring and Conceptualizing Adequacy, 68 Med. Care Res. & Rev. 441-461 (Aug. 2011).

Using Payroll Deduction to Shelter Individual Health Insurance from Income Tax. 46 Health Serv Res. 348-64 (Nov. 2010), first author with Chris Hager and David Orentlicher.

The Mission of Safety Net Organizations Following National Insurance Reform. 26 J Gen Intern Med. 802 (2011).

Per Capita Payments in Clinical Trials: Reasonable Costs versus Bounty Hunting, 85 Acad. Med. 1554-56 (2010), first author with J. Friedman et al., http://www.ncbi.nlm.nih.gov/pubmed/20881671

Professional Obligations when Patients Pay Out of Pocket.  58 J. Fam. Prac. E1 (2009), with Carl Schneider.

**Mark A. Hall**

http://www.jfponline.com/Pages.asp?AID=8100&issue=November_2009&UID

Disclosure of Financial Relationships to Clinical Research Participants: Goals, Evidence, and Recommendations, 361 New Engl J Med 916-21 (2009). 2nd author, with Weinfurt KP, King NMP, et al., http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2765249/

Ownership of Medical Information, 301 JAMA 1282-4 (2009), with Kevin Schulman, http://www.ncbi.nlm.nih.gov/pubmed/19318657.

Toward a 21st Century Health Care System: Recommendations for Health Care Reform, 150 Ann Intern Med. 493-495 (2009), one of 20 group authors, http://www.annals.org/content/150/7/493.abstract.

Community Hospital Oversight of Clinical Investigators' Financial Relationships, 31 IRB: Ethics Hum Res. 7-13 (2009); 1st author, with K. Weinfurt, J. Lawlor, et al., http://www.thehastingscenter.org/Publications/IRB/Detail.aspx?id=3136

Learning From The Legal History Of Billing For Medical Fees, 23 *J Gen Intern Med* 1257 (2008), with Carl E. Schneider, http://www.ncbi.nlm.nih.gov/pubmed/18414955 .

The Professional Ethics of Billing and Collections, 300 JAMA 1806 (2008), with Carl E. Schneider, http://jama.ama-assn.org/cgi/content/extract/300/15/1806 .

Screening for Hemochromatosis and Iron Overload: Satisfaction with Results Notification and Understanding of Mailed Results in  Unaffected Participants of the HEIRS Study, 12 *Genet Test.* 491 (2008), 6th author, with Helen Harrison, Barbara Harrison, et al., http://www.ncbi.nlm.nih.gov/pubmed/18939938 .

Effects Of Disclosing Financial Interests On Participation In Medical Research: A Randomized Vignette Trial, 156 *Am Heart J.* 689 (2008), 2nd author with Kevin Weinfurt, Joelle Friedman, et al., http://www.ncbi.nlm.nih.gov/pubmed/18946893 .

Effects of Disclosing Financial Interests on Attitudes Toward Clinical Research, 23 *J. Gen. Intern. Med.* 860-66 (2008), 2nd author with Kevin P. Weinfurt, Joelle Y. Friedman, et al., http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2517900/ .

Developing Model Language for Disclosing Financial Interests to Potential  Clinical Research Participants, 29(1) *IRB Ethics & Human Research* 1-5 (Feb. 2007), 5th author with Kevin P. Weinfurt, Jennifer S. Allsbrook, et al., http://www.ncbi.nlm.nih.gov/pubmed/17364012

Effects of State Managed Care Patient Protection Laws on Physician Satisfaction, 64 *Med. Care Res. Rev.* 585-599 (2007), 3rd author with Frank Sloan and John Ratliff

Genetic Screening for Iron Overload: No Evidence of Discrimination at 1 Year. 56 *J. Fam. Prac.*  829 (2007), 1st author with James Barton, Paul Adams, et al.,

13

**Mark A. Hall**

http://www.ncbi.nlm.nih.gov/pubmed/17881622 .

Results Communication And Patient Education After Screening For Possible Hemochromatosis And Iron Overload, 9 *Genet Med.* 778-791 (2007), 3rd author with Ann P. AP, et al., http://www.ncbi.nlm.nih.gov/pubmed/18007147 .

Impact Of Hemochromatosis Screening In Patients With Indeterminate Results, 8 *Genet Med.* 681-7 (2006), 5th author with Roger T. Anderson, et al., http://www.ncbi.nlm.nih.gov/pubmed/17108759 .

Attitudes of African American and Low Socioeconomic Status White Women Toward Medical Research, 18 *J. Health Care Poor Underserved* 85-99 (2007), 4th author with Deborah Farmer, et al.

Measuring Trust in Medical Research, Medical Care, 44 *Medical Care* 1048-1053 (2006). 1st author with F. Camacho, Janice Lawlor, et at., http://www.ncbi.nlm.nih.gov/pubmed/17063137 .

Disclosing Conflicts of Interest in Research: Views of IRBs, Conflict of Interest Committees, and Investigators, 34 *J. Law Medicine & Ethics* 581 (2006), 5th author with Kevin P. Weinfurt, Joelle Y. Friedman, et al.

Views of Potential Research Participants on Financial Conflicts of Interest: Barriers and Opportunities for Effective Disclosure, 21 *J. Gen. Intern. Med.* 901 (2006), 5th author with Kevin P. Weinfurt, Joelle Y. Friedman, et al.

Policies of Academic Medical Centers for Disclosing Financial Conflicts of Interest to Potential Research Participants, 81 *Acad. Med.* 113-18 (Feb. 2006), 5th author with Kevin P. Weinfurt, Michaela A. Dinan, et al.

Employers' Liability Risk for Managed Care Injuries, 22(1) *Benefits Q.* 45-48 (Jan. 2006).

Privatization of Blue Cross Plans: Public Benefit or Public Harm? 27 *Annu. Rev. Public Health* 443-463 (2006), 1st author with Christopher Conover.

The Impact on Patient Trust of Legalizing Physician Aid in Dying. 31 *J. Med. Ethics* 693-697 (2005), 1st author with Felicia Trachtenberg and Elizabeth Dugan.

Patient Acceptability of Genotypic Testing for Hemochromatosis In Primary Care, 7 *Genetics in Medicine* 557-563 (2005), 3rd author with Roger T. Anderson, Nancy Press, Diane Tucker, et all.

Impacts of Managed Care Patient Protection Laws on Health Services Utilization and Patient Satisfaction with Care, 40 *Health Services Res.* 647-667 (June 2005), 3rd author with Frank Sloan & John Rattliff.

14

## Mark A. Hall

Health Insurers' Medical Necessity Determinations for Bariatric Surgery. 1(2) *Surg for Obesity Related Disorders* 86-90 (March 2005).

Concerns In A Primary Care Population About Genetic Discrimination By Insurers, 7(5) *Genetics in Med*. 311-16 (2005), 1st author with Jean E. McEwen, James C. Barton, et al.

How Patients' Trust Relates To Their Involvement In Medical Care, 54 *J. Fam. Pract*. 344-52 (2005), 2nd author with Felicia Trachtenberg & Elizabeth Dugan.

Liability Implications of Physician-Directed Care Coordination, *3 Ann. Fam. Med. 115-120 (2005),* 1st author with Ralph Peeples and Richard Lord.

How Patient-Physician Encounters In Critical Medical Situations Affect Trust: Results Of A National Survey, 4 *BMC Health Services Research* 24 (2004), 2nd author with Rahul A. Shenolikar & Rajesh Balkrishnan.

Do Employers Voluntarily Include Patient Protections in Self-Insured Health Plans? *Managed Care Interface,* Jan. 2005, pp. 76-80, 2nd author with Janice Lawlor.

Managed Care Patient Protection or Provider Protection? A Qualitative Assessment, 117 *Am. J. Med*. 932 (2004).

Balancing Commercial and Public Interests. 5(6) *Current Controlled Trials in Cardiovascular Medicine* 1 (2004), 2nd author with Curt Furberg & Mary Anne Sevick.

An Exploration of Patients' Trust in Physicians in Training. 15 *J. Health Care for the Poor and Underserved* 294-306 (2004), 4th author with Denise E. Bonds, et al.

Malpractice Litigation *Reform*: Empirical Approaches to Establishing the Legal Standard of Care, 19(5) *J. Medical Practice Mgt*. 279 (April 2004), 1st author with Michael D. Green.

The Impact and Enforcement of Prudent Layperson Laws, 43 *Ann Emerg. Med*. 558-66 (2004).

Effect of Language Immersion on Communication With Latino Patients, 64 *N.C. Med. J*. 258-62 (2003), 3rd author with Shari Barkin, et al.

Trust and Satisfaction with Physicians, Insurers, and the Medical Profession, 41 *Medical Care* 1058 (2003), 2nd author with Balkrishnan R., Dugan E., & Camacho F.T.

Trust in the Medical Profession: Conceptual and Measurement Issues, 37 *Health Serv. Res*. 1419-39 (Oct. 2002), 1st author with Fabian Camacho, Elizabeth Dugan, et al.

Measuring Patients' Trust in their Primary Care Providers, 59 *Med. Care Res. & Rev*. 293 (2002), 1st author with Beiyao Zheng, Elizabeth Dugan, et al.

15

**Mark A. Hall**

Capitation Payment, Length of Visit, and Preventive Services: Evidence from a National Sample of Outpatient Physicians, 8 *Am. J. Managed Care* 332-40 (April 2002), 2nd author with Rajesh Balkrishnan, Don Mehrabi, et al.

Do Patients Trust Their Doctors? Does it Matter? 62 *N.C. Med. J.*188-191 (2001). Patients' fear of genetic discrimination by health insurers: the impact of legal protections, 2 *Genetics in Medicine* 214-21 (2000), 1st author with Stephen Rich.

Laws Restricting Health Insurers' Use of Genetic Information: Impact on Genetic Discrimination. 66 *Am. J. Human Genetics* 293 (2000), 1st author with Stephen Rich.

The Impact of Health Insurance Market Reforms on Market Competition. 6 *Am. J. Managed Care* 57 (2000).

Ethical Practice in Managed Care: A Dose of Realism, 128 *Ann. Intern. Med.* 395 (1998), 1st author with Rbt. A. Berenson.

When Courts Review Medical Appropriateness, 36 *Medical Care* 1295 (1998), 2nd author with G.F. Anderson & T.R. Smith.

Medical Technology Assessment and Practice Guidelines: Their Day in Court, 2nd author with G.F. Anderson & E.P. Steinberg, 83 *Am. J. Pub. Health* 1635-39 (1993).

Reforming the Health Insurance Market for Small Businesses. 326 *New Eng. J. Med.* 565-70 (1992).

**Miscellaneous**

Supreme Court Amicus Brief on Behalf of 104 Health Law Professors in Support of the Affordable Care Act, Jan. 2012.

Using Empirical Research to Inform Research Ethics: The Conflict of Interest Notification Study (COINS), SoCRA Source, Aug. 2011, pp. 12-18, first author with J. Sugarman & K. Weinfurt.

Risk Adjustment Under the Affordable Care Act: A Guide for Federal and State Regulators, The Commonwealth Fund, May 2011, http://www.commonwealthfund.org/Content/Publications/Issue-Briefs/2011/May/Risk-Adjustment-Under-the-ACA.aspx

Who will be Uninsured after Health Insurance Reform? (March 2011), http://www.rwjf.org/coverage/product.jsp?id=71998, with M. Buettgens.

The Costs and Adequacy of Safety Net Access for the Uninsured in Six Communities (six in-depth case study reports) (June 2010).

16

## Mark A. Hall

Book Review of Patient, Health Thyself: How the New Medicine Puts the Patient in Charge, by Robert M. Veatch.  New Engl. J. Med. 359(26): 2851-52 (2008).

"47 Million & Counting: Why the Health Care Marketplace is Broken," Senate Finance Committee, June 2008.

Book Review, Health Care At Risk: A Critique of the Consumer-Driven Movement, by Timothy Jost, J. Health Pol. Pol'y & L. 845 (2008).

"A Tribute to Daniel Strouse," 48 Jurimetrics J. 125, 129 (2008).

"The HIPAA Headache," Hastings Center Report 5 (Jan 2008).

"Teaching DRG's: How and Why," Am. Health Lawyers Assoc. (2007).

"Did Regulation Kill Managed Care?", 3 (4) Law and Bioethics Report (Spring 2004).

Letter, "Evidence-Based Medicine on Trial," 291 JAMA 1697 (2004).

Book Review, Holding Health Care Accountable, by Haavi Morreim, 28 J. *Health Pol. Pol'y & L.* 556-560 (2003).

Assessment of Potential Impact on Accessibility and Affordability of Blue Cross & Blue Shield of North Carolina's Proposed Conversion to For-Profit Status, submitted to N.C. Commissioner of Insurance, 2002-2003, with Christopher J. Conover.

Symposium Introduction: Empirical Approaches to Establishing the Medical Standard of Care, 37 *Wake Forest L. Rev.* 663 (2002), with Michael D. Green.

Barriers to Small-Group Purchasing Cooperatives (March 2000), a research report done for the Economic and Social Research Institute, with Elliot K. Wicks and Jack A. Meyer.

Letter, "How Should Physicians Involve Patients in Medical Decisions?" 283 JAMA 2390 (2000), with Carl Schneider, *reprinted in* Marsha Garrison & Carl E. Schneider, *The Law of Bioethics: Individual Autonomy and Social Regulation* (2003).

When Genes are Decoded, Who Should See the Results?  New York Times, Feb. 29, 2000, at D7 (invited op-ed column).

Forward, "Genetics, Law and Public Policy," *Wake Forest L. Rev.*, 1999.

Letter, "Expanding Managed Care Liability," Health Affairs, 1999

Letter, "Exploring the Ethics of Clinical Role Conflicts," 282 JAMA 132 (1999)

17

**Mark A. Hall**

Book Review, U.S. Health Law and Policy: A Guide to the Current Literature, by Donald Caldwell, Jr., 20 *J. Leg. Med.* 435-39 (1999).

Character of Guidelines Evolves, Concern Lingers Over Protection, 13(4) *Medical Malpractice Law & Strategy* 1-4 (1996), with D.S. Dadakis.

Managed Competition Meets Tax-Neutrality, 14(2) *Health Aff* 274 (1995).

Letter to the Editor, *Ann. Intern. Med.* 1996 (regarding health care rationing).

Letter to the Editor, *New Eng. J. Med.* 1995 (regarding outcomes research).

Book review, *J. Health Pol. Pol'y & Law* 1995 (regarding Medicaid fraud).
Letter to the Editor, 11 *Issues in Science and Technology* 18 (1995) (regarding organ procurement).

Futility policies and the law. 56 *NC Med J* 450 (1995).

Medical Liberalism's past and Future.  Review Of: E.J. Emanuel, *The Ends of Human Life: Medical Ethics in a Liberal Polity*, 34 *Jurimetrics J* 235 (1994), with Kader D, Karjala D, et al.

Health Policy and the Courts.  *Health Affairs* 1993 (Spring); 230 (letter).

Book review of M. Siegler et al., *Medical Innovation and Bad Outcomes*. 28 *Jurimetrics J.* 247-52 (1988).

Book review of P. Danzon, *Medical Malpractice: Theory, Evidence, and Public Policy*, 26 *Jurimetrics J* 203 (1986).

Introduction to: Diana S. Greene, *79 Ways to Calm a Crying Baby* (1988).


**SELECTED TALKS AND CONFERENCES:**

Debater, "The Constitutionality of Health Care Reform," Federalist Society, Winston-Salem NC, Feb. 2012

Panel Organizer and Speaker, "Constitutional Challenges to Health Care Reform: What to Expect from the Supreme Court,"  AcademyHealth, National Health Policy Conference, D.C., Feb. 2012.

Speaker, "The Constitutionality of the Individual Mandate," NYU Law School, Feb. 2012.

Speaker, "Risk Adjustment under the Affordable Care Act," Tilburg University, The Netherlands, Dec. 2011.

**Mark A. Hall**

Speaker, "Commerce Clause Challenges to Health Care Reform," Columbia Univ. Law School, Oct. 2011.

Speaker, "Commerce Clause Challenges to Health Care Reform," Petrie-Flom Center, Harvard Law School, Sept. 2011.

Commentator, "Constitutionality of the Affordable Care Act," Duke Univ. Law School, Sept. 2011.

Speaker, "Constitutional Challenges to Health Care Reform," AcademyHealth annual meeting, Seattle, June 2011.

Speaker, "Constitutional Challenges to Health Care Reform," Am. Society Law Medicine and Ethics, Chicago, June 2011.

Speaker, "Consumer-driven health care: perspectives from a different hemisphere," University of Melbourne Medical School, Dean's Lecture, April 2011.

Speaker, "The Politics, Policy and Law of Obama's Health Care Reform," University of Melbourne Law School, Sir Kenneth Bailey Memorial Lecture, April 2011.

Speaker, "Challenges to U.S. Health Care Reform: Rhetoric vs. Reality," University of Tasmania Law School, March 2011.

Speaker, "Legal Issues in Health Care Reform," Univ. of Pennsylvania Law School, Philadelphia, Oct. 2010.

Speaker, "Constitutional Implications of the Patient Protection and Affordable Care Act," No. Kentucky Univ. College of Law, Oct. 2010.

Keynote Speaker, "Constitutional Challenges to Health Care Reform," Forsyth Memorial Hospital, Winston-Salem NC, Oct. 2010.

Speaker, Conflicts of Interest in Medical Research, Carilion Clinic, Roanoke VA, Sept. 2010.

Speaker, "Free Markets, Regulation and the Constitution," Hillsdale College Center for Constitutional Studies, Washington DC, Sept. 2010.

Lead Faculty, Workshop on Health Care Reform, WFU Translational Science Institute, Winston-Salem NC Aug. 2010.

Speaker, "Achieving Universal Coverage through Safety Net Expansion" ASLME Health Law Teacher's Conference, Austin TX, June 2010.

Keynote Speaker, "Implications for Employers of Health Insurance Exchanges," Greensboro NC, June 2010.

19

**Mark A. Hall**

Lead Faculty, "Constitutional Challenges to Health Care Reform," N.C. Bar Association, May 2010.

Commentator, Empirical Health Law Conference, Univ. Michigan, May 2010.

Keynote Speaker, "Debating the Constitutionality of Health Care Reform," Am. Health Lawyers Assoc., D.C., May 2010.

Organizer and Speaker, "Patient-Centered Law and Ethics," Wake Forest University, April 2010.

Speaker, "Can the 'Safety Net' Provide Adequate Access to Health Care for the Uninsured?," Loyola Law School, Chicago, Nov. 2009.

Speaker, "Regulatory and Corporate Law Update," ASLME Health Law Teacher's Conference, Cleveland, June 2009.

Speaker, "The Constitutionality of Mandates to Purchase Health Insurance," ASLME Health Law Teacher's Conference, Cleveland, June 2009.

Keynote Speaker, "The Constitutionality of Mandates to Purchase Health Insurance," O'Neill Institute for Health Law, Georgetown Univ., April 2009.

Speaker, "The Ethics and Practice of Consumer-Driven Health Care," Univ. British Columbia, Vancouver, April 2009.

Speaker, "An Essentialist View of Health Care Law," Univ. British Columbia, Vancouver, April 2009.

Speaker, "The Ethics and Practice of Consumer-Driven Health Care," Univ. of Montana, Missoula, March 2009.

Speaker, "Using Section 125 Cafeteria Plans to Shelter Employees' Premium Contributions," State Health Access Reform, Philadelphia, Feb. 2009.

Moderator, "Commercialization of Research in Regenerative Medicine," Wake Forest Univ., Feb. 2009.

Speaker, "Advice to the President on Health Care Reform," Wake Forest Univ., Jan. 2009.

Speaker, "An Essentialist Theory of Health Care Law," UNC Law School, Jan. 2009.

Organizer, "Conflict of Interest Notification Study," Wash. D.C., Dec. 2008

Speaker, "Legal and Ethical Issues in Responding to a Flu Pandemic," Forsyth County Medical Society, Nov. 2008

**Mark A. Hall**

Speaker, "Government-Sponsored Reinsurance: Purposes and Prospects," Harvard Law School, Nov. 2008.

Speaker, "Health Care: Public or Private Good?," Phi Kappa Phi Honor Society Annual Form, UNC-Greenville, Oct. 2008

Speaker, "Property Rights in Medical Information," WFU Translational Science Institute Annual Conference, Oct. 2008

Speaker, "Content Analysis of Judicial Opinions," Univ. of Chicago and Northwestern Univ. Law Schools, Oct. 2008

Speaker, "Insurance Discrimination and Huntington's Disease," Winston-Salem NC, Oct. 2008

Speaker, "Property Rights in Medical Information," Univ. of Texas Law School, Sept. 2008

Speaker, "Presidential Candidates' Health Care Reform Proposals," Wake Forest Univ., Sept. 2008

Speaker, "Managing Conflicts of Interest in Non-Academic Research Institutions," Am. Assoc. Medical Colleges FOCI Meeting, Rochester MN, Sept. 2008

Invited Congressional Testimony, "47 Million and Counting: Why the Health Care Marketplace is Broken," Senate Finance Committee, June 2008.

Speaker, "Legal Rights in Electronic Medical Records," Harvard Law School, Cambridge MA, June 2008

Speaker, "Ownership of Electronic Medical Records," Am. Soc'y Law Medicine & Ethics, Philadelphia, June 2008

Speaker, "Trust, Disclosures, and Conflicts of Interest," Institute of Medicine, Washington, D.C., May 2008

Speaker, "Can Consumers Control Health Care Costs?," Brookings Institute, March 2008.

Commentator, "Health Policy: A Constitution-Free Zone," Stanford Univ. Center for Advanced Study for the Behavioral Science, Palo Alto, Dec. 2007.

Speaker, "Patients as Consumers: The Law of Medical Billing," Harvard Univ. Law School, Cambridge, Mass., Nov. 2007.

Speaker, "An Essentialist View of Health Law," Canadian Health Law Assoc., Banff, Canada, Nov. 2007.

Speaker, "Community Hospitals' Oversight of Investigator's Financial Relationships," Health Care Compliance Assoc., Chicago, Nov. 2007.

21

**Mark A. Hall**

Speaker, "Systematic Content Analysis of Judicial Opinions," Law & Society Association, Berlin, July 2007.

Speaker, "Government-Sponsored Reinsurance," Health Law Teacher's Conference, Boston, June 2007

Speaker, "An Essentialist View of Health Care Law," University of Toronto Law School, March 2007.

Speaker, "Patients' Legal Obligations to Pay their Medical Bills," Georgetown Univ. Law School, Feb. 2007.

Commentator, "Supply and Demand of Organ Donations," Univ. North Carolina Law School, Feb. 2007.

Fallon-Friedlander Endowed Lectureship, "The Law, History and Ethics of Medical Fees," University of Chicago Law and Medical Schools, Feb. 2007.

Speaker, "The Risks of Genetic Discrimination," National Society of Genetic Counselors, Nashville, Nov. 2006.

Speaker, "Measuring Trust in Medical Researchers," Public Responsibility in Medicine and Research (PRIMR) Annual Meeting, Washington, D.C., Oct. 2006.

Panelist, "Managing Medical Resources," Am. Board Internal Med., Philadelphia, June 2006.

Speaker, "Consumer-Driven Health Care and Moral Hazard," Am. Institute for Econ. Research, Great Barrington MA, June 2006.

Speaker, "An Essentialist View of Health Law," Am. Soc'y Law Med. & Ethics annual Health Law Teacher's meeting, Baltimore, June 2006.

Speaker, "Disclosing Investigators' Conflicts of Interests to Research Participants," Assoc. Certified Research Professionals Annual Meeting, Phoenix, April 2006.

Organizer, "Rethinking Health Law," an invitation-only workshop of leading health law scholars, Wake Forest Univ., Dec. 2005.

Participant/Presenter, "American Health Care: Who Pays, Who Benefits?", Duke University, Nov. 2005.

Participant, "Budgetary Approaches to Health Care Spending," Urban Institute, Nov. 2005.

Speaker, "The Law and Ethics of Consumer-Driven Health Care," Robert Wood Johnson Foundation, Annual Meeting of Investigators in Health Policy Research, San Diego, Oct. 2005

22

**Mark A. Hall**

Speaker, "Measuring Patients' Trust in the U.S.", University of Bristol, England, workshop on trust in medical institutions, Sept. 2005.

Speaker, "Consumer Driven Health Care," Am. Society Law Medicine & Ethics Annual Health Law Teachers conference, Houston, June 2005.

Speaker, "Fundamentals of the Small Group Health Insurance Market," briefing for Congressional Staff organized by the National Health Policy Forum, May 2005.

Speaker, "Managed Care and Consumer-Driven Health Plans: The Potential for Unification," Kaiser Permanente Institute for Health Policy Roundtable, Washington DC, April 2005.

Speaker, "Trust in the Medical Setting: The Challenge of Corporate Interests," Boston Univ. Colloquium for Philosophy of Science, Sept. 2004.

Speaker, "Empirical Studies of Health Care Law and Policy," Chinese Health Law Scholars Program, Temple Univ., July 2004.

Speaker, "Patients' Trust in Physicians and Medical Institutions," Office of Minority Health Conference on Strengthening the Informed Consent Process to Address Racial and Ethnic Health Disparities, Tuskegee AL, July 2004.

Speaker, "The Impact of State Managed Care Regulation on Industry Evolution," Am. Society of Law Medicine and Ethics, Annual Health Law Teacher's Meeting, Newark, June 2004.

Speaker, "Redesigning the Medical Malpractice Liability System," Clifford Symposium on Tort Law and Policy, Depaul Univ., Chicago, April 2004.

Speaker, "Empirical Approaches to the Malpractice Standard of Care," Am. College of Legal Medicine, Annual Meeting, Las Vegas, March 2004.

Keynote Speaker, "Can Health Care Corporations be Caring?" Northwest Consortium of Health Law Programs, Inaugural Meeting, Seattle, Feb. 2004.

Speaker, "IRBs and You," Am. Assoc. Law Schools, Annual Meeting, Atlanta Jan. 2004

Speaker, "Health Policy Impacts of Blue Cross Conversions," Protecting Community Health Assets (Consumers Union), Chicago, Nov. 2003.

Speaker, "Genetic Discrimination: Risks and Realities," National Society of Genetic Counselors, Charlotte NC, Sept. 2003.

Speaker, "Health Policy Implications of Blue Cross Conversions to For-Profit Status," Am. Society Law, Med. & Ethics, Wilmington DE, June 2003.

23

**Mark A. Hall**

Speaker, "Genetic Discrimination and Screening for Liver Disease," Digestive Disease Week, Orlando, May 2003.

Speaker, Economic Analysis and Health Policy, Salem Univ. Economics Honor Society, Winston-Salem NC  May 2003.

Speaker, "Medical Necessity and Surgery for Obesity," Law, Economics and Social Justice, Duke University, San Diego, April 2003.

Speaker, "Conflicts of Interest and Managed Care," Speas Symposium, Davidson Univ., March 2003.

Panelist, "Blue Cross Conversions to For-Profit Status," New York University, Nov. 2002.

Speaker, "The Scope and Limits of Public Health Law," McLean Symposium, Univ. of Chicago, Nov. 2002.

Speaker, "Fixing the Problems in the Individual Market," Center for Studying Health System Change Forum, Washington DC, Oct. 2002.

Speaker, "Managed Care Patient Protection Laws," Mich. Assoc. of Health Plans, July 2002.

Organizer, "Empirical Approaches to Defining the Malpractice Standard of Care," Wake Forest Univ., April 2002.

Speaker, "Legal and Public Policy Implications of Practice Guidelines," American Academy of Cardiology, Atlanta, March 2002.

Speaker, "Foundation Support for Insurance Market Reforms," Grantmakers in Health, New York, March 2002.

Speaker, "Trust in Physicians and Medical Institutions: What is it, Can it be Measured, and Does it Matter," RWJ Health Policy Scholars, Univ. of Michigan, March 2002.

Speaker, "Health Care Law and Regulation: A Primer," Law and Economics Institute for State Court Judges, Orange, CA, Oct. 2001.

Speaker, "HIPAA: Five Years Later," CATO Institute, Washington D.C., July 2001.

Speaker, "Tax Credits and Purchasing Cooperatives," Center for Studying Health Systems Change, Washington D.C., April 2001.

Speaker, "Individual Insurance Market Reforms,"  National Conference of State Legislatures, Charlotte, NC, Feb 2001.

**Mark A. Hall**

Speaker, "The Geography of Health Insurance Regulation," Am. Society of Law, Medicine, and Ethics, Cleveland, June 2000.

Speaker, "Disclosure of Financial Incentives," Medical Group Management Assoc., Winston-Salem NC, May 2000.

Panelist, "Factors Affecting Decisions to Seeking Genetic Testing," Arizona State Univ., Phoenix, April 2000.

Speaker, "Doctor-Patient Trust and Public Policy," U. Mich. Law School, Feb. 2000.

Speaker, "Genetic Enhancement, Distributive Justice and the Goals of Medicine," Univ. San Diego Law School, Jan. 2000.

Organizer and Moderator, "Genetic Enhancement and Public Policy," Wake Forest Univ., Nov. 1999.

Speaker, "Doctor-Patient Trust and Public Policy," Am. Society of Bioethics and Humanities, Philadelphia, Oct. 1999.

Plenary Speaker, "Laws Restricting Health Insurers' Use of Genetic Information," Am. Society of Human Genetics, San Francisco, Oct. 1999.

Speaker, "Health Insurance Market Reforms: A Qualitative Evaluation," National Association of Insurance Commissioners, Atlanta, Sept. 1999.

Panelist, "Health Insurance Reform," Am. Society of Law, Medicine and Ethics, St. Louis, June 1999.

Speaker and Organizer, Individual Insurance Market Reforms, Alpha Center, Washington D.C., Jan. 1999.

Speaker, Integrated Delivery Systems, NC Society of Health Care Attorneys, Raleigh, Oct. 1998.

Speaker, Managing Care in the Next Century, Univ. of Michigan Journal of Law Reform, Oct. 1998.

Speaker, Health Insurance Regulation Update, ASLME Health Law Teacher's Conference, Houston, June 1998.

Speaker, Insurance Market Reform and the Nature of Competition, Univ. Penn. Institute for Law and Economics, Philadelphia, April 1998.

Speaker, Insurers' Use of Genetic Information, Competitive Enterprise Institute, Washington, D.C., April 1998.

Speaker, Insurers' Use of Genetic Information, American Actuarial Society, Atlanta, March 1998.

**Mark A. Hall**

Speaker, Coverage of Experimental Therapies, Federal Judicial Center, Health Law for Federal Judges, Palm Springs CA, Nov. 1997.

Keynote Speaker, Managed Care Medical Ethics, Cumberland Law School, Birmingham, Nov. 1997.

Speaker, Recent Developments in Managed Care Liability, East Carolina Medical School, Sept. 1997.

Speaker, Disclosure of Financial Incentives, Robert Wood Johnson Foundation Malpractice Program, Duke Univ., Sept. 1997.

Invited panelist, Managed Care Ethics, Center for Biomedical Ethics, U. Penn., Jan. 1997.

Speaker, The Ethics of Patient Cost-Sharing, World Congress of Bioethics, San Francisco, Nov. 1996.

Invited panelist, Nonprofit Conversions, NYU Center for Law and Philanthropy, Oct. 1996.

Speaker, Health Care Law Seminar for Federal Judges, Federal Judicial Center, June 1996.

Speaker and Panel Chair, The ABCs of Integrated Delivery Systems, Annual Health Law Teacher's Meeting, Am. Society Law, Medicine & Ethics, June 1996.

Speaker, The Economics of Patient Cost-Sharing, Law and Economics Assoc. Annual Meeting, Chicago, May 1996.

Can the Courts Dictate Medical Judgment?, Univ. Alabama School of Public Health, Feb. 1996.

Consumer Protection of Managed Care Subscribers, Seton Hall Law School, Nov. 1995.

Judicial Review of Health Insurance Coverage Disputes, Blue Cross of California, Aug. 1995.

Speaker, The Employer's Responsibility in Managed Care, Am. Society of Law, Medicine & Ethics, Minneapolis, May 1995

Speaker, Judicial Determination of Medical Necessity, Georgetown Law School, Washington, D.C., April 1995

Speaker, The Communitarian Ethics of Insurance Selection, The Hastings Center, Washington, D.C., March 1995

Discussion Leader, The Legal Implications of Medical Futility, Duke University, March 1995

Speaker, "Judicial Resolution of Disputes over Health Insurance Coverage," Univ. of Alabama School of Law, Feb. 1995

**Mark A. Hall**

Speaker, The Economics of Managed Care, John Locke Foundation seminar for state legislators, Durham NC, Nov. 1994.

Speaker, What Can Health Insurance Market Reforms Accomplish?, American Enterprise Institute, Washington D.C., August 1994.

## PUBLIC SERVICE ACTIVITIES (recent):

Consultation with various federal and state agencies and officials regarding health care regulation issues.

Interviews with local and national media, including New York Times, Wall Street Journal, Newsweek, ABC News, National Public Radio, BBC World News, and Christian Science Monitor.

Community Advisory Board, WFDD public radio station, Winston-Salem NC.

Big-Brothers, Big-Sisters volunteer, 2009-present

## GRANTS:

Co-Principal Investigator, and subcontractor:  Evaluating Implementation of Health Insurance Exchanges, Commonwealth Fund, $300,000 ($100,000 subcontract from Washington & Lee), 2011-2013.

Principal Investigator, Developing and Evaluating an Adequate National Safety Net To Complement Expansions Of Public And Private Insurance, Robert Wood Johnson Foundation, $400,000, 2009-2011.

Principal Investigator, Using "Section 125 Plans" to Shelter Employee's Individual Insurance Premiums from Tax, Robert Wood Johnson Foundation, $225,000, 2007-2009.

Principal Investigator, Robert Wood Johnson Foundation, The Law and Ethics of Consumer-Driven Health Care, funded by the Investigator Awards in Health Policy Research program, $275,000, 2005-2008.

Principal Investigator, Subcontract to Duke University, Disclosing Conflicts of Interest in Research, NIH, $200,000, 2004-2008.

Principal Investigator, Subcontract to Duke University, The Costs of Health Services Regulation, $100,000, AHRQ (HHS), 2004-2005.

Principal Investigator, Evaluating the Impact of Managed Care Patient Protection Laws, Robert Wood Johnson Foundation, $584,000, 2001-2004.

27

**Mark A. Hall**

Investigator and Chair of Ethics Committee, Type-1 Diabetes Genetics Consortium, NIH, 2003-07 (10% salary support).

Investigator and Chair of Ethics Committee, Hereditary Hemochromatosis and Iron Overload, NIH, 2000-2005 (20% salary support).

Principal Investigator, Patient Trust in Managed Care: The Effect of Disclosing Financial Incentives, Robert Wood Johnson Foundation, $400,000, 1998-2000.

Principal Investigator, Insurers' Use of Genetic Tests, NIH, $175,000, 1997-99.

Principal Investigator, The Effects of Health Insurance Market Reforms, Robert Wood Johnson Foundation, $500,000, 1996-99.

Principal Investigator, Legal Barriers to Insurers' Use of Practice Guidelines, AHCPR, $120,000, 1994-95.

Consultant, The Medical Malpractice Effects of Practice Guidelines, Robert Wood Johnson Foundation, 1993-94.

Principal Investigator, Coverage Determinations and Defensive Medicine, 1992-93, Office of Technology Assessment.

Principal Investigator, Health Insurance Market Reform, 1992-93, American Enterprise Institute.

Principal Investigator, The Ethics and Economics of Bedside Rationing, 1992, Robert Wood Johnson Foundation.

Principal Investigator, Faculty Fellowship in Health Care Finance, 1990-91, Robert Wood Johnson Foundation.

Principal Investigator, Symposium, Interdisciplinary Perspectives on Health Care Financing Reform, 1990, National Health Lawyers Association and Flinn Foundation.

**COURSES TAUGHT:**
Law Schools
      Health Care Law and Policy
      Law and Medicine (Including Medical Malpractice)
      Bioethics
      Health Care Rationing
      Comparative Health Care Law and Policy
      Administrative Law
      Contracts
      Insurance Law
      Nonprofit Organizations
      Torts

**Mark A. Hall**

Legal History
Civil Law
Management (M.B.A.) School:  Health Care Law
Masters in Bioethics:   Bioethics Seminar
Medical School (Lectured or Discussion Leader)
Medicine as a Profession and Bioethics
Medical Malpractice and Informed Consent
Health Care Reform and Health Policy
Simulated Practice Assessment
Qualitative Research Methods
Undergraduate:  Freshman Seminar on Death and Dying

**University Service**
University-Wide
Bioethics Task Force and Center Planning
Health Benefits Committee
Computer Advisory Committee
Institutional Review Board
Created Joint Degree for Law and Masters in Health Administration
Ph.D. Dissertation Committee in Philosophy Department
Law Schools
Chair, Appointments Committee
Chair, Faculty Development Committee (Speaker Series)
Student Admissions
Chair-Search Committee
Founder and Organizer of Faculty Reading Group
Information Technology Committee
Curriculum Committee
Center for Law, Science and Technology
Management (M.B.A.) School:  Joint Babcock/Law Committee
Medical School-Wide
Hospital Ethics Committee
Conflicts of Interest Committee
Scientific Integrity and Research Ethics Committee
Faculty Research Advisory Committee
Health Policy Task Force
Medical Center Strategic Planning
Pre-implantation Genetic Diagnosis Ad Hoc Committee
Medical School Departmental
Executive Committee
Chair, Faculty Recruitment Committee
Chair, Retreat Planning Committee
Chair, Faculty Appointments
Chair, Distinguished Visitor Series
Chair, Seminar Series
Strategic Planning

29

**Mark A. Hall**

Professional Development
Harassment Policy
Health Services Research Center

# EXHIBIT B

Documents Comprising Exhibit B
Were Sent On A CD Via Overnight Mail