Case No. No. 15-2382
_____

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

JACK REESE, JAMES CICHANOFSKY, ROGER MILLER,
and GEORGE NOWLIN, for themselves and the class

Plaintiffs-Appellees

v.

CNH INDUSTRIAL N.V. and CNH
INDUSTRIAL AMERICA, LLC

Defendants-Appellants.

On Appeal from the United States District Court
for the Eastern District of Michigan
Case No. 2:04-cv-70592

_____

**BRIEF OF PLAINTIFFS-APPELLEES**

_____


McKnight, Canzano, Smith,
Radtke & Brault, P.C.
By: Darcie R. Brault
423 S. Main St. 2nd Floor
Royal Oak, MI 48067
248-354-9650
Attorneys for Plaintiffs-Appellees

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................i

TABLE OF AUTHORITIES ............................................................................v

STATEMENT IN SUPPORT OF ORAL ARGUMENT ..................................... viii

COUNTER-STATEMENT OF ISSUES ................................................1

INTRODUCTION ........................................................................2

COUNTER-STATEMENT OF FACTS .................................................3

A.      The Contracts .................................................................3

     1.      The Indemnity Plan ..................................................6

     2.      The FAS 106 Medical Cap Letter ......................................7

     3.      The 1994 Negotiations and the 1995 Case Managed Care Plan ..................................................................7

     4.      The 1998 Negotiations and the 1998 PPO Plan ...................8

     5.      The Negotiation of the 1998 PPO Plan ................................8

     6.      Elimination of the FAS 106 Medical Cap Letter .................9

     7.      CNH's Admissions that Retiree Healthcare Benefits Were Improved in the 1998 Negotiations .............................9

B.      Continuing Bargaining History .......................................9

COUNTER-STATEMENT OF THE CASE .......................................10

SUMMARY OF ARGUMENT ........................................................17

ARGUMENT .......................................................................................19

I.    STANDARD OF REVIEW .........................................................19

II.   THE DISTRICT COURT CORRECTLY APPLIED ORDINARY
      CONTRACT PRINCIPLES IN CONCLUDING THAT RETIREE
      HEALTHCARE BENEFITS VESTED .......................................19

      A.    *Tackett* Requires Courts to Apply Ordinary Contract Principles
            To Ascertain and Effectuate the Intent of the Parties .........19

      B.    The District Court Correctly Analyzed the CBA Language to
            Find "at Least" an Ambiguity ............................................21

      C.    Extrinsic Evidence Confirms the Intent of the Parties ........24

      D.    Understanding Retiree Healthcare Benefits in the Context
            Of the Federal Common Law of the Shop Under Section 301 ..........25

      E.    Ordinary Rules of Contract Interpretation Permit an Inquiry
            Into the Circumstances Giving Rise to the Agreement ......................31

      F.    The Evolution of CNH's Obligation ...................................34

      G.    *Tackett* Does Not Require "Clear and Express" Vesting
            Language ...........................................................................39

      H.    CNH's Reliance Upon The Letters of Understanding
            Is Misplaced ......................................................................41

            1.    National and State Healthcare Initiatives Letter ......................41

            2.    1998 Cost of Healthcare Letter of Understanding ...................42

III.  CNH'S PROPOSED PLAN IS NOT REASONABLY
      COMMENSURATE WITH THE CURRENT PLAN ..................................43

A.    The District Court Carefully Followed the Direction Provided By *Reese II* .................................................................45

    1.    The Proposed Plan Dramatically Changes Premium Contributions...........................................................46

    2.    Out of Pocket Costs Increase Dramatically Under the Proposed Plan.....................................................47

    3.    Cost Growth and Cost Shifting.................................49

    4.    Quality of Care "Available" Under Both Plans was Found Comparable...................................................51

    5.    The District Court Found that the First Four Inquiries Demonstrate the Proposed Plan is Not Reasonably Commensurate with the Current Plan......................................54

    6.    CNH Makes Healthcare Available to Current Employees And People Retiring Today Pursuant to Unique Bargains And Tradeoffs that Render Plan Comparison Difficult...........55

    7.    Comparisons Between Other Companies With Different Employers And Plans Are Difficult And Do Not Weigh In Favor Of Either Party. .......................................57

    8.    Balancing .........................................................59

B.    As A Matter Of Law And Policy, The Court Must Review The Proposed Changes As A Whole, And May Not Adjust The Plan Terms Until The Lowest Common Denominator Of Reasonableness Is Reached...................................................60

CONCLUSION .......................................................61

CERTIFICATE OF COMPLIANCE.........................................x

CERTIFICATE OF SERVICE .............................................xi

iv

ADDENDUM ...................................................................................1

# TABLE OF AUTHORITIES

*CASES*

*Alabama v. North Carolina*, 560 U.S. 330 (2010)..................................32

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505,
91 L. Ed. 2d 202 (1986) ..........................................................19

*Citizens Ins. Co. v. MidMichigan Health ConnectCare Network Plan*,
449 F.3d 688 (6th Cir. 2006) .................................................24

*Fox v. Massey-Ferguson, Inc.*, 172 F.R.D. 653 (E.D. Mich. 1995),
*aff'd* , 91 F.3d 143 (6th Cir. 1996).........................................42

*Gallo v. Moen, Inc.,* 2016 FED App. 0030P (6th Cir. 2016)...........34, 35, 38, 39, 41

*Henry v. Chesapeake Appalachia LLC*, 739 F.3d 909 (6th Cir. 2014) ..................23

*Hinckley v. Kelsey-Hayes Co.*, 866 F. Supp. 1034 (E.D. Mich. 1994)..................42

*Kia Motors Am., Inc. v. Glassman Oldsmobile Saab Hyundai, Inc.*,
706 F.3d 733 (6th Cir. 2013) .................................................21

*Litton Financial Printing Div. v. NLRB*, 501 U.S. 190 (1991)...............6, 34, 39, 40

*M&G Polymers USA, LLC v. Tackett,*
135 S. Ct. 926 (2015)......................iv, 14, 15, 17, 19, 20, 21, 22, 24, 30, 31, 33, 40

*Noe v. PolyOne Corp.*, 520 F.3d 548 (6th Cir. 2008).............................19

*Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*,
499 U.S. 117 (1991)..........................................................20

*Price v. Board of Trustees of Indiana Laborer's Pension Fund*,
632 F.3d 288 (6th Cir. 2011) .................................................19

*Reese v. CNH America LLC*, 574 F.3d 315
(6th Cir. 2009) (*Reese I*) ...........................................6, 10, 12, 14, 21, 53

*Reese v. CNH Global N.V.*, 2007 U.S. Dist. LEXIS 63670
(E.D. Mich. Aug. 29, 2007) ................................................................................6, 23

*Reese v. CNH America LLC,* 694 F.3d 681
(6th Cir. 2012) (*Reese II*) .................................................... iv, 14, 16, 18, 42, 43, 45

*Russell v. Citigroup, Inc.* 748 F.3d 677 (6th Cir. 2014) ...........................................32

*Sprague v. General Motors Corp.,* 133 F.3d 388 (6th Cir. 1998) ....................40, 41

*Shelby Cty. Health Care Corp. v. Majestic Star Casino*,
581 F.3d 355 (6th Cir. 2009) ...................................................................................24

*Steel Workers v. Kelsey-Hayes Co.*, 750 F.3d 546 (6th Cir. 2014) ..................53, 61

*Steelworkers v. Warrior Gulf & Navigation Co.*, 363 U.S. 574,
80 S. Ct. 1347; 4 L. Ed. 2d 1409 (1960)....................................................25, 26, 33

*Stolt-Nielsen S. A. v. Animal Feeds Int'l Corp.*, 559 U.S. 662,
130 S. Ct. 1758, 176 L. Ed. 2d 605 (2010)............................................................20

*Tackett v. M&G Polymers USA, LLC,*
2016 FED App. 0014P (6th Cir. 2016) (*Tackett III*) ............. iv, 6, 20, 23, 34, 39, 41

*Textile Workers v. Lincoln Mills*, 353 U.S. 448; 77 S. Ct. 912;
1 L. Ed. 2d 972 (1957) ............................................................................................25

*UAW v. Yard-Man, Inc.,* 716 F.2d 1476 (6th Cir. 1983) .... 15, 19, 20, 21, 30, 31, 40

*Williams v. Fenix and Scission, Inc.*, 608 F.2d 1205 (9th Cir. 1979)......................32

*Wulf v. Quantum Chemical Corp.*, 26 F.3d 1368 (6th Cir. 1990) ...........................23

*Yolton v. El Paso Tenn. Pipeline Co.*, 2008 U.S. Dist. LEXIS 17619
*33 (E.D. Mich. 2008) ........................................................................................28, 29

*Yolton v. El Paso Tenn. Pipeline Co.*, 318 F. Supp. 2d 455
(E.D. Mich. 2003) ...............................................................................................24, 27

vii

*Yolton v. El Paso Tenn. Pipeline Co.,* 435 F.3d 571 (6th Cir. 2006) ..........21, 23, 24

*STATUTES*

Employee Retirement Income Security Act of 1974 (ERISA),
29 U.S.C. §1001 *et seq*.................................................................................40

§ 301 of the Labor Management Relations Act,
29 U.S.C. § 185 ............................................................20, 25, 31, 33, 40

*RULES*

Fed. R. Civ. P. 56 .................................................................................19

*OTHER AUTHORITY*

11 Williston on Contracts §30:6, p. 108 (4th ed. 2012) ..........................................32

11 Williston on Contracts § 30:19 ..........................................................20

11 Williston on Contracts § 30:23 ..........................................................21

3 Corbin, Contracts § 551 ..................................................................21

Kolodrubetz, "Employee-Benefit Plans, 1950-1967,"
32 *Soc. Sec. Bulletin* (April 1969) ..........................................................36

"Retiree Healthcare and *Reese v. CNH America:* The Beginning
of the End of Contract Law As We Know It?"
59 *Wayne L. Rev.* 417, 418 (2013)..........................................................53

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Plaintiffs request oral argument because the record is factually rich and procedurally complex. Contrary to Appellants' suggestion of "undisputed material facts," Appellee contests Appellants' version of the record below. CNH's current characterization is contrary to the contractual facts upon which the District Court has made findings, both recently and stretching back to the original motions for summary judgment in 2007.

Additionally, the limitation of an appellate brief challenges the parties and the Court to incorporate the complexities of the record, particularly in regard to the proposed changes to the vested retiree healthcare benefits and the answers to the several detailed questions posed by this Court in *Reese v. CNH America LLC,* 694 F.3d 681 (6th Cir. 2012) (*Reese II*). It will assist the Court to have counsel available to respond to questions about the record for clarity.

Oral argument is also important when the applicable law has been the subject of recent Supreme Court review and subsequent review by this Court. *M&G Polymers USA, LLC v. Tackett,* 135 S. Ct. 926 (2015), *Tackett v. M&G Polymers USA, LLC,* 2016 FED App. 0014P (6th Cir. 2016) (*Tackett III*). This Court's February 8, 2016 decision in *Gallo v. Moen, Inc.,* 2016 FED App. 0030P (6th Cir. 2016) is at odds with the *Tackett III* analysis in several important respects

ix

and may be the subject of *en banc* review. The current dynamism of the law weighs in favor of oral argument.

## COUNTER STATEMENT OF ISSUES

I.    Did the district court correctly conclude that the retiree healthcare benefits are vested where, stripped of inferences, the contract facts continue to support vesting, and, even if the contract is ambiguous, extrinsic evidence clearly indicates an intent to vest the benefits?

II.   Did the district court correctly conclude that the unilateral and massive cost shift from CNH to the class, with no commensurate benefit to the class, was not the kind of modification contemplated by this Court in its prior decisions?

# INTRODUCTION

The parties first negotiated the contract language at issue over forty years ago. CNH contemporaneously, and thereafter regularly, communicated to participants that the intent of the language was to vest retiree healthcare benefits for life.

For the last twelve years CNH has asked the courts to ignore its promises to the class, to release it from its legal obligation to provide vested healthcare benefits to the class, and to thereby saddle a group of fixed income-retirees, with huge, necessary, unexpected, and growing expenses.

CNH's arguments are cynically made in the light of the contract language and the mountains of extrinsic evidence which clearly show the intent of the parties to vest the retiree healthcare benefits.

The cynicism is no doubt a product of high stakes: Relying on CNH's consultant's calculations, the total savings sought by CNH through their proposed plan to cut benefits, in just the first ten years, is **$192,872,559.00**. This dramatic cost shift is completely unmoored from the contract and the parties' intent to vest the benefits, and is not tied to any proportional improvement in the benefits under the plan.

This is Appellant's third appeal of the decisions of the district court finding that the retiree healthcare benefits at issue are vested for life and cannot be changed

in the manner CNH proposes. This Court has twice held that the benefits are vested, but allowed leeway for modification based on what it called "unique" historical bargaining facts; and only so long as the change resulted in commensurate benefits.

Rather than propose a moderate, mutually beneficial adjustment, consistent with this Court's vesting dispensation, CNH failed its cue, and instead proposed drastic one-sided changes to the vested benefits, far in excess of the margin granted by this Court.

CNH took advantage of this Court's "reasonably commensurate" inch to take a *de facto,* benefit-terminating mile.

## COUNTER-STATEMENT OF FACTS

### A.    The Contracts

The Plaintiffs-Appellees are a class of CNH retirees (and spouses). While employed, the retirees were represented by the United Automobile, Aerospace and Agricultural Workers of America ("UAW"), with which CNH entered into a series of collectively bargained agreements ("CBAs"), called "Central Agreements."

For decades, healthcare benefits were extended to retirees through language similar or identical to that found in the 1998 contract:

The group insurance plan agreed to between the parties will run concurrently with this Agreement and is hereby made a part of this Agreement.[1]

1998 Central Agreement, R.439-4:16755.[2]

The collectively bargained group insurance benefits were contained in a separate document, the "Group Insurance Plan" and incorporated into the Central Agreements.

In 1974, CNH agreed, beginning January 1, 1975, to pay the full cost of healthcare benefits for all retirees and eligible surviving spouses regardless of age. 1974 Plan, R.129-26:6710-11. Over the years, the language has remained substantively unchanged. 1980 Plan, R.129-28:6465-67; 1983 Plan, R.129-29:5519-22, 1990 Plan, R.129-30:5030-33; 1995 Plan, R.129-31:6295-98.

Indeed, **24 years later**, in the 1998 Group Benefit Plan, the following language governed healthcare benefits for retirees and surviving spouses:

### I. Provisions Applicable to Employees Retired on Company Pension and *Surviving Spouses Receiving Company Pension*

> 1) Employees who retire under the Case Corporation Pension Plan for Hourly Paid Employees after July 1, 1994, or their surviving spouses eligible to receive a spouse's pension under

---

[1] Identical language was used to convey pension benefits: "The pension plan agreed to between the parties will run concurrently with this Agreement and is hereby made a part of this agreement." 1998 Central Agreement, R.439-4:16755.

[2] Citations to the record below are by record number and a colon, followed by the page identification numbers, e.g. R.439:16755.

the provisions of that Plan, **_shall be eligible for the Group benefits as described in the following paragraphs_**. All other coverages cease coincident with the date of employment termination due to retirement. (The provisions of this section shall not apply to individuals eligible for or receiving retirement benefits under the deferred vested provisions of the Pension Plan.)

    (a) The following benefits will apply to employees who retire on/or after the dates noted above and who have ten (10) or more years of services at the retirement date.

***

**<u>Group Health Care</u>**
1. The following benefits will apply to employees who retire on/or after the dates noted who have ten (10) years of service at the retirement date, or surviving spouse eligible to receive a spouse's pension under the provisions of the Pension Plan

| | |
|---|---|
| **_Medical_**\* | Vision |
| **_Prescription Drug_** | Hearing |
| Dental | |

\*Eligibility for specific coverage based on each plan's eligibility requirements.

***

3) Contribution for Coverage

    (b)    1. **_No contributions are required_** for the Health Care Plan, Dental Plan, Vision Plan and Hearing Plan.

1998 Plan, R.129-32:6403-06 (emphasis added).

CNH's representations to the contrary,[3] the CBAs are unequivocal that retirees pay "no contributions" for their healthcare coverage.[4]

## 1. The Indemnity Plan

From before 1974 until 1998, the basic healthcare plan for Case hourly active employees and retirees was the Case indemnity healthcare plan ("Indemnity Plan"). From 1974 until 1998, the provisions of the Indemnity Plan remained relatively constant. *Cf.* 1974 Group Plan, R.273-4:10031-10043 and 1995 Group Plan, R.273-11:10180-101972.

Disputes between the UAW and Case about "reasonable and customary" fees and the "hold harmless" provision of the Indemnity Plan were common leading up to 1998 negotiations. Dispute Documentation, R.273-13:10275-347.

---

[3] CNH selectively cites to the record below, misstates facts and peppers its brief with conclusory and simplistic characterizations of the CBAs, e.g. referencing contracts that "expire" or are "superseded." CNH's linguistic supposition that all of the terms simply "expire" at the end of a particular CBA is contrary to this Court's determination, twice, that the benefits are vested, ignores that CNH continued to pay the benefits, and makes presumptions about durational clauses contrary to *Litton Financial Printing Div. v. NLRB*, 501 U.S. 190, 203 (1991), not endorsed in *Tackett,* and rejected by the this Court in *Tackett III.*

[4] This is a particularly egregious example of CNH's misstatement of undisputed facts: CNH asserts that, in the 1998 CBA, the word "currently" was inserted in the "no contribution" provision. Appellants' Brief, p. 6. This is false. The word "currently" is not in the contract. It is in a Summary Plan Description ("SPD") written *by* CNH *after* the 1998 negotiations. The district court and this Court have both recognized that the SPD, written *after* the CBA was ratified, cannot reflect the intent of the parties at the time of bargaining. *Reese v. CNH Global N.V.*, 2007 U.S. Dist. LEXIS 63670 (E.D. Mich. Aug. 29, 2007); *Reese I* at 323.

### 2. The FAS 106 Medical Cap Letter

The 1990 Group Benefits Plan was effective from June 2, 1990 through October 2, 1993. 1990 Central Agreement, R.273-7:10129. The 1993 Extension Agreement extended the 1990 Central Agreement through February 5, 1995. Extension Agreement, R.273-8:10132.

Section 9 of the Extension Agreement, entitled "FAS 106 Out-Year Cost Limiters," refers to a "Letter of Agreement" ("FAS 106 Letter") which is attached to the Extension Agreement. It states:

> This will confirm our understanding that the average per capita annual cost to the Company of providing medical and related benefits under the Case Group Benefit Plan to retired employees and surviving spouses of deceased employees shall not exceed $2,750 for Medicare eligible individuals and $8,500 for those individuals who are not eligible for Medicare. Notwithstanding the foregoing, no covered person shall be required to pay a portion of any excess amount prior to April 1, 1998.

Extension Agreement, R.273-8:10139.

During the 1995 negotiations, the UAW and Case agreed to extend the date in the letter from April 1, 1998 to January 1, 1999. Haas Deposition and 1995 Medical Cap Letter, R.129-11:5200,5322.

### 3. The 1995 Negotiations and the 1995 Case Managed Care Plan

During the 1995 negotiations, Case proposed substituting a managed healthcare plan for the Indemnity Plan for active employees and current retirees. Contract Negotiation Proposals, R.273-14:10348-354, Company Benefit Proposals

7

R.273-15:10355-10369. In 1995, the UAW and Case agreed to retain the Indemnity Plan as it then existed for active employees and current retirees. However, the UAW and Case also agreed that the Case Managed Care Network Plan ("1995 Network Plan") would be mandatory for newly hired employees and *optional* for existing employees and current retirees. Tentative Agreement, R.273-16:10374,10380.

### 4. The 1998 Negotiations and the 1998 PPO Plan

Negotiations for the 1998 CBA opened in early February 1998. Reese Declaration, R.273-2:10008, ¶25. Case and the UAW initialed a Tentative Agreement on April 26, 1998. Tentative Agreement, R.273-51:10599-10632. Hourly employees finally ratified the Tentative Agreement on May 14, 1998. NewsUAW, R.273-54:10637-10640.

### 5. The Negotiation of the 1998 PPO Plan

During the 1998 negotiations, Case presented the UAW with several proposals relating to healthcare benefits, beginning on February 3, 1998 and continuing through April 23, 1998. Multiple Bargaining Proposals, R.273-19 through 26:10390-10497. Case also presented the UAW with various "Plan Comparisons" and "Benefit Comparisons." R.273-29 through 31:10516-10539. Ultimately, Case and the UAW agreed to replace the Indemnity Plan with a "high

quality Case Managed Care Health Network Plan (PPO design)" for current active employees and retirees. Benefit Detail, R.273-51:10614.

### 6. Elimination of the FAS 106 Medical Cap Letter

During the 1998 negotiations, Case agreed to eliminate the FAS 106 letter. 1998 Tentative Agreement, R.273-51:10599-10632.

### 7. CNH's Admissions that Retiree Healthcare Benefits Were Improved in the 1998 Negotiations

After the 1998 negotiations, Case sent employees and retirees a series of newsletters announcing the PPO Plan. In a July 1998 newsletter Case announced "**Important Improvements to Your Health Care**." Case stated that "union negotiators and Case management have worked together to advance your health care benefits" and that: "This newsletter focuses on improvements to your health care benefits" and describes the "improved managed care system" beginning September 1, 1998. Newsletter, R.273-65:10753-10757.

In the second Benefit News for Case Union Employees, Case informed retirees about the "improved managed care health care system" effective September 1, 1998 and that "[y]our other benefits are also improving." Newsletter, R.273-66.10758-10766.

### B. Continuing Bargaining History

In 2005, CNH and the UAW reached a new Central Agreement effective from March 21, 2005 through April 30, 2011. The healthcare provisions "are not

applicable to ... any retiree who has retired from the Company prior to December 1, 2004." 2005 Group Benefits Plan, R.273-73:10809.

On March 25, 2010, Case and the UAW reached a mid-term agreement under which the 2005 Central Agreement was terminated effective May 9, 2010. Letter, R.273-74:10810-11.

The Medical Insurance provisions of the 2010 Central Agreement apply only to active employees and to retirees "who retire after November 1, 2004." 2010 Agreement, R.273-75:10825.

## COUNTER-STATEMENT OF THE CASE

On August 29, 2007, the district court granted Plaintiffs' motion for summary judgment and denied CNH's motions for summary judgment. Opinion and Order, R.214:8869-8892. After analyzing the language of the CBA and relevant extrinsic evidence, the district court concluded:

> [T]he plain language of the relevant agreements, as further supported by extrinsic evidence, demonstrates Case's and the UAW's intent to grant lifetime retiree health insurance coverage to retirees and surviving spouses of retirees who are eligible for or are receiving a pension.

Opinion and Order, R.214:8890-91.

On February 15, 2008, the district court entered judgment in favor of Plaintiffs. Judgment, R.227:8969-8971. On February 19, 2008, CNH filed its ***first appeal***. Notice of Appeal, R.228:8972-8973.

10

On July 27, 2009, the Sixth Circuit affirmed that retiree healthcare benefits vested for life. *Reese v. CNH America LLC*, 574 F.3d 315, 327 (6th Cir. 2009) (*Reese I*). The court then posed the question "[w]hat does vesting mean in this context?" and focused on the 1998 negotiations where Case and the UAW agreed to substitute the Case Managed Network Plan for the existing Indemnity Plan for active employees and the small group of existing retirees who had retired after July 1, 1994. The court examined the 1998 CBA and, drawing all inferences in favor of CNH, cited selected extrinsic "clues" that *could* support an interpretation that the vested benefits of retirees could be "change[d] from CBA to CBA." 574 F.3d at 325. According to the court, any such modifications must be "reasonably commensurate" with the benefits provided in the 1998 CBA, "reasonable in light of change in health care" and "roughly consistent with the kinds of benefits provided to current employees." *Id*. at 326.

The court remanded the case to this Court to "decide how and in what circumstances CNH may alter such benefits - and to decide whether it is a matter amenable to judgment as a matter of law or not." 574 F.3d at 327.

On August 10, 2009, Plaintiffs filed a Petition for Panel Rehearing, Case No. 08-1234 Doc. 00615640260, arguing that the court had decided an issue – what vesting means in the context of the 1998 negotiations – that CNH had not raised either before the district court or on appeal. Plaintiffs also challenged the court's

11

determination that there had been "material alterations" to health benefits for existing retirees in 1998, which was the predicate for this Court's conclusion that future changes could be made. Plaintiffs cited record facts showing that the 1998 negotiations resulted in substantial *improvements* to the benefits provided for both existing and future retirees, noting that Judge Sutton had acknowledged that the *improvement* of benefits would not "break any promises to provide irreducible benefits for life." *Reese I*, at 325.

On September 24, 2009, the panel denied Plaintiffs' motion for reconsideration. Judge Sutton, the author of *Reese I*, filed a published concurrence. 583 F.3d 955 (6th Cir. 2009). Judge Sutton responded to Plaintiffs' protest of the court's assessment of the factual record, stating that it "overlooks the posture of the case - summary judgment - in which all inferences run in favor of the party that lost below: CNH." *Id*. at 956. Judge Sutton instructed that, on remand, the parties were free to develop evidence that would show either 1) that "plaintiffs should win as a matter of law because the prior retirees either approved of the changes or they did not diminish the nature of the benefit package that existed upon retirement;" *or* 2) "that CNH should be allowed to make reasonable modifications to the health-care benefits of retirees, consistent with the way the parties have interpreted and implemented prior CBAs containing similar language." *Id*.

12

On remand, CNH filed a motion for approval of changes to Plaintiffs' benefits. CNH's Motion, R.271:9785-810. Plaintiffs filed a motion for summary judgment. Plaintiffs' Motion for Summary Judgment, R.273:9969-9997. Plaintiffs argued that the 1998 negotiations had improved (and had not diminished) retiree healthcare benefits and that, therefore, Plaintiffs should, in Judge Sutton's words "win as a matter of law." Plaintiffs also argued that any future modifications to retiree healthcare benefits could only be made, as in the 1998 negotiations, by the agreement of CNH and the UAW, and not unilaterally.

On March 3, 2011, the district court granted Plaintiffs' motions for summary judgment and denied CNH's motions. Opinion and Order, R.304:11626-11650. Initially, the court determined that, by his concurrence, Judge Sutton "removes any doubt as to what the panel intended this Court to do on remand particularly as he authored the original decision." *Id.* R.304:11637-11640. Then, after an extensive review of the evidence presented, the court held that the 1998 negotiations had resulted in *improve*d healthcare benefits for existing retirees. *Id*. R.304:11640-11645. The court noted that, immediately after the 1998 negotiations, "Case touted the health care benefits agreed to in 1998 as 'improvements' for employees and retirees." *Id.* R.304:11645. The court concluded, viewing the record before it in a light most favorable to CNH, that there was "no evidence that the UAW and CNH (or Case previously) ever negotiated a *reduction* of those benefits." *Id.*

13

R.304:11648 (emphasis in original). The district also concluded that, to the extent CNH can make future changes to retiree health care benefits, it may do so "only through an agreement with the UAW." Opinion and Order, R.304:11647.

On March 16, 2011, CNH filed its **second appeal**. Notice of Appeal, R.309:11700-01.

On September 13, 2012, Judge Sutton again authored the opinion for the majority, *Reese v. CNH America LLC,* 694 F.3d 681 (6th Cir. 2012) (*Reese II)*. Without mentioning the 2009 concurrence, he stated that the district court had "misread" *Reese I* and erred in addressing the issue of whether benefits had been improved or diminished in the 1998 negotiations. Instead, Judge Sutton stated that, in *Reese I*, the court "recognized that CNH could alter [benefits] on its own, not as part of a new collective-bargaining process," so long as the changes were "reasonable." *Reese II* at 684-685. The majority remanded the case to the district court for it to "take evidence on" several questions. *Reese II* at 685-686.

On remand, the district court prevailed upon CNH to present their proposed plan so that the remand proceedings could begin. CNH presented that plan to Plaintiffs in March of 2012. Proposed Plan, R.419-4 through 419-6:14149-14286. The salient provisions are described in the record at Plaintiffs' Motion for Summary Judgment, R.419:14030-33.

14

Plaintiffs and CNH filed cross motions for summary judgment on the issue of the reasonableness of the changes proposed by CNH. Plaintiffs' Motion for Summary Judgment, R.419:14016-14077 and CNH's Motion for Summary Judgment, R.423:14708-14741.

Before the district court issued its decision, the Supreme Court issued *M&G Polymers USA LLC v. Tackett*, 135 S. Ct. 926 (2015).

On February 24, 2015, CNH filed a motion with the district court requesting summary judgment under *Tackett*. CNH Motion for Summary Judgment, R.438:16600-02, Brief in Support R.439:16603-16618. On September 28, 2015, Judge Duggan issued an opinion, holding that he was "constrained" by *Tackett* to enter summary judgment for CNH. Opinion and Order, R.445:16910-36. Plaintiffs filed a Motion for Reconsideration, R.447:16938-74, which the district court granted on November 9, 2015. Opinion and Order, R.450:16996-17041. The court found that its earlier decision was hasty and failed to consider and apply ordinary contract principles, without inferences.[5] Proper analysis resulted in a finding that

---

[5] The district court, realized its error:

> *Tackett* does not hold that courts must ignore language that under *Yard-Man* and its progeny inferred an intent to vest. To the contrary, *Tackett* advises courts to apply "ordinary principles of contract law[,]" 135 S. Ct. at 933; and under those principles, "' the intention of the parties'" is "gathered from the whole instrument ..." *Id.* at 937 (Ginsburg, J., concurring) (emphasis added).

Opinion and Order, R.450:17002.

the contract language was at least ambiguous and that the extrinsic evidence overwhelmingly supported a finding that the parties intended to vest the benefits. *Id.* R.450:17002-06.

Turning to the motions relating to the "reasonableness" inquiry, the district court then found that CNH's proposed plan was not "reasonably commensurate" with the current plan after a thorough analysis of each element of the plans. *Id.* R.450:17009-20.

After considering whether the Proposed Plan provided benefits that are "reasonably commensurate" with the Current Plan, "roughly consistent with the kinds of benefits provided to current employees," and whether the proposed changes are "reasonable in light of changes in health care" the court summarized: "Plaintiffs are far worse off under the proposed plan and the cost-shift proposed by CNH is extreme." *Id.* R.450:17021. The court further found that if approval of CNH's plan modifications requires satisfaction of all three elements of the *Reese* framework, the Court rejects CNH's proposed changes based upon CNH's failure to satisfy this first element; whether the Proposed Plan was reasonably commensurate with the Current Plan.

The district court went on to consider the other questions put by this Court. It found the Proposed Plan was similar to the benefits of current employees.

16

However, it was impossible to discern precisely how much better or worse given the practical difficulties of the comparison. *Id.* R.450:17026.

The district court turned to the third element of the reasonableness framework, under *Reese II*; how the Proposed Plan compared to plans available to retirees and workers at companies similar to CNH and with demographically similar employees. The court found this inquiry practically problematic, that it did "not shed light on whether the proposed changes are 'reasonable in light of changes in health care,'" and was not strongly supported by either Plaintiffs or CNH. *Id.* R.450:17037-17039.

The district court also determined that courts should not "red-line" plans to fashion a minimally commensurate one. *Id.* R.450:17039-40.

On November 10, 2015, CNH filed its **third appeal**. Notice of Appeal, R.451:17042-44.

## SUMMARY OF ARGUMENT

CNH promised lifetime, retiree healthcare benefits to the class. CNH initially promised its retirees lifetime healthcare benefits in the 1970s. Over decades and many collectively bargained contracts, the meaning of the contract language was reinforced by the parties' conduct and admissions. In 1998, the identical, serially adopted language meant what CNH historically and repeatedly said that it meant: that the class would receive retiree medical benefits for life.

17

CNH looks to this Court to approve a large-scale bait and switch. On five separate occasions, the courts have determined that the contract language at issue promised vested benefits. CNH seizes upon the decision in *Tackett* to ask this Court to revisit the vesting issue. CNH argues that rigid adherence to the principles expressed in *Tackett* require this Court to ignore the historical meaning of the language, the admissions of CNH regarding what the language means, the decades of conduct shaped by the promise, and the ambiguities of the contract. CNH would eschew all the record evidence, in favor of a requirement of "clear and express" vesting language, which it claims would change the benefits from unambiguously "vested" to unambiguously "not vested." This position has been twice rejected by this Court.

Ordinary contract principles are applied to collective bargaining agreements only when consistent with federal labor policies, including interpretive consideration of the common law of the shop. Even applying ordinary contract principles, the Court may review the circumstances giving rise to the agreement. The district court did not err in finding the contract language at issue is at least ambiguous. Extrinsic evidence confirms the intent of the parties to vest the benefits.

In *Reese II*, this Court held that the benefits are vested, but, CNH could make changes, so long as the resulting plan was "reasonably commensurate" with

18

the current benefits plan and so long as the change was consistent with advances in technology. The matter was remanded to the district court with specific direction to consider evidence on this issue.

CNH's proposed changes are drastic and over-reaching. CNH's plan is designed to grow to be unaffordable, thereby practically relieving CNH of its obligation to provide vested benefits. The district court was correct to reject them, *in toto*.

## ARGUMENT

### I.    STANDARD OF REVIEW

On appeal, a district court's grant of summary judgment is reviewed *de novo*. *Price v. Board of Trustees of Indiana Laborer's Pension Fund*, 632 F.3d 288 (6th Cir. 2011); *Noe v. PolyOne Corp.*, 520 F.3d 548, 551 (6th Cir. 2008). However, the Court must rely upon the record created below. Fed. R. Civ. P. 56.

> We do not weigh evidence, assess credibility of witnesses, or determine the truth of matters in dispute.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

### II.    THE DISTRICT COURT CORRECTLY APPLIED ORDINARY CONTRACT PRINCIPLES IN CONCLUDING THAT RETIREE HEALTHCARE BENEFITS VESTED

#### A. *Tackett* Requires Courts to Apply Ordinary Contract Principles to Ascertain and Effectuate the Intent of the Parties

In *M&G Polymers USA, LLC v. Tackett*, ___ U.S. ___, 135 S.Ct. 926 (2015), the Supreme Court held that the inferences identified in *UAW v. Yard-Man, Inc.,* 716 F.2d 1476 (6th Cir. 1983), cannot be used to determine vesting of collectively bargained healthcare benefits. Instead, "ordinary principles of contract law," when consistent with federal labor policy under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, govern the inquiry. *Id*. at 933: "In this endeavor, as with any other contract, the parties' intentions control." *Id*. (quoting *Stolt-Nielsen S. A. v. Animal Feeds Int'l Corp.*, 559 U.S. 662, 682, 130 S. Ct. 1758, 176 L. Ed. 2d 605 (2010).

The *Tackett* majority identified some of the traditional principles of contract interpretation. 135 S. Ct. 933-37. Justice Ginsberg identified others in her concurrence. 135 U.S. at 937-38 (some citations omitted).

On remand, in *Tackett v. M&G Polymers USA*, 2016 FED App. 0014P (6th Cir. 2016)("*Tackett III*"), the Sixth Circuit held that all relevant interpretive principles should be applied to determine the parties' intent, including those identified in Justice Ginsberg's concurrence. The court then identified each of those principles. *Id*. at \*6. Moreover, *Tackett III* acknowledged that this is not an end to the inquiry. There may be additional relevant principles:

> . . . the parties identified additional 'ordinary principles of contract law' that may be relevant here, including that contracts incorporate existing law, *Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 130 (1991); see also 11 Williston on Contracts § 30:19;

3 Corbin, Contracts § 551, and that subsequent changes in the law are not incorporated unless the contract so indicates, *Kia Motors Am., Inc. v. Glassman Oldsmobile Saab Hyundai, Inc.*, 706 F.3d 733, 738 (6th Cir. 2013) (quoting 11 Williston on Contracts § 30:23).

## B. The District Court Correctly Analyzed the CBA Language to Find "at Least" an Ambiguity

The district court reaffirmed that retiree benefits had vested, relying on ordinary principles of contract interpretation. It concluded that *Tackett* does not require courts to ignore contract language that was previously found to "plainly" disclose an intent to vest benefits.[6] Opinion and Order, R.450:17001-02. Applying the principles of *Tackett* to the Group Benefit Plan, the district court concluded that the relevant language was "at least" ambiguous as to whether benefits vested and that, therefore, looked at extrinsic evidence to resolve any ambiguity.

As the district court held, the relevant language, that: "*Employees Retired on Company Pension and Surviving Spouses Receiving Company Pension*" "shall be eligible" for healthcare benefits with "no contribution" can reasonably be

---

[6] *Yolton v. El Paso Tenn. Pipeline Co.,* 435 F.3d 571, 583 (6th Cir. 2006); *Reese I*, 574 F.3d at 322-23 (affirming summary judgment on the basis of the contract language alone). Notably, the district court expressly *disavowed any reliance* on *Yard-Man* in its previous decisions. Opinion and Order, R.214:8890-8891. *Reese I* relegated the *Yard-Man* inferences to "nothing more" than a "nudge in favor of vesting in close cases" and then affirmed that these benefits were vested without reliance on *Yard-Man* inferences, 574 at 321, clearly not considering this to be a "close case." *In Yolton*, the Sixth Circuit, addressing the same contract language, stated: "[T]he [district] court's analysis does not in any sense *rely* on an inference." 435 F.3d at 580. Nonetheless, the district court undertook a fresh review of the after *Tackett*.

interpreted to evince an intent to vest those benefits. Retirees will be "Retired on Company Pension" until they die. Surviving spouses will be "receiving [a] company pension" for their lifetimes. Even if that tying language is not conclusive of vesting after *Tackett*, it and other provisions in the CBAs, at the very least, create an ambiguity requiring consideration of extrinsic evidence. *Id.* R.450:17002.

It is significant that, in *Tackett*, where the CBA contained nearly identical language, Justice Ginsberg agreed that it created an ambiguity. She stated: "a provision stating that retirees 'will receive' health-care benefits if they are 'receiving a monthly pension' is relevant to [the vesting] examination." 135 S. Ct. at 938.

The district court looked at other provisions of the CBA. It noted that, unlike the specified healthcare coverage for retirees, "[a]ll other coverages cease coincident with the date of employment termination due to retirement" and that the inclusion of durational clauses for some benefits but not for retiree healthcare also is an indicia that the CBA is ambiguous as to the duration of retiree healthcare benefits. Opinion and Order, R.450:17004.

The court analyzed the provisions in the 1998 Central Agreement that provide that both the group insurance plan and the pension plan ran concurrently with it. According to the court, the parties used identical language, knowing that

the obligation to provide pension benefits would not end at the expiration of the agreement. *Id*. R.450:17004.

Here, in *Yolton*, the Sixth Circuit accepted Plaintiffs' argument that these two "concurrent" provisions of the CBA supported a finding of vesting, stating: "This argument further bolsters the interpretation noted above that the expiration of a CBA affects only future retirees in the context of benefits. Reviewing 'each provision in question as part of the integrated whole,' the use of similar language in sections 4A and 4C provides substantial support for the plaintiffs' position." 435 F.3d at 581.

Finally, the district court noted the history of the negotiations, in which the parties had agreed in 1993 and 1995 to a FAS medical cap letter and then, in 1998, agreed to delete it. Opinion and Order, R.450:17005. "As this Court has previously found, these [medical cap] agreements reflect the parties' intent to vest retiree healthcare benefits which were provided in the 1998 collective bargaining agreement and preceding agreements. *See Reese v. CNH Global N.V.*, No. 04-70592, 2007 WL 2484989, at *7-9 (E.D. Mich. Aug. 29, 2007)."

In sum, the district court concluded that, because the CBA was reasonably susceptible to more than one interpretation, it was ambiguous. *See Henry v. Chesapeake Appalachia LLC*, 739 F.3d 909, 912 (6th Cir. 2014) (applying Ohio law); *Wulf v. Quantum Chemical Corp.*, 26 F.3d 1368, 1376 (6th Cir. 1990). The

23

court therefore looked to extrinsic evidence to resolve that ambiguity. *See Tackett III*; *Shelby Cty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 370 (6th Cir. 2009); *Citizens Ins. Co. v. MidMichigan Health ConnectCare Network Plan*, 449 F.3d 688, 694 (6th Cir. 2006).

### C. Extrinsic Evidence Confirms the Intent of the Parties

The district court concluded that the extrinsic evidence unequivocally supports a finding that the parties intended to grant Plaintiffs vested, lifetime retiree health care coverage, referencing its prior rulings where it summarized that evidence. CNH did not even attempt to dispute what the extrinsic evidence showed; it simply argued that; 1) clear and express vesting language was required; and 2) the contract was not ambiguous. Opinion and Order, R.450:17001. Thus, CNH left the district court's previous findings about the impact of the extrinsic evidence unchallenged.

Indeed, the court could have reached no other conclusion. The evidence is overwhelming and unequivocal that CNH intended to vest retiree healthcare benefits. Plaintiffs set forth the extrinsic evidence in multiple, factually rich, submissions below. *See e.g.*, Plaintiffs' Motion for Summary Judgment, R.129:5150-5167. This evidence is also summarized in *Yolton* decisions, by both the district court and Sixth Circuit. *Yolton v. El Paso Tenn. Pipeline Co.*, 318 F.

24

Supp. 2d 455, 468-70 (E.D. Mich. 2003); *Yolton,* 435 F.3d at 583 (assessing "defendant's conduct [that] also indicates plaintiffs' were vested").

### D. Understanding Retiree Healthcare Benefits in the Context of the Federal Common Law of the Shop Under Section 301

The district court correctly applied "ordinary" rules of contract interpretation But, CBAs are not "ordinary" contracts. In *Tackett,* the Supreme Court cited *Textile Workers v. Lincoln Mills*, 353 U.S. 448; 77 S. Ct. 912; 1 L. Ed. 2d 972 (1957), acknowledging that common law rules of contract interpretation are to be applied *only* when *consistent* with federal labor policies. 135 S. Ct. at 933.

In *Lincoln Mills*, the Court held that Section 301 requires courts to fashion substantive federal common law for the interpretation and enforcement of labor contracts. 353 U.S. at 456.

Three years later, in *Steelworkers v. Warrior Gulf & Navigation Co*., 363 U.S. 574, 581-82, 80 S. Ct. 1347; 4 L. Ed. 2d 1409 (1960), the Court fashioned substantive federal common law under Section 301 by describing the fundamental *difference* between a labor contract and a commercial one:

> The collective bargaining agreement ... is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. ... The collective agreement covers the whole employment relationship. It calls into being a new common law -- the common law of a particular industry or of a particular plant.

The Court then held that "***industrial common law – the practices of the industry and the shop – is equally a part of the collective bargaining agreement***

*although not expressed in it.*" *Id.* at 585 (emphasis added).[7] In other words, a court cannot discern what a CBA means *without* determining the customs and practices of the industry *and* the shop. Unlike "ordinary" contract law, evidence of the common law of the shop is not in any way "extrinsic" to the CBA, but is "equally a part of the [CBA] although not expressed in it." *Id*. at 582.

Correctly interpreted under the federal common law of the shop, the meaning of the retiree healthcare provisions of the CNH/UAW CBAs becomes fully apparent.

In 1971, when Case and the UAW first agreed to company-paid retiree healthcare benefits, Case sent a letter to retirees telling them what Case had agreed to in the negotiations – to provide fully paid benefits at age 65 for them and for their surviving spouse "for the remainder of her lifetime." Devine Letter, R.129-14:6092. At a meeting between Case and the UAW in early February 1972, the UAW pointed out that the description of dependent benefits in another part of that letter was inaccurate. Meeting Minutes, *Id*. at 6097. Case agreed to and did send a

---

[7] While *Warrior Gulf* addressed arbitration, the inquiry into the meaning of a contract provision does not change based on who interprets it. The lesson of *Warrior Gulf* is that, when courts undertake to interpret collective bargaining agreements, they must immerse themselves in the "law of the shop" in order to effectively perform their interpretive function and so as not to misunderstand the actual common law of the shop. Otherwise, courts lack the "same experience and competence" as arbitrators to make the determination of what the labor agreement means. 363 U.S. at 581-582.

follow up letter making the correction. Devine Follow up Letter, R.129-14:6094. Thus, we *know* what the words in the CBA "Surviving Spouses Receiving Company Pension ... shall be eligible" for healthcare benefits mean. Case told us in 1971 when Case agreed to use those words to describe its obligation: Case said they mean "for the remainder of her lifetime."

Over the years, this common law of the shop was continually re-affirmed. Plaintiffs set forth this history in detail in their initial motion for summary judgment. Plaintiffs' Motion for Summary Judgment, R.129:5150-5163 and supporting exhibits. The following is illustrative:

Case corporate and plant personnel held exit interviews with retiring employees, with union representatives present, assuring them that they and their spouses would have lifetime healthcare benefits. **When employees retired under the 1987 Plant Closing Agreements, Case representatives, in the presence of union representatives, told them individually and in mass meetings, t*hat they would have fully paid lifetime benefits that would "continue" "unchanged" for their lifetimes*.** *See, e.g.*, *Yolton*, 318 F. Supp. 2d at 468-70 (emphasis added). After the plants closed and the CBAs at those locations were terminated, CNH continued to provide unchanged, lifetime benefits to those retirees.

In the 1990 negotiations, Case agreed to provide healthcare benefits for a surviving spouse of a disability retiree who, through a quirk in the pension plan,

was not receiving a survivor pension. After the negotiations, Case wrote to this surviving spouse, telling her she would have the "same [healthcare benefits] as those provided to other surviving spouses of deceased retirees" and she would "now have those coverages for your lifetime." Devine Letter, R.153:6737. Case copied Jack Reese, the UAW's chief negotiator, confirming that Case had complied with its agreement.

In 1991-92, Case negotiated with the UAW for voluntary early retirement benefits to reduce its work force, Case and the UAW held mass meetings with prospective retirees. At early retirement seminars on November 18, 1991 and March 12, 1992, Case passed out sheets outlining the benefits retirees would have under the program. As to surviving spouses, Case wrote that "**the surviving spouses will continue all medical, dental, vision, etc. coverages for life.**" Graham Deposition and Exhibits, R.129-10:5758-5762,5767,5775 (emphasis added).

In May 1992, in a meeting to discuss Case's upcoming FAS 106 accounting problem, its attorney presented the UAW with a power point from its consultant. In describing the "Plan Provisions" for healthcare benefits for "UAW Represented Employees," Case defined the "Duration of Benefits" as "Lifetime" with no annual contributions. *Yolton v. El Paso Tenn. Pipeline Co.*, 2008 U.S. Dist. LEXIS 17619 *33 (E.D. Mich. 2008).

28

In 1993, when Case and the UAW negotiated another plant closing agreement, Case's corporate labor relations department prepared a summary of "Plant Closing Benefits." Case benefit and personnel representatives held meetings with retiring employees to explain their benefits. The summary provided, under the heading "Special Early Retirement," that retirees would: "Receive retiree medical benefits for life." Lojeski Deposition and Exhibit, R.129-14:6075-6080,6149.

In 1993, the UAW and CNH negotiated the FAS 106 Letter, with a future per person "cap" on CNH's obligation for retiree healthcare, caps that would become effective only *after* the expiration of the extended 1990 CBA. This cap letter was included in the 1995 CBA, but with the effective date of the cap extended, again beyond expiration of the 1995 CBA. When, in late 1997, El Paso announced its intention to impose the "caps" on Pre-IPO retirees, characterizing those caps as a cost sharing agreement between CNH and the UAW, R.207-4:8813-8814, the UAW denounced that characterization as "absolutely not true." *See* UAW Protests, R.207-5:8805,8807; *Yolton supra,* 2008 U.S. Dist. LEXIS 17619 at **31-32 (E.D. Mich. 2008).

Immediately thereafter, in the 1998 negotiations, the UAW demanded and CNH agreed to eliminate the caps on its *future*, *post*-CBA obligation for retiree healthcare. With the elimination of the cap letter, CNH understood and agreed that its *post–CBA* obligation for those benefits was unlimited both in duration and cost.

29

This is simply a portion of the continuous, unequivocal history of the common understanding of CNH and the UAW that retiree healthcare benefits are "lifetime" benefits. Those benefits were unaffected by the closing of plants and the termination of the CBAs. This history of the meaning of this contract language was brought to bargaining repeatedly, including in 1998.

This is simply a portion of the continuous, unequivocal history of the meaning Case assigned to the retiree healthcare language it first negotiated in 1971. From the beginning, CNH stressed and repeatedly confirmed its obligation to provide "lifetime" benefits, CBA after CBA, through plant closings and the termination of CBAs at those plants. This is the common law of the shop through the end of bargaining in 1998 when CNH agreed to delete the medical cap letter.

The district court understandably followed the analytical framework first established by the Sixth Circuit in *Yard-Man* and most recently, by *Tackett*, framing its review of this history in terms of "extrinsic" evidence, not the common law of the shop. And, the result is the same because both methods, properly applied, disclose the *actual* intent of the parties. But any approach to contract interpretation that does not acknowledge and incorporate the common law of the shop as fundamental in interpreting CBAs will fail to grasp the essence of collective bargaining and CBAs in general. Any approach to contract interpretation that imposes *post hoc* interpretive hurdles to the consideration of evidence

improperly deemed "extrinsic," will, in far too many cases, negate the common law of the shop and, consequently, suppress, rather than identify and enforce the intent of the parties.

In *Tackett*, the Supreme Court recognized that the custom in the *industry* is an appropriate factor in determining the intent of the parties to a CBA but that any such consideration had to be based on "affirmative evidentiary support," not unsupported notions that indiscriminately spanned different industries. *Id*. at 936. *Tackett* found that the *Yard-Man* analysis was "too speculative and too far removed from the context of any particular contract to be useful in discerning the parties' intention." *Id*. at 935. Obviously, the "law of the shop" is, by definition, "*the* context" of *the* CNH/UAW CBAs and is directly probative "in discerning the parties' intention." *Tackett* does not, in any sense, foreclose or limit consideration of affirmative evidence showing what the parties themselves understood their obligation to be.

### E. Ordinary Rules of Contract Interpretation Permit An Inquiry Into the Circumstances Giving Rise to the Agreement

In the end, a proper analysis under either "ordinary" principles of contract interpretation, or the federal common law under Section 301, will arrive at the same result. In this regard, both the *Tackett* majority and concurrence cited Williston as a source of ordinary principles of contract interpretation. 135 U.S. at

31

933, 935-38. In the section cited by the majority, 11 Williston on Contracts §30:6,

p. 108 (4th ed. 2012), Williston elaborated on the correct principle to be applied:

> While unambiguous contract language is generally interpreted without resort to extrinsic evidence, it need not be interpreted in a vacuum; the underlying goal in interpreting a contract is to ascertain the intent of the parties, and the surrounding circumstances when the parties entered the contract, among other relevant considerations, may well shed light on that intent.

In *Williams v. Fenix and Scission, Inc.*, 608 F.2d 1205, 1210-11 (9th Cir.

1979), Judge, now Justice Kennedy, relied on Williston for his rejection of a strict

"plain meaning" approach to contract interpretation:

> This approach to contractual interpretation has been rejected by the circuit and is out of line with the better-reasoned contract law cases. It results in the exclusion of evidence clearly probative of the parties' understanding of their obligations. Examination of the circumstances which give rise to the agreement, of the subsequent acts and communications which bear on the parties' intent at the time of contracting, are relevant to show the intended meaning of a provision in a contract.

In *Alabama v. North Carolina*, 560 U.S. 330, 346 (2010), the Supreme Court

reiterated another "ordinary" rule of contract interpretation that "[t]he practical

construction, or the parties' conduct under the agreement, is 'highly significant'

evidence of the parties' intent."

Recently, the Sixth Circuit, in *Russell v. Citigroup, Inc.*, 748 F.3d 677, 681

(6th Cir. 2014), restated this traditional principle of contract interpretation: "A

court must interpret a provision in a contract not in isolation, but against the

backdrop of 'the contract as a whole ... [which includes] the situation of the parties and the conditions under which the contract was written.'"

All of these "ordinary" rules, which require courts to take into account the circumstances giving rise to the initial agreement, the customs and usages of the industry, the subsequent conduct and communications of the parties and the practical construction given to the contract's terms, are all relevant to the inquiry of what any contract means. Sometimes this evidence is (improperly) deemed "extrinsic" to the contract, while under Section 301, such evidence is "equally part of the collective bargaining agreement although not expressed in it." *Warrior Gulf*, 363 U.S. at 585.

These ordinary contract principles were not abrogated by *Tackett*. Indeed, the majority opinion requires courts to apply these principles to CBAs because, in CBAs as in all contracts, the primary purpose of contract interpretation is to "ascertain the intention of the parties" at the time the contract was made. 135 S. Ct. at 935.

CNH eschews the evidence of the "circumstances which give rise to the agreement, of the subsequent acts and communications which bear on the parties' intent at the time of contracting" because it otherwise must lose. The intent of the parties to vest retiree healthcare is overwhelmingly clear either under "ordinary" principles of contract interpretation or the federal common "law of the shop."

### F.  The Evolution of CNH's Obligation

The Central Agreements between CNH and the UAW, like all CBAs, all ran for a period of time, generally three or six years, and all had expiration dates. As *Litton* held, the fact that CBAs have expiration dates does not mean that all benefits will cease when a CBA expires. Whether benefits survive the expiration of a CBA depends on the intent of the parties, which can be either explicit or implied in the agreement.

*Tackett* did not change the law in this regard. In *Tackett III*, the court stated it "cannot presume . . . that a general durational clause says *everything* about the intent to vest," at*4 (emphasis in original), following the Supreme Court's direction that the fact a CBA ends "does not preclude the conclusion that the parties intended to vest lifetime benefits for retirees." 135 S. Ct. at 937.

In *Gallo*, however, the majority focused on the general duration clause and the fact that CBAs, by their nature, have limited terms. The majority stated that "everything CBAs said about [the topic of retiree healthcare] was contained in a three year agreement" and opined that it would be unusual for an employer to make a commitment for vested healthcare benefits in that context. 2016 FED App. 0030P *5 (6th Cir. 2016).

As the dissent pointed out, the "majority's refusal to acknowledge distinctions regarding the nature of collective bargaining causes it to

mischaracterize Retirees' argument" and to employ "opposite inferences" favoring *every* employer, without any corroborating, affirmative evidence. *Id*. *16, 20. In other words, the *Gallo* majority "put a thumb on the scale" in favor of *all* employers -- regardless of what actual evidence might show -- that retirees must overcome to be able to even present that evidence to the fact finder.

As shown above, there is simply no question that CNH agreed in 1971 to provide lifetime healthcare benefits for retirees and surviving spouses. CNH re-confirmed that agreement to the UAW and to its employees and retirees consistently over the years. The fact that a court in 2016 might have difficulty discerning a clear intent from language negotiated in 1971 can be no excuse to ignore the overwhelming affirmative evidence showing the parties' original, actual intent.

But, the entire premise that a CBA contains all that is to be said about a particular subject ignores, not only the common law of the shop, but the fact that, with respect to retiree healthcare, as with many other matters, the employer's obligation did not emerge in full bloom in a single CBA. CNH's current retiree healthcare obligation is the product of a long evolutionary process, the full measure of which can be discerned only by reviewing the entire history and context that gave rise to that obligation. In other words, a court must examine the

circumstances giving rise to the obligation or, as to CBAs, the common law of the *particular* shop.

The beginning of this contextual process for Case and the UAW was the passage of Medicare in 1965 when the federal government undertook to provide comprehensive healthcare benefits to persons over age 65.[8]

By the 1971 negotiations, Case had agreed to pay the full cost of the supplemental insurance plan for Medicare-eligible retirees and surviving spouses and one-half the premium for retirees under 65. Devine Letter, R.129-14:6092.

In the 1974 negotiations, Case agreed to begin paying the full premium cost of retiree healthcare for employees and surviving spouses under age 65 effective January 1, 1975. Case also agreed to a dental insurance plan for employees, but not retirees, effective July 1, 1975. R.129-26:6706,6711.

In the 1977 negotiations, Case agreed to extend the dental plan to retirees, and to surviving spouses "receiving" a spouse pension, effective October 1, 1977. R-129-27:5696. Case agreed to provide vision benefits to active employees effective January 1, 1978. R.129-26:6710.

---

[8] The same is true for many employers. A study of 98 large collectively-bargained benefits plans found that, by 1967 "more than 2 out of 5" extended healthcare to retirees and "about 85 percent" were "financed in full by the employer." Kolodrubetz, "Employee-Benefit Plans, 1950-1967," 32 *Soc. Sec. Bulletin* (April 1969) at 4.

By 1990, Case had agreed to provide a vision and hearing benefit for retirees with more than ten years of service at retirement. 1990 Plan, R.129-30:5031.

CNH agreed to provide retiree healthcare benefits when the retiree population was small and the benefits relatively inexpensive. And then, Case agreed during subsequent negotiations, to expand both its obligation and the benefits over time, from CBA to CBA, during which the retiree population grew and benefits became more expensive.

Throughout this time, CNH had a choice; it could have attempted to reduce or eliminate its obligation with respect to employees retiring in the *future*, as Caterpillar did in 1992, by bargaining to impasse and unilaterally imposing reductions on active employees who would retire thereafter, a strategy that resulted in an eight year labor war between Caterpillar and the UAW.

CNH took a different route, one that again reveals the law of the CNH/UAW shop. In the early 1990's, Case wanted to reduce its labor force. It negotiated a Voluntary Termination of Employment Program (VTEP) with the UAW which included a special early retirement program that allowed employees to "grow into" an early retirement pension and retiree healthcare at age 55.[9] In calculating the cost of that retiree healthcare benefit, Case used a "life span" of 74 years (or 19 years

---

[9] As noted earlier, CNH held meetings at which it distributed summaries of the benefits provided under the VTEP, including "lifetime" health care benefits for surviving spouses.

after the employee reached age 55). The potential additional cost of retiree healthcare benefits, "assum[ing] all eligible participate," was projected by CNH to be slightly more than *$112 million*. Haas Deposition and Exhibit, R.129-11:5217-5230,5326.

These uncontested facts are probative of at least two things with respect to the issue at hand. First, they are further affirmative evidence of the common law of the shop; that is, in the 1990's as for the prior two decades, CNH understood and acted consistently with that understanding that its obligation for retiree healthcare benefits lasted for the lifespan of a retiree, not the duration of any particular CBA. Second, contrary to the majority's speculation in *Moen*, it is *not* unusual, or *at least it is not the case here*, that a multi-billion dollar corporation will make large financial commitments in a single stroke; here a commitment to 2624 employees who would not otherwise be eligible, to provide pension and healthcare benefits (for the "life span" of retirees at a potential cost of $112 million) in order to otherwise re-order its business by substantially reducing its work force.[10]

The other commitment CNH made in a single stroke was the elimination of the medical cap letter in the 1998 negotiations. These caps were *only* effective

---

[10] The cost of the retiree health care obligation, more than $100,000,000, was actually *smaller* than CNH's obligation to provide each terminating retiree with an average cash payment of $70,000. The total per person cost for the VTEP program was more than $100,000, or potentially $492 million.

beginning on dates *intentionally* set *after the expiration* of the CBA. El Paso and CNH have asserted that those caps were substantive and the future obligation for medical inflation above the caps rested solely upon the retirees. Nevertheless, CNH agreed to *eliminate* those post-CBA caps in 1998 -- an agreement that can only mean that CNH agreed to undertake the *entire* cost of that *post-CBA* obligation, including all medical inflation thereafter, for the retirees' lifetimes. This undisputed evidence, unique to CNH/UAW CBAs, shows that in 1998, CNH agreed that the general "duration" clause did not apply to its obligation to retirees, because, in 1998, CNH negotiated away any contractual right to impose future cost limitations on what CNH had already agreed was a *post*-CBA obligation.

### G. *Tackett* Does Not Require "Clear and Express" Vesting Language

In *Tackett III*, the court cited Justice Ginsberg's concurrence for the proposition that "No rule requires 'clear and express' language in order to show that parties intended health-care benefits to vest." It also cited *Litton*, 501 U.S. 190, 203 (1991) which held that promises of lifetime retiree healthcare "may arise" from the express or "implied terms of the expired" CBA. *Tackett III* at *6, 7. In *Gallo v. Moen*, 2016 FED App. 0030P at *12 2016 U.S. App. LEXIS 2118, the majority agreed that "*Tackett* does not create a clear-statement rule."

CNH (and the amicus) argues, nonetheless, that absent "clear and express" language, the Court is precluded from finding benefits to be vested. CNH relies in

large part on its claim that the *Tackett* intended to incorporate the "clear and express" rule of *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998) into the context of collectively bargained benefits.

The district court disagreed, finding that CNH overstates the significance of the Supreme Court's single reference to *Sprague*. Opinion and Order, R.450:17000. It noted that *Sprague* involved unilaterally offered benefits and was only discussed as a point of comparison with *Yard-Man*. The district court understood that, if the Supreme Court intended adoption of the presumptive rule in *Sprague* to trump the intent of the parties and overrule *Litton*, then the Supreme Court would have had no reason to, as it did, remand the case for a determination if the CBA – which lacked clear and express language – vested the benefits. *Tackett*, 135 S.Ct. at 937.

It is critical to note a few things in this regard. The "clear and express" rule in *Sprague* came, not from ordinary principles of contract interpretation, or from the substantive federal law of contracts developed under Section 301, but entirely from an analysis of the history of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §1001 et seq. and the importance of written documents in ERISA's "elaborate" enforcement scheme whereby the employer unilaterally provided benefits to salaried retirees. *Sprague*, 133 F.3d at 399-403. In other

words, *Sprague* did not even attempt to determine what the result would have been under "ordinary" bilateral contract principles.

In *Gallo*, the majority concluded that the Supreme Court "endorsed our decision in *Sprague*." It interpreted *Tackett* as a directive to "treat collectively and noncollectively bargained contracts about retiree healthcare benefits similarly—to apply the same basic rules of contract interpretation to both sets of contracts." 2016 FED App. 0030P at *4. Because *Sprague* did not attempt to apply contract principles (it analyzed a statute), and certainly did not attempt to ascertain the common law of the shop, this analysis is fatally flawed. *Tackett III*, however, was correct, stating "[w]e need not decide here whether *Sprague*'s 'clear and express language' requirement comports with ordinary principles of contract law. 2016 FED App. 0014P at *8.

### H. CNH's Reliance upon the Letters of Understanding is Misplaced

#### 1. National and State Healthcare Initiatives Letter

CNH argues that the "National and State Healthcare Initiatives" letter is evidence that the parties understood benefits were subject to change. That letter says nothing about either the intent to vest benefits or changing the level of benefits. It addresses the situation where federal or state governments provide healthcare benefits that are also provided under the CBA. The level of benefits does not change; CNH is merely relieved of the cost of duplicating benefits

otherwise provided by a federal or state government. Plaintiff's Response to Summary Judgment, R.425:14969-70. *See Hinckley v. Kelsey-Hayes Co.*, 866 F. Supp. 1034, 1041 (E.D. Mich. 1994) ("statutory benefits" provision "merely protects the defendant from having to give its retirees duplicate benefits already provided by the government"). *Accord Fox v. Massey-Ferguson, Inc.*, 172 F.R.D. 653, 677-78 (E.D. Mich. 1995), *aff'd*, 91 F.3d 143 (6th Cir. 1996).

CNH asserts that this Court addressed the Letter in *Reese II,* 574 F.3d at 324-5, Appellants' Brief, p. 45. It did not. To the extent this Court considers CNH's passing reference to that Letter as relevant, Plaintiffs have addressed the Initiatives Letter, including CNH's waiver of any reliance on it, in detail below. R.425:14970-71,82-83,86-87.

### 2. *1998 Cost of Healthcare Letter of Understanding*

In *Reese I*, the court, in viewing the evidence most favorably to CNH, 574 F.2d at 321, cited the 1998 Cost of Healthcare Letter as a "clue" that the parties understood that retirees' vested benefits could be reasonably modified in the future. *Id*. at 325-26.

On remand, Plaintiffs submitted the entire bargaining history to the district court to show the *actual* meaning of that Letter. Plaintiffs' Motion for Summary

Judgment, R.273:9969-10811.[11] That evidence confirmed what district court had held in its first decision:

> The plain language of the 1998 Letter of Understanding simply provides that, during the term of the 1998 Central Agreement, the cost for health insurance coverage for retirees electing a non-Network option ... will not be greater than the cost (if any) for the Network option. ... It does not provide that contributions can be sought ... for Network coverage once the 1998 Central Agreement expires.

Opinion and Order, R.214:8885-8892.

The district court correctly reaffirmed its reading of this Letter. Opinion and Order, R.304:11641-11642. Moreover, any interpretation that retirees would have to pay for their healthcare coverage, despite express contract language to the contrary, would be directly contrary to CNH's commitment, when it agreed to the elimination of the FAS medical cap letter *in the same CBA*, to assume the *entire* obligation for *future* medical inflation.

## III.  CNH'S PROPOSED PLAN IS NOT REASONABLY COMMENSURATE WITH THE CURRENT PLAN

In *Reese II*, the Sixth Circuit held that CNH could make changes "reasonably commensurate" with the Plaintiffs' current healthcare plan and consistent with advances in technology.

---

[11] Plaintiffs also set it forth in their appeal brief in *Reese II*. 006110991287, 06/20/2011, pp.41-45.

CNH's proposed changes, revealed for the first time on remand, included a massive cost shift and reduction of benefits, with no corresponding advantage to class members. Chart showing Cumulative Increases in Cost and Income, R.419-12:14382-14384, Lynne Report, R.419-9:14354-61. *See also*, Daniels Report, R.419-13:14388-91.[12]

CNH's Proposed Plan shifts ever-increasing costs to the Class. It requires all class members to pay premium contributions, with annual contribution increases at 60% of the cost of future medical inflation. The Proposed Plan ***eliminates*** prescription drug benefits for Medicare eligible class members. For pre-Medicare class members, the Proposed Plan imposes an eight to twelve fold increase in the copays for a 30-day supply of retail brand name drugs and a $20 to $120 copay increase for *each* 90-day supply of mail order drugs. The Proposed Plan implements deductibles and co-insurance payments for In-Network services and increases the deductibles and co-insurance payments for Out-of-Network and Non-Network services. Plaintiffs' Motion for Summary Judgment, R.419:14030-33.

According to CNH's benefit consultant, the relative value of the benefits paid under the Current Plan is about 98%, while the relative value of the Proposed

---

[12] Appellees set forth the facts relevant to the "reasonableness" question in Plaintiffs' Motion for Summary Judgment, R.419:14016-14077 and Reply, R.430:16288-16290. Appellee also rebutted the facts presented by CNH at R.425:14963-14983.

Plan for Medicare-eligible class members starts at 35.5%, decreasing to 31% in eight years and 25% by 2032. For pre-Medicare-eligible class members, the relative value of the Proposed Plan in 2015 is 80.8%, decreasing to 65% by 2022 and 53% by 2032. *Id.* R.419-2:14080-81.

### A. The District Court Carefully Followed the Direction Provided by *Reese II*

The *Reese II* majority instructed the District Court to take evidence on the following questions, and "others it considers relevant to the reasonableness question:"

[1] What is the average annual total out-of-pocket cost to retirees for their healthcare under the old plan (the 1998 Group Benefit Plan)? What is the equivalent figure for the new plan (the 2005 Group Benefit Plan)?

[2] What is the average per-beneficiary cost to CNH under the old plan? What is the equivalent figure for the new plan?

[3] What premiums, deductibles and copayments must retirees pay under the old plan? What about under the new plan?

[4] How fast are the retirees' out-of-pocket costs likely to grow under the old plan? What about under the new plan? How fast are CNH's per-beneficiary costs likely to grow under each?

[5] What difference (if any) is there between the quality of care available under the old and new plans?

[6] What difference (if any) is there between the new plan and the plans CNH makes available to current employees and people retiring today?

[7] How does the new plan compare to plans available to retirees and workers at companies similar to CNH and with demographically similar employees?

*Id.* 685-686.

The district court followed the direction of this Court, addressing each of these inquiries in turn, informed by the extensive briefing of the parties.[13] Opinion and Order, R.450:17007-40. The Court first turned to [1]-[4] as they each required a comparison of total out-of-pocket costs to retirees under the Current Plan and Proposed Plan, currently and in the future. *Id.* R.450:17010-20. The district court's fact-specific analysis is based upon CNH's own admissions and submissions. *Id.* R.450:17009.[14]

### 1. The Proposed Plan Dramatically Changes Premium Contributions

The Current Plan provides that "no contributions" are required for the Health Care Plans, *supra.* The Proposed Plan imposes premium "sharing," calling for, in

---

[13] Plaintiffs filed their Motion for Summary Judgment, R.419:14016-14077 and Reply, R.430:16288-16296. Plaintiffs also filed their Response to CNH's Motion for Summary Judgment. R.425:14954-15002. In relation to CNH's Motion for Summary Judgment, Plaintiffs also filed a Motion to Strike CNH's Expert Declarations, R.428:15749-15781 and Reply, R.432:16513-16523.

[14] Appellees relied exclusively on the projections *CNH's consultant*. CNH does not argue with Plaintiffs' estimates of the costs that would be shifted to retirees under the Proposed Plan. To the extent CNH takes issue with the numbers Appellees or the district court relied upon, it is essentially impeaching its own evidence, without record support. *See*, Reply, R.430:16288-16296.

2013, premium contributions of $1,092 per year for pre-Medicare retirees and surviving spouses and $120 per year for Medicare-eligible Plan Participants, and surviving spouses. In subsequent years, premium contributions **will increase by 60% of the total cost increase from one year to the next**.[15] They are paying nothing now but **by 2022, they will be paying $6,714, and in 2032, they will be paying $17,458.** Opinion and Order, R.450:17015-16. Each year, 60% of the cost of the projected increase of medical inflation is shifted from CNH to the Class, and therefore the percentage of participant out of pocket costs relative to total plan costs escalates while, conversely, the relative value of plan benefits to the participant plummets.

### 2. Out of Pocket Costs Increase Dramatically Under the Proposed Plan.

The district court analyzed the out-of-pocket costs to the class under both plans. *Id.* R.450:17010-18. The district court summarized its findings at *Id.*

---

[15] The 60% increase is mentioned, but not defined in the Proposed Plan. R.419-4:14161. CNH ***never states how the premiums will be calculated*** and certainly does not guarantee that the premiums will not increase more dramatically year over year compared to its projections -- as they have recently done for post-2005 retirees. Coogan Deposition, R.419-11:14380, Contribution History, R.420-1:14433-14434.

R.450:17018. In examining the district court's chart, this Court should note that under the Current Plan, all participants are part of the "in-network" plan.[16]

The average[17] annual out of pocket cost to Medicare-eligible participants under the Current Plan for 2013 is projected to be $138; $239 in 2022 and $419 in 2032. This is an increase of 73% by 2022 and 204% by 2032 and is a constant as a percentage of plan costs (generally 2.7% of total plan costs). The average annual out of pocket cost to pre-Medicare participants under the Current Plan is projected to grow from $227 in 2013 to $377 in 2022 and to $661 in 2032, an increase of 66% by 2022 and 191% by 2032. CNH projected annual out of pocket costs for Pre-65 participants in 2032 to be $596. The percentage of participant costs to total plan costs remains constant at 1.5%. Lynne Report, R.419-9:14354-55.

Because of the elimination of prescription drug benefits, the Proposed Plan would result in an immediate, precipitous shift in plan costs to Medicare

---

[16] Under the Current Plan, there are two Plans: the 1998 Network PPO Plan and the Non-Network Plan. CNH admits that no class member is enrolled in the 1998 "Non-Network" Plan. The Network PPO Plan has in-network and out-of-network benefits. Based upon the claims data CNH has provided through discovery, virtually every claim under the 1998 PPO Plan has been processed as an in-network benefit. Lynne Report, R.420-3:14461-2.

[17] The cost shift is dramatic and will affect the whole class, regardless of financial and health condition. However, an average does not capture the harm done to the most vulnerable of the class.

participants.[18] Currently, Medicare class members pay 2.7% of costs under the Current Plan. According to Towers Perrin, CNH's actuary, under the Proposed Plan, Medicare participants would be responsible for 62.6% of total plan costs in 2013; 69.0% of total plan costs in 2022 and 74.9% of plan costs in 2032. Per Capita Payments, R.419-2:14080-14081.

### 3. Cost Growth and Cost Shifting

The average annual out of pocket cost to **pre-Medicare participants** under the Proposed Plan is projected to grow from an average of $1,587 in 2013 to $9,345 in 2022 and to $25,817 in 2032. This represents an immediate increase of **599%** from $227 under the Current Plan; and an increase of **4,016%** from the cost of the Current Plan **by 2022** and an **11,273% increase by 2032**. CNH projected the out of pocket cost to Pre-65 participants under the Proposed Plan to be **$21,615 in 2032**. The average annual out of pocket cost to pre-Medicare participants under the Proposed Plan increases significantly over the years as a percentage of total plan costs. The **projected participant share of plan costs** is projected to shift immediately **from 1.5% under the Current Plan** to 10.9% under the Proposed Plan in 2013 and then grow to 34.9% in 2022 and 46.8% in 2032 according to Towers Watson. Per Capita Payments, R.419-2:14080-14081.

---

[18] CNH contends that the retirees can purchase a Medicare Part D Plan, but the availability of Part D coverage is not a substitute for vested, contractual coverage. Plaintiffs' Motion for Summary Judgment, R.419:14055.

By cost-shifting to its retirees, CNH will save itself a bundle:[19]

- According to Towers Watson, CNH's cost under the **Current Plan** for each **Medicare-eligible** participant is projected to be $4,973 in 2013, $8,701 in 2022 and $15,322 in 2032.

- Towers Watson projects CNH's cost under the **Proposed Plan** for each **Medicare-eligible** participant to be $1,300 in 2013, $1,681 in 2022 and $2,352 in 2032.[20]

- CNH's cost under the **Current Plan** for each pre-**Medicare** participant is projected to be $15,177 in 2013, $25,148 in 2022 and $39,749 in 2032.

- CNH's cost under the **Proposed Plan** for each pre-**Medicare** participant is projected to be $12,931 in 2013; $17,407 in 2022 and $24,570 in 2032.

Per Capita Payments, R.419-2:14080-14081.

The total cost shift, according to CNH's own numbers, is estimated to save CNH $192,872,559 *just in the first ten years*.[21]

---

[19] In 2032, under the Proposed Plan, CNH will spend $2,352 a year per Medicare participant. This is *less than half* as much as CNH spends for Medicare participants in 2013 under the Current Plan. Under CNH's Proposed Plan, CNH's costs for providing healthcare benefits for Medicare participants in 2032 will be $400 a year *less* than the amount of CNH's capped obligation under the rejected FAS 106 Letter. Cap Letter, R.420-4:14474. In effect, through its Proposed Plan, CNH is seeking to unilaterally achieve what it gave up in bargaining in 1998.

[20] Notably, CNH projects to pay *less than half of what CNH is paying today*.

[21] CNH argued that these projections failed to account for the amount it shifts to the federal government, instead of the class. The estimated total cost in that same ten years to the retiree under the Proposed Plan is $112,875,637, meaning that just under $80,000,000 will be picked up by the federal government. Future Expected Aggregate Payments, R.430-1:16297-16298. CNH does not mention the federal subsidies it has received and will receive under the Current Plan.

50

### 4. Quality of care "Available" Under Both Plans Was Found To Be Comparable

The district court found:

> The parties agree that the quality of care is comparable under both plans, except that the quality of care for Medicare-eligible participants is reduced under the proposed plan due to the unavailability of prescription drug coverage for that class of participants through the plan. Aside from this, the parties agree that both plans cover services that are "medically necessary" for the care of the participant and offer the same suite of benefits.

Opinion and Order, R.450:17020 (noting that the practical deterioration of the quality of care based upon affordability raised at Plaintiff's Motion for Summary Judgment, R.419:14061-63 by Plaintiffs was considered as part of its cost analysis).

CNH conceded that the Proposed Plan does not cover a single medical procedure or prescription drug that is not covered by the Current Plan. CNH conceded that the Proposed Plan does not and is not designed to address or improve the "quality" of care in any manner different than the Current Plan. Both plans provide benefits under general descriptions of services (not a fixed, narrowly specified services that cover new medical technologies and newly approved drugs), subject only to the general requirement that the services provided be medically necessary for the care of the participant. Therefore, technically and factually, the quality of care under the Proposed Plan will be no different, and certainly *no better* than that provided under the Current Plan.[22]

---

[22] Quality of care would be less in the sense that some items are not covered under

CNH contends that the District Court erred in failing to address the alleged general improvement in healthcare which it alleges to have occurred over the past decades, as part of the "quality of care" comparison between the Proposed Plan and the Current Plan. Despite having presented no record evidence[23] below in support of this position, CNH argues that the proposed cost-shift "bears a reasonable relation to the improvements in benefits" going forward.[24] CNH does not reference any new or improved benefit to the class. Rather, CNH is claiming the class should pay more for the benefits it already has. Plaintiffs' Motion for Summary Judgment, R.419:14045-46.

---

the Proposed Plan. Moreover, the cost-sharing would likely lead to an indirect reduction in the quality of care, as retirees would forego treatment or drop coverage when it became unaffordable. Plaintiffs' Motion for Summary Judgment, R.419:14061-63.

[23] As argued below, CNH's broad generalizations do not constitute evidence. Response to CNH's Motion for Summary Judgment, R.425:14974-83, Plaintiffs' Motion to Strike CNH's Expert Declarations, R.428:15749-15781. To the extent CNH presented evidence regarding prescription drug use and medical procedure codes, Appellees thoroughly debunked CNH's analysis *and* conclusions. Plaintiffs' Motion to Strike CNH's Expert Declarations, R.428:15778-79, Reply in Support of Plaintiffs' Motion to Strike, R.432:16518.

[24] CNH's claim that its cost-shifting is proportional to market expectations (Appellants' Brief, p. 54), is rebutted by its own expert who admitted that it is not possible to accurately predict the cost of healthcare benefits, and that he thought the trends unlikely to continue. Macey Report, R.423-22:14914-15. See also Lynne Report, R.428-6:15942-45.

If CNH's position were to be extrapolated - that increased value of the benefits opens a door to increased price - then every vested plan would be subject to change due to medical inflation, and every contract subject to revision. "Retiree Healthcare and *Reese v. CNH America:* The Beginning of the End of Contract Law As We Know It?" 59 *Wayne L. Rev.* 417, 418 (2013).

CNH's approach invites the kind of amorphous "reasonableness" determination rejected by the Sixth Circuit in *Steel Workers v. Kelsey-Hayes Co.*, 750 F.3d 546, 554 (6th Cir. 2014). Response to CNH's Motion for Summary Judgment, R.425:14989-90. CNH's approach fails to incorporate the limits in *Reese I* and *Reese II.* "CNH should be allowed to make reasonable modifications to the health-care benefits of retirees, consistent with the way the parties have interpreted and implemented prior CBAs containing similar language." *Reese I* at 956. See also, Plaintiffs' Motion for Summary Judgment, R.419:14036-14047.

CNH's approach mistakenly assumes the parties never anticipated or bargained over the burden of healthcare inflation. But this is not true. See discussion of FAS 106 cap letter, above. By eliminating the cap letter in 1998, CNH agreed to assume the risk of future medical cost inflation. Plaintiffs' Motion for Summary Judgment, R.419:14059, Response to CNH's Motion for Summary Judgment, R.425:14991-93. Conversely, these parties have never contracted for a thing of value with the understanding that the other party could unilaterally change

the consideration in the future. There is no precedent in the parties' relationship or prior CBAs for the cost-shift proposed by CNH.

The cornerstone of any contract interpretation is the parties' intent. Reply in Support of Plaintiffs' Motion for Summary Judgment, R.430:16290-91. The generalized "reasonableness" inquiry urged by CNH impermissibly distances the analysis of what vesting meant from the context of these parties' intentions. *Tackett* at 935.

### 5. The District Court Found that the First Four Inquiries Demonstrate the Proposed Plan is Not Reasonably Commensurate with the Current Plan

The district court summarized the first four inquiries and found "the plan proposed by CNH bears little resemblance to the current plan from a cost-sharing perspective," "Plaintiffs are far worse off under the proposed plan" and "the cost-shift proposed by CNH is extreme." It concluded:

> In allowing "reasonable" modifications to Plaintiffs' vested healthcare benefits, this Court does not believe the Sixth Circuit had in mind anything near the magnitude of the changes proposed here. "Reasonably commensurate" changes must mean, at a minimum, changes that are not drastic. Because the cost changes proposed here are drastic, the Court does not believe that such changes can even arguably qualify as "reasonably commensurate."

> Therefore, the Court concludes that the proposed plan is far from "reasonably commensurate"[25]– or "equal in measure or extent"– to the current plan.

---

[25] The district court adopted a dictionary definition approach to the meaning of

Opinion and Order, R.450:17020-22.

>    **6.  CNH Makes Healthcare Available To Current Employees And People Retiring Today Pursuant To Unique Bargains And Tradeoffs That Render Plan Comparison Difficult.**

CNH asserts that the Proposed Plan is the 2005 CBA benefits plan.[26] CNH argues this "fact" supports the notion that the Proposed Plan is a "reasonable" modification of the Current Plan. The Proposed Plan is not the 2005 plan. Plaintiffs' Motion for Summary Judgment, R.419:14055-56, Response to CNH's Motion for Summary Judgment, R.425:14971.

---

"reasonably commensurate." Appellants urge a standard of "reasonableness" that accounts for the law of the Sixth Circuit, the contract language, the context of collective bargaining and the inherent balance that results from bargaining. Plaintiffs' Motion for Summary Judgment, R.419:14036-47. See also *Tackett* at 933 (parties' intentions control, "likely behavior" is "too speculative and too far removed from the context of any particular contract to be useful in discerning the parties' intention." At 935).

[26] The benefits that are currently provided to post-2005 retirees were negotiated in the wake of a long labor dispute; the 2005 agreement was reached while CNH had locked out active employees for nearly six months. For many reasons CNH was able to impose terms during the 2005 negotiations. CNH closed the East Moline combine factory in 2004 and moved the operations to a non-union facility. Seven hundred active employees retired as a result, leaving active membership at a historic low, which contributed to a reduction in the UAW's bargaining leverage. The reductions demanded and obtained by CNH in 2005 were drastic. But, one additional fact relating to the 2005 negotiations simply cannot be emphasized too strongly in this regard – the UAW adamantly refused to negotiate in 2005 over any reductions in the healthcare benefits of the Class Members here. Now, CNH is asking this Court to impose on Class Members, the massive benefit reductions it could not obtain in bargaining.

55

CNH's Proposed Plan does not provide the tradeoffs that post-2005 retirees received as a result of the 2005 negotiations to mitigate the massive reductions the 2005 contract imposed. CNH urged the district court to look only at the plan documents. The district court correctly found: "To consider only the two plans would result in a distortion of the full retiree healthcare picture." Opinion and Order, R.450:17026. Outside the plan document, there were **three significant, mitigating benefit improvements gained in 2005** for post-2005 retirees, all of which CNH asked the district court to ignore:

- CNH agreed to a **large pension increase** for post-2005 retirees; $6,000 a year in additional supplemental allowance pension payments to age 62 and, for a 30-year employee, an annual increase in basic pension benefits of $1,746 per year starting at age 62 and continuing for life.[27]

- In 2005, CNH agreed to **increase the Medicare Part B reimbursement** benefit from $65.50 per Medicare participant (the amount the Class receives) to $100.00 per month per person. Coogan Deposition, R.419-11:14378-79. This benefit was intended to reimburse future retirees for both the Medicare Part B and Part D premiums (and required proof of enrollment in such plans). This increased benefit provided post-2005 retirees with an additional $414 a year (or $818 a year for a couple) beginning at age 65, for life.

- CNH agreed to establish and contribute to **Retiree Medical Savings Accounts**. RMSA Description, R.420-7:14493-14499. For employees who retired after May 1, 2005, and during the terms of the six-year 2005 CBA, CNH contributed a median amount of more than $16,000, and as much as

---

[27] These increases are greater than those provided to Class Members retiring under the 1998 CBA. Class members who retired under the 1990 and 1995 CBAs receive even less in pensions. *See*, Schaeffer Deposition, R.420-6:4480-92.

$29,000,[28] into these accounts for each retiree.

Added together, these additional benefits **could easily exceed $135,000 over the lifetime of a post-2005 retiree who retired early with 30 years of service**. Plaintiffs' Motion for Summary Judgment, R.419:14066.

While CNH argues that the class would always pay "less" than the 2005 retirees because the cost-shifting would begin later, CNH failed to make a record of how much of a difference there would be over time or to otherwise quantify the "less" that the class would pay. This failure, and the district court's obligation to view facts in favor of CNH, led to its ambivalence on this factor in determining whether the Proposed Plan was reasonably commensurate to the Current Plan. Opinion and Order, R.450:17028.

### 7. Comparisons Between Other Companies With Different Employers And Plans Are Difficult And Do Not Weigh In Favor Of Either Party.

The district court questioned the value of this comparison in determining whether the Proposed Plan was reasonably commensurate with the Current Plan because the parties "predictably" each selected, from an impractically wide array, comparator plans that supported their positions. *Id.* R.450:17031.

Appellees proffered John Deere as a competitor. John Deere is CNH's principal competitor in the United States. It manufactures the same kinds of

---

[28] See Plonka Affidavit, R.420-8:14502.

products as CNH – farm tractors and agricultural implements as well as small construction equipment like skid loaders and back hoes. John Deere has factories in Midwestern states, including Illinois and Iowa. Like CNH, John Deere has a union workforce represented by the UAW and the retiree healthcare benefits for hourly employees derive from a collective bargaining agreement.

The healthcare plan for hourly John Deere retirees is remarkably similar to the Current Plan. It is far superior to the Proposed Plan. The current 2009 John Deere CBA has two healthcare plans; the managed care organization (MCO) plan and the John Deere Traditional Option Plan. Deere Plan, R.420-9:14537-14549. For a description of the plan terms, *see* Plaintiffs' Motion for Summary Judgment, R.419:14068.

CNH did not contest that John Deere was an appropriate comparator. CNH instead offered a wide-ranging and eclectic group of partial comparators without regard to this Court's direction that the comparison involve employers "similar to CNH" with "demographically similar employees."

CNH's continued reliance upon the "Towers Watson survey of nearly nine hundred employers" is remarkable given how thoroughly that reliance was discredited. Response to CNH Motion for Summary Judgment, R.425:14978-79:14999-15001. The district court found it to be irrelevant. Opinion and Order, R.450:17036.

CNH also offered a Caterpillar contract as a comparator. Appellees addressed the inherent flaws in that comparison. In that instance, CNH's consultant misled the district court on several key components of the plan. See Response to CNH's Motion for Summary Judgment, R.425:14995-98.

The district court ultimately found that the comparisons proffered by the parties did not "shed light on whether the modifications proposed by CNH are 'reasonable in light of changes to health care.'" Opinion and Order, R.450:17036-37.

### 8. Balancing

The district court did not err in its determination that, after weighing the factors[29] pursuant to this Court's direction, CNH's Proposed Plan is not commensurate with the Current Plan. *Id.* R.450:17039.

---

[29] In addition to the factors listed in *Reese II,* Appellees urge that other factors should also be considered in the "reasonably commensurate" analysis, including: 1) whether Defendant considered modifications that would produce cost-savings with less impact on the Class? Plaintiffs' Motion for Summary Judgment, R.419:14069-70, 2) whether Defendant's proposed changes address the bases for the Court's determination that the benefits could be modified, e.g. do the proposed changes advance the availability of new technology, *Id.* R.419:14070, and 3) the relative impact of the Proposed Plan on the retirees compared to CNH, *Id.* R.419:140170-74. The district court declined to consider these other factors.

**B. As A Matter Of Law And Policy, The Court Must Review The Proposed Changes As A Whole, And May Not Adjust The Plan Terms Until The Lowest Common Denominator Of Reasonableness Is Reached**

CNH would draw the district courts and this Court into the position of a benefits plan architect, severing provisions to bring them just below the margin of "reasonableness." Adoption of CNH's red-lining approach would permit CNH and other providers of vested benefits[30] to make periodic unilateral changes throughout the lifetime of the retirees - subject to a litigated determination of whether each such change meets "reasonableness" standards. It would result in costly, recurring, and disruptive litigation, as employers make unilateral changes every few years and retirees or unions challenge those changes.

Appellees argued below that fairness dictated an *in toto* review of the Proposed Plan. Plaintiffs' Motion for Summary Judgment, R.419:14074-75. The district court agreed and found that a piecemeal approach espoused by CNH:

> ...would encourage employers to request modifications that are unreasonable, knowing that they can rely on a court to separately examine each proposed modification and tweak it so that it falls just within the hazy category of "reasonable." It is not the role of a court to write or rewrite a healthcare plan, and incentivizing employers to suggest reasonable modifications while believing them to be unreasonable arguably encourages bad faith conduct. In addition, courts lack the expertise necessary to fashion the specifics of a

---

[30] Employers can seek reductions but retirees cannot ask for benefit *increases* from the Court or propose new plans that contain modifications that the retirees submit are "reasonable."

healthcare plan. The Court does not believe *Reese* requires, or even contemplates, judicial scrutiny into such minute, yet important, plan details.

*Id.* R.450:17040.

The district court's decision on the present record, and the decision ***not*** to further expand that record, is neither unjust nor erroneous. *See Steel Workers v. Kelsey Hayes,* 750 F.3d at 561 (concurring opinion).

## CONCLUSION

Appellees request that this Court affirm the district court's decision in its entirety.

Respectfully submitted,

McKNIGHT, CANZANO, SMITH
RADTKE & BRAULT, P.C.

By:  /s/Darcie R. Brault
Darcie R. Brault (P43864)
Attorneys for Appellees
423 N. Main St., 2nd Floor
Royal Oak, MI  48067
(248) 354-9650
dbrault@michworkerlaw.com

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 13,971 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2013 in fourteen-point Times New Roman.

Respectfully submitted,

McKNIGHT, CANZANO, SMITH
RADTKE & BRAUKT, P.C.

By:  */s/Darcie R. Brault*
Darcie R. Brault (P43864)
Attorneys for Appellees
423 N. Main St., 2nd Floor
Royal Oak, MI  48067
(248) 354-9650
dbrault@michworkerlaw.com

xi

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of March, 2016, I caused the foregoing Brief to be filed with the Court electronically using the CM/ECF system, which will send a notification to all counsel of record, effecting service on them. *See* 6th Cir. R. 25(f)(1)(A).

Respectfully submitted,

McKNIGHT, CANZANO, SMITH
RADTKE & BRAUKT, P.C.

By:  */s/Darcie R. Brault*
Darcie R. Brault (P43864)
Attorneys for Appellees
423 N. Main St. Second Floor
Royal Oak, MI  48067
(248) 354-9650
dbrault@micherworklaw.com

**ADDENDUM**
**PLAINTIFFS' DESIGNATION OF**
**RELEVANT DISTRICT COURT DOCUMENTS**

| Docket Rec. No. | Record Name | Page ID Range |
|---|---|---|
| 129 | Plaintiffs' Motion for Summary Judgment | 5131-5167 |
| 129-3 | Affidavit of Robert Betker, Ex. 3 | 5991-5994 |
| 129-8 | Clark Deposition, Ex. 8 | 5880-5919 |
| 129-10 | Graham Deposition and Exhibits | 5708-5776 |
| 129-11 * | Haas Deposition and Exhibit, Ex. 14 | 5168-5338 |
| 129-12 | Julie Gonzales Deposition<br>**FILED UNDER SEAL** | 6718 |
| 129-14 | Lojeski Deposition, Ex. 19 | 6000-6154 |
| 129-15 | Transcript of Karen Hamilton Meeting, Ex. 15 | 6656-6683 |
| 129-25 | 1998 Tentative Agreement, Ex. 33 | 5452-5479 |
| 129-26 | 1974 Group Insurance Plan, Ex. 34 | 6684-6713 |
| 129-27 | 1977 Group Insurance Plan, Ex. 35 | 5662-5707 |
| 129-28 | 1980 Plan, Ex. 36 | 6465-6467 |
| 129-29 | 1983 Plan, Ex. 37 | 5519-5522 |
| 129-30 | 1990 Plan, Ex. 38 | 5030-5033 |
| 129-31 | 1995 Plan, Ex. 39 | 6295-6298 |
| 129-32 | 1998 Plan, Ex. 40 | 6330-6427 |
| 129-33 | 1990, 1995 & 1998 Central Agreement Signature Pages, Ex. 41 | 5566-5585 |
| 129-34 | 1967, 1970, 1971, 1974, 1977, 1980, 1983, 1987 Central Agreement Signature Pages, Ex. 42 | 6577-6604 |
|  | * The ECF System electronic docket number provides 129-10 as a path to 129-11. |  |

1

| Docket Rec. No. | Record Name | Page ID Range |
|---|---|---|
| 129-36 | Case Negotiation Team Documents, Ex. 44 | 6547-6568 |
| 129-37 | 1983 Indianapolis Depot Shutdown Agreement, Ex. 45 | 5920-5940 |
| 129-38 | 1987 Rock Island, Bettendorf & Terre Haute Shutdown Agreement, Ex. 46 | 6488-6546 |
| 129-39 | 2002 East Moline Shutdown Agreement, Ex. 47 | 5586-5643 |
| 129-48 | Burlington Voluntary Supplement Program Benefit Summaries  **FILED UNDER SEAL** | 6724 |
| 129-49 | Racine Benefit Summaries  **FILED UNDER SEAL** | 6725 |
| 129-50 | East Moline Benefit Summaries (Handwritten)  **FILED UNDER SEAL** | 6726 |
| 129-51 | East Moline Benefit Summaries (Typed - "Free")  **FILED UNDER SEAL** | 6727 |
| 129-52 | East Moline Benefit Summaries (Typed - "Continued at No Cost")  **FILED UNDER SEAL** | 6728 |
| 129-53 | Plant Closing Benefit Summaries  **FILED UNDER SEAL** | 6729 |
| 129-54 | Terre Haute Benefit Summaries  **FILED UNDER SEAL** | 6730 |
| 129-55 | Terre Haute Disability Pension Summaries  **FILED UNDER SEAL** | 6731 |
| 129-56 | Leroy and Norma Tussler Documents  **FILED UNDER SEAL** | 6732 |
| 129-57 | May 28, 1974 Letter - Devine to McCoy  **FILED UNDER SEAL** | 6733 |
| 129-58 | October 10, 1974 Letter - Hook to Gordon  **FILED UNDER SEAL** | 6734 |
| 129-59 | October 19, 1989 Letter - Hamilton to Knotek  **FILED UNDER SEAL** | 6735 |

| Docket Rec. No. | Record Name | Page ID Range |
|---|---|---|
| 129-60 | Donna and Eugene Key Documents **FILED UNDER SEAL** | 6736 |
| 129-61 | June 18, 1990 Letter - Devine to Williams **FILED UNDER SEAL** | 6737 |
| 129-62 | Thomas and Reba Williams Documents **FILED UNDER SEAL** | 6738 |
| 129-63 | November 8, 1993 Letter - Matkov to Crist **FILED UNDER SEAL** | 6739 |
| 129-64 | July 1, 1994 Letter - Hamilton to Jaskulske **FILED UNDER SEAL** | 6740 |
| 129-65 | April 26, 1996 Intra-Company Correspondence - Hamilton to Kaisler  **FILED UNDER SEAL** | 6741 |
| 129-66 | November 20, 2002 Email - Benson to Erenberger re Keith Hartman   **FILED UNDER SEAL** | 6742 |
| 129-67 | December 18, 1992 Letter - Hamilton to Stifter **FILED UNDER SEAL** | 6743 |
| 153 | Devine Letter **FILED UNDER SEAL** | 6737 |
| 207-4 | El Paso to Participants Letter | 8811-8814 |
| 207-5 | "Strictly Retired" Newsletter, Vogel Letter to Local 1306 Participants, Union Voice Local 1304 Newsletter | 8804-8809 |
| 214 | Opinion & Order Granting Summary Judgment in Part and Denying in Part | 8869-8892 |
| 227 | Judgment | 8969-8971 |
| 228 | Notice of Appeal | 8972-8973 |
| 271 | CNH's Motion for Approval of Reasonable Changes to Plaintiffs' Health-Care Benefits | 9785-9810 |
| 273 | Plaintiffs' Motion for Summary Judgment | 9969-9997 |

| Docket Rec. No. | Record Name | Page ID Range |
|---|---|---|
| 273-2 | Reese Declaration, Ex. A | 10003-10017 |
| 273-4 | 1974 Group Plan, Ex. A-1 | 10022-10050 |
| 273-7 | 1990 Central Agreement, Ex. A-3 | 10125-10129 |
| 273-8 | Extension Agreement, Ex. A-4 | 10130-10144 |
| 273-11 | 1995 Group Plan, Ex. A-7 | 10161-10212 |
| 273-13 | Dispute Documentation, Ex. A-8 | 10275-10347 |
| 273-14 | Contract Negotiation Proposals, Ex. A-9 | 10348-10354 |
| 273-15 | Company Benefit Proposals, Ex. A-10 | 10355-10369 |
| 273-16 | Tentative Agreement, Ex. A-11 | 10370-10384 |
| 273-19 | Case Bargaining Proposals, Ex. A-14 | 10390-10394 |
| 273-20 | 1998 Company Benefit Proposals, Ex. A-15 | 10395-10409 |
| 273-21 | Company Response to Verbal Union Proposal, Ex. A-16 | 10410-10418 |
| 273-22 | Company Proposals on Letters of Understanding, Ex. A-17 | 10419-10426 |
| 273-23 | Company Benefits Counter Proposals, Ex. A-18 | 10427-10430 |

| Docket Rec. No. | Record Name | Page ID Range |
|---|---|---|
| 273-24 | Case Managed Health Care Plan, Ex. A-19 | 10431-10461 |
| 273-25 | 3/98 Group Insurance Items, Ex. A-20 | 10462-10479 |
| 273-26 | 4/98 Group Insurance Items, Ex. A-21 | 10480-10497 |
| 273-29 | 4/98 Benefits Comparisons, Ex. A-24 | 10516-10520 |
| 273-30 | 4/98 Benefits Comparisons, Ex. A-25 | 10521-10531 |
| 273-31 | 4/98 Benefits Comparisons, Ex. A-26 | 10532-10539 |
| 273-51 | 1998 Tentative Agreement, Ex. A-46 | 10599-10632 |
| 273-54 | NewsUAW, Ex. A-49 | 10637-10640 |
| 273-65 | July 1998 Benefits Newsletter | 10753-10757 |
| 273-66 | July 1998 Benefits Newsletter | 10758-10766 |
| 273-73 | 2005 Group Benefits Plans, Ex. N | 10801-10809 |
| 273-74 | Daane Letter to Settles & Williams, Ex. O | 10810-10811 |
| 273-75 | 2010 Agreement | 10812-10836 |
| 304 | Opinion & Order | 11626-11650 |

| Docket Rec. No. | Record Name | Page ID Range |
|---|---|---|
| 309 | Notice of Appeal | 11700-11701 |
| 419 | Plaintiffs' Motion for Summary Judgment | 14016-14077 |
| 419-2 | Ex. 6 to Report of John Stahl - Ex. A | 14079-14081 |
| 419-4 | 2005 Employee Group Insurance Plan | 14147-14239 |
| 419-5 | CNH Health & Welfare Plan | 14240-14279 |
| 419-6 | CNH Clarifying Letter | 14280-14286 |
| 419-9 | Mark Lynne Report 9/24/2013 - Ex. F | 14347-14371 |
| 419-11 | Tom Coogan Deposition, Ex. H | 14373-14381 |
| 419-12 | Chart Demonstrating Increased Costs, Ex. I | 14382-14384 |
| 419-13 | Daniels Preliminary Expert Report, Ex. J | 14385-14431 |
| 420-8 | Plonka Affidavit, Ex. R | 14500-14536 |
| 420 | Index of Exhibits | 14432 |
| 420-1 | UAW Retiree Contribution History, Ex. K | 14433-14434 |
| 420-3 | Mark Lynne Report 1/15/2014, Ex. M | 14455-14472 |
| 420-6 | Sharon Schaeffer Deposition, Ex. P | 14480-14492 |

| Docket Rec. No. | Record Name | Page ID Range |
|---|---|---|
| 420-7 | Retiree Medical Savings Account Plan, Ex. Q | 14493-14499 |
| 420-9 | Deere Benefit Plans, Ex. S | 14537-14549 |
| 423 | CNH's Motion for Summary Judgment | 14708-14741 |
| 423-22 | Macey Report, Ex. C | 14890-14930 |
| 425 | Response to CNH's Motion for Summary Judgment | 14954-15002 |
| 428 | Plaintiffs' Motion to Strike CNH's Expert Declarations | 15749-15781 |
| 430 | Reply in Support of Plaintiff's Motion for Summary Judgment | 16288-16296 |
| 430-1 | Future Expected Aggregate Payments | 16297-16298 |
| 432 | Reply in Support of Plaintiffs' Motion to Strike | 16513-16523 |
| 438 | CNH's Motion for Summary Judgment | 16600-16602 |
| 439 | CNH's Brief in Support of its Motion for Summary Judgment | 16603-16618 |
| 439-4 | 1998 Central Agreement | 16711-16758 |
| 445 | Opinion & Order | 16910-16936 |
| 447 | Plaintiffs' Motion for Reconsideration | 16938-16974 |

| Docket Rec. No. | Record Name | Page ID Range |
|---|---|---|
| 450 | District Court Opinion and Order | 16996-17041 |
| 451 | Notice of Appeal | 17042-17044 |

Copies of decisions not available in publicly accessible electronic database FRAP 32.1, 6 Cir. 32.1 (a)

P:\RHC Cases\Case Corp\Case - Reese litigation\Appeals\Appeal - 2015\Appellees' Brief.docx