No. 15-2382

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

JACK REESE, JAMES CICHANOFSKY,
ROGER MILLER, AND GEORGE NOWLIN,
ON BEHALF OF THEMSELVES AND A SIMILARLY SITUATED CLASS,

*Plaintiffs-Appellees*,

v.

CNH INDUSTRIAL N.V., AND
CNH INDUSTRIAL AMERICA, LLC,

*Defendants-Appellants.*

On Appeal from the United States District Court for the
Eastern District of Michigan, No. 04-CV-70592

## REPLY BRIEF OF DEFENDANTS-APPELLANTS
## CNH INDUSTRIAL N.V., AND
## CNH INDUSTRIAL AMERICA, LLC

Bobby R. Burchfield
Nikesh Jindal
Joshua N. Mitchell
KING & SPALDING LLP
1700 Pennsylvania Ave, NW
Washington, DC  20006
Telephone:  (202) 737-0500
Facsimile:  (202) 626-3737
bburchfield@kslaw.com
njindal@kslaw.com
jmitchell@kslaw.com

*Counsel for Defendants-Appellants CNH Industrial N.V.
and CNH Industrial America, LLC*

April 8, 2016

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

I. "ORDINARY PRINCIPLES OF CONTRACT LAW" DEFEAT PLAINTIFFS' CLAIMS FOR VESTED BENEFITS UNDER THE CBA............................................................................ 3

   A. This Case Mirrors *Gallo* in All Relevant Respects................. 4

      1. The Plain Language in the 1998 CBA Precludes Vesting.................................................................. 5

      2. Plaintiffs' Efforts To Divine an Ambiguity Concerning Vesting Are Foreclosed by *Tackett* and *Gallo*.................................................................. 10

   B. Plaintiffs' Different Principles of Contract Construction Contravene *Tackett*.................................14

   C. The Extrinsic Evidence Cited by Plaintiffs Does Not Establish Vesting. .................................................18

II. THE CHANGES TO THE PLAN PROPOSED BY CNH COMPLY WITH THE CRITERIA SET FORTH IN *REESE I* AND *REESE II*. ....................................................22

   A. The Proposed Benefits Are Reasonably Commensurate with the Current Benefits. ...........................23

   B. The Proposed Changes Are "Reasonable in Light of Changes in Healthcare."..............................29

   C. The Proposed Changes Are "Roughly Consistent With the Kinds of Benefits Provided to Current Employees."....................................................31

   D. The Plan's Components Are Severable. ...............................32

CONCLUSION.......................................................33

# TABLE OF AUTHORITIES

**Cases**

*Gallo v. Moen Inc.,*
   813 F.3d 265 (6th Cir. 2016) .................................................................. passim

*Gateway Coal Co. v. United Mine Workers of America,*
   414 U.S. 368 (1974) .......................................................................17

*M&G Polymers USA, LLC v. Tackett,*
   135 S.Ct. 926 (2015) .................................................................. passim

*Reese v. CNH America LLC,*
   574 F.3d 315 (6th Cir. 2009) .................................................................. passim

*Reese v. CNH America LLC,*
   694 F.3d 681 (6th Cir. 2012) .................................................................. passim

*Sprague v. General Motors Corp.,*
   133 F.3d 388 (6th Cir. 1998) .......................................................................16

*Tackett v. M & G Polymers USA, LLC,*
   733 F.3d 589 (6th Cir. 2013) .......................................................................33

*Tackett v. M & G Polymers USA, LLC,*
   811 F.3d 204 (6th Cir. 2016) .......................................................................5, 9

*UAW v. Yard-Man, Inc.,*
   716 F.2d 1476 (6th Cir. 1983) .......................................................................4

*United Steelworkers of Am. v. Warrior Gulf & Navigation Co.,*
   363 U.S. 574 (1960) .......................................................................16

*Witmer v. Acument Global Techs., Inc.,*
   694 F.3d 774 (6th Cir. 2012) .......................................................................21

*Yolton v. El Paso Tenn. Pipeline Co.,*
   435 F.3d 571 (6th Cir. 2006) .......................................................................6

**Statutes**

29 U.S.C. § 1053 .......................................................................13

# INTRODUCTION

In our opening brief, we showed that Plaintiffs' retiree health benefits are not vested as a matter of law because they were renegotiated and granted anew in each collective bargaining cycle. We showed that the "correct legal principles" set forth to govern vesting decisions in *M&G Polymers USA, LLC v. Tackett,* 135 S.Ct. 926 (2015), further confirm that Plaintiffs' health benefits are not vested. Remarkably, Plaintiffs contest none of this. They cannot deny that their benefits were granted anew with the 1995 and 1998 CBAs, and simply ignore this decisive point. Nor can they explain how the "correct legal principles" identified by the Supreme Court in *Tackett*, and recently applied by this Court in *Gallo v. Moen Inc.*, 813 F.3d 265 (6th Cir. 2016), could allow vesting. Instead, to support the district court's decision, Plaintiffs propose a brand new set of legal principles, which finds no support in *Tackett*, *Gallo*, or any other pertinent vesting decision. These novel principles would undermine rather than implement the direction of the Supreme Court in *Tackett,* and would require a trial in every retiree health benefits dispute even if, as here,

the contract language is clear. The district court's ruling that the benefits are vested is incorrect as a matter of law and must be reversed.

In the event that this Court determines, contrary to *Tackett* and *Gallo*, that Plaintiffs' benefits are vested, the changes proposed by CNH fully comply with the criteria for such changes set forth in this Court's earlier decisions in this case. *Reese v. CNH America LLC*, 574 F.3d 315 (6th Cir. 2009) ("*Reese I*"); *Reese v. CNH America LLC*, 694 F.3d 681 (6th Cir. 2012) ("*Reese II*"). For all their bluster about the unfairness of cost sharing, Plaintiffs are unable to dispute two fundamental facts. First, the prospective cost increases they will *incur* are reasonably commensurate with the enhanced benefits they will *receive*. The undisputed evidence shows that "roughly half" of the increased cost of health care is attributable to improved procedures, drugs, and technologies. A payment by Plaintiffs of 60% of the *future* increases in costs is reasonable and fair, especially in light of steadily improving benefits and the continued free care they have received since the 1998 CBA expired twelve years ago. Second, their union has now twice agreed to this same plan for more recent retirees, and those more recent retirees will always pay more for their health benefits than these

Plaintiffs. Accordingly, even if Plaintiffs' benefits were vested, the changes proposed by CNH comply with the criteria set forth in *Reese I* and *II*, and CNH urges the Court to allow immediate implementation.

## I. "ORDINARY PRINCIPLES OF CONTRACT LAW" DEFEAT PLAINTIFFS' CLAIMS FOR VESTED BENEFITS UNDER THE CBA.

As shown, CNH Br. at 32-35, this Court's ruling in *Reese I* that Plaintiffs' health care benefits are vested did not survive the Supreme Court's decision in *Tackett*. Also as shown, *id.* at 33-39, the renegotiation of health benefits for all existing retirees, as well as for future retirees, in iterative bargaining cycles is fundamentally inconsistent with vesting. Plaintiffs cannot deny either of these decisive points.

Moreover, unable to explain how the "ordinary principles of contract law" set forth in *Tackett* support vesting, Plaintiffs attempt to undermine the holding of *Tackett* by asserting a wholly new set of principles. Indeed, they argue that the "law of the shop" and extrinsic evidence should override the contractual language and the "correct legal principles" set forth in *Tackett*. Plaintiffs' efforts to subvert the

Supreme Court's decision in *Tackett* and this Court's decision in *Gallo* must fail.

## A.    This Case Mirrors *Gallo* in All Relevant Respects.

Plaintiffs acknowledge the Supreme Court's holding in *Tackett* that the inferences derived from *UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983) "cannot be used to determine vesting of collectively bargained healthcare benefits." Pls. Br. at 20. Plaintiffs further acknowledge that *Tackett* instructs courts to interpret collective bargaining agreements "according to ordinary principles of contract law, at least where those principles are not inconsistent with federal labor policy." *Tackett*, 135 S.Ct. at 933.

In *Gallo*, this Court applied the rules of contract construction set forth in *Tackett* to resolve a vesting dispute in favor of the employer. Courts must "consider the general durational clauses in the CBAs … in deciding how long a company has committed to provide healthcare benefits to retirees," "not construe ambiguous writings to create lifetime promises," and "not infer that the parties intended [retiree] benefits to vest for life" "when a contract is silent as to the[ir] duration." *Gallo*, 813 F.3d at 268 (citing *Tackett*, 135 S.Ct. at 936). In their opposition

4

brief, however, Plaintiffs ignore these basic principles from *Tackett* and *Gallo*, which, applied here, defeat their vesting claims.[1]

### 1.    The Plain Language in the 1998 CBA Precludes Vesting.

In accord with ordinary principles of contract interpretation, *Gallo* instructs that "[t]he first and best way to divine the intent of the parties is from the four corners of their contract and from traditional canons of contract interpretation.… Absent ambiguity from this threshold inquiry, no basis for going beyond the contract's four corners exists."  813 F.3d at 273-74.  As in *Gallo*, the Court may resolve the vesting issue in this case as a matter of law from the face of the CBA, with no resort to extrinsic evidence.

The "*[f]first and foremost*" reason for rejecting vesting, according to *Gallo*, is the absence of any provision granting lifetime healthcare benefits.  *Id.* at 269 (emphasis in original).  "That is what matters, and

---

[1]  Plaintiffs in *Gallo* sought *en banc* review, arguing that the panel decision was inconsistent with both the Supreme Court's decision in *Tackett* and the Sixth Circuit's subsequent remand of that case to the district court in *Tackett v. M & G Polymers USA, LLC*, 811 F.3d 204 (6th Cir. 2016) ("*Tackett III*").  *See* Pet'n for Reh'g, *Gallo v. Moen, Inc.*, No. 14-3633 (6th Cir.), ECF No. 67, at 5.  On March 16, 2016, this Court denied the rehearing petition because no judge voted for *en banc* reconsideration.

5

that is where the plaintiffs fall short." *Id.* Likewise, Plaintiffs here are unable to point to any contractual language conferring vested benefits. "[W]hen a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life." *Tackett*, 135 S.Ct. at 937.

Further, the plain language of the 1998 CBA negates vesting in two ways. First, Plaintiffs did not receive their benefits under the CBAs in effect when they retired, but under the CBA in effect when the benefits were paid. *Cf. Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 581 (6th Cir. 2006) (vesting means that "someone already retired under a particular CBA continues to receive the benefits provided therein despite the expiration of the agreement itself"). With each collective bargaining cycle beginning in 1995, CNH and the union renegotiated the terms and granted anew changed health benefits for all persons who had retired since July 1, 1994. CNH Br. at 35-39. Thus, all the Plaintiffs—whether they retired during the 1993 extension, the 1995 CBA, or the 1998 CBA—currently receive their benefits under the CBA executed in 1998. *See* R.129-32:6403 (1998 GBP) (providing health benefits to "[e]mployees who retire under the

Case Corporation Pension Plan for Hourly Paid Employees after 7/1/94"); *Reese I*, 574 F.3d at 324 (recognizing that the 1998 CBA "reset the rules for employees who retired after July 1, 1994"). *See also* R.129-31:6291 (1995 GBP). When the prior agreements expired, so did the benefits for existing retirees. Plaintiffs concede that the UAW broke from this pattern of "re-upping" the benefits for existing retirees when it "adamantly refused to negotiate" about them in the 2005 bargaining cycle. Pls. Br. at 55 n.26. Thus, Plaintiffs' benefits expired on May 2, 2004, when the 1998 CBA expired.

This structure parallels the CBAs in *Gallo*, which "continued" benefits to "former employees who retired under prior CBAs." 813 F.3d at 270. As this Court correctly noted, "[t]here would be no need to 'continue' such benefits if prior CBAs had created vested rights to such benefits." *Id.* Thus, the cycle-to-cycle renegotiation of Plaintiffs' benefits shows a recognition by both parties that the benefits were *not* vested, but guaranteed only for the duration of the existing CBA.[2] Plaintiffs simply have no response to this decisive point.

---

[2]  Once again, Plaintiffs assert that the 1998 CBA and the shift to managed care improved their benefits, Pls. Br. at 9, but this Court

Second, the six-year durational clause of the 1998 CBA negates vesting. *See* CNH Br. at 42. As *Gallo* put it, "we should not expect to find lifetime commitments in time-limited agreements." 813 F.3d at 278–79; *see also Tackett*, 135 S.Ct. at 937 (emphasizing the "traditional principle that 'contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement.'"). In line with *Tackett*'s directive that general durational clauses must be respected, 135 S.Ct. at 936, this Court in *Gallo* further elaborated:

> When a specific provision of the CBA does not include an end date, we refer to the general durational clause to determine that provision's termination. Absent a longer time limit in the context of a specific provision, the general durational clause supplies a final phrase to every term in the CBA: "until this agreement ends."

813 F.3d at 269 (citations omitted).

These principles apply equally here to preclude vesting. The language in the 1998 GBP specifying that Plaintiffs "shall be eligible for the Group benefits," R.129-32:6403, read in context with the durational

---

directly rejected that argument in *Reese I* and again in *Reese II*. *See Reese I*, 574 F.3d at 325 (noting that the new managed care arrangement "represented a reduction in the effective choices of coverage available for all retirees and the coverage actually provided to many, if not most, of them"); *Reese II*, 694 F.3d at 684 (quoting *Reese I*).

clause, merely "*guarantee*[s] benefits until the agreement expires, nothing more." *Gallo*, 813 F.3d at 269 (emphasis in original). [3]

Plaintiffs invoke the *Gallo* dissent and *Tackett III* to argue that the Court "cannot presume … that a general durational clause says everything about the intent to vest." Pls. Br. at 34-35 (citing *Gallo*, 813 F.3d at 276 (Stranch, J., dissenting), and *Tackett III*, 811 F.3d at 209). But for vested benefits to coexist in a CBA with a general durational clause, the CBA must contain *something* speaking to the duration of those benefits; silence will not do. *Tackett*, 135 S.Ct. at 937. As *Gallo* explained, "In the absence of specific language in the retiree healthcare provisions, the general durational clause controls." 813 F.3d at 272.

---

[3] The Summary Plan Description ("SPD") of the 1998 Group Benefit Plan also confirms that benefits were not vested. It states: "[a]n amendment or *termination* of the … benefit plans may affect … the coverage[]" of retirees. *See Reese I*, 574 F.3d at 323 (emphasis in original) (citing R.125-20:4368). Although this SPD would allow termination only upon expiration of the 1998 CBA and Group Benefit Plan, it served fair warning to Plaintiffs about the prospect of termination at that time. As *Gallo* observed about a similar reservation of rights clause, "[h]ow can one simultaneously say that healthcare benefits are 'vested' but may be [terminated] by the employer?" 813 F.3d at 270.

Here, Plaintiffs can point to no language that would trump the durational clause.[4]

### 2. Plaintiffs' Efforts To Divine an Ambiguity Concerning Vesting Are Foreclosed by *Tackett* and *Gallo*.

Plaintiffs' failure even to acknowledge contractual provisions that directly preclude vesting undermines their effort to construct an ambiguity on the issue of vesting. The inferences that the district court applied to manufacture an ambiguity, and that Plaintiffs continue to assert on appeal, were directly repudiated by *Tackett* and again by *Gallo*. If not sufficient, standing alone, to *establish* vesting, those inferences are not sufficient to resist CNH's motion for summary judgment *against* vesting. *See* CNH Br. at 47. Plaintiffs also have no answer for the Supreme Court's admonition that "courts should not construe ambiguous writings to create lifetime promises." *Tackett*, 135 S.Ct. at 936.

---

[4]   Plaintiffs refer to the "five separate occasions" that courts have found that these contracts promised vested benefits, Pls. Br. at 18, but those decisions were based on the *Yard-Man* inferences repudiated in *Tackett*.

First, Plaintiffs point to the tying of eligibility for retiree health benefits to eligibility for a pension and posit that even if "not conclusive of vesting after *Tackett*," this language "at the very least  create[s] an ambiguity."  Pls. Br. at 22.  But as this Court noted in *Gallo*, "*Tackett* rejected this kind of 'tying' analysis as a relic of a misdirected frame of reference, calling it one of many *Yard-Man* inferences that was 'inconsistent with ordinary principles of contract law.'"  813 F.3d at 272 (citing *Tackett*, 135 S.Ct. at 937).  If "tying" cannot independently support vesting, it lacks the power to obscure clear contract provisions defeating vesting.

Plaintiffs also invoke Justice Ginsburg's concurrence in *Tackett*, which states that language connecting the *duration* of pension benefits to the *duration* of health benefits might possibly be "*relevant* to th[e] examination."  135 S.Ct. at 938 (emphasis added); *see also id.* ("[R]etirees 'will receive' health-care benefits if they are 'receiving a monthly pension'").  Even if Justice Ginsburg's analysis were authoritative — and it is not[5] —  *Gallo* explained "[t]hat sort of

---

[5]  As this Court recognized in *Gallo*, the Opinion of the Court in *Tackett* repudiates the tying analysis, not once but twice.  *See Tackett*, 135

durational linkage is absent … where the CBAs simply state that those who are *eligible* for pensions are also *eligible* for health benefits." 813 F.3d at 272 (emphasis in original). The language here specifying that employees who retire under the pension plan "shall be eligible for" healthcare benefits plainly speaks to eligibility, not duration, and therefore does not "mean[] that retirees will get those benefits *for as long as* they earn a pension." *Id.* (emphasis in original).

---

S.Ct. at 935, 937. In that respect, Justice Ginsburg's concurrence is inconsistent with the Opinion of the Court. Further, a concurring opinion cannot "supplement" the Opinion of the Court. *See* CNH Br. at 44 n.15. In *Tackett III*, the Court cited *Alexander v. Sandoval*, 532 U.S. 275 (2001), to justify reliance on Justice Ginsburg's concurrence, but the holding of *Alexander* actually rejects reliance on a concurring opinion. *Alexander* holds that when the majority Opinion does not address a concurrence, the Court's "holding is not made coextensive with the concurrence because the[] opinion does not expressly preclude … the concurrence's approach. The Court would be in an odd predicament if a concurring minority of the Justices could force the majority to address a point they found it unnecessary (and did not wish) to address, under compulsion of … [a] new principle that silence implies agreement." *Id.* at 285 n.5. The analysis in *Alexander* fits Justice Ginsburg's concurrence exactly, confirming that it carries no weight.

Moreover, it is noteworthy that the *Tackett* plaintiffs relied on "tying" as a key part of their argument in support of vesting on remand, but *Tackett III* ignored that argument.

As a related point, Plaintiffs note that the 1998 CBA specifies that both the GBP and the pension plan "run concurrently with this agreement." Pls. Br. at 4 (quoting R.439-4:16755). But that observation does not address *duration* of the benefits; pension benefits are vested by virtue of ERISA, while welfare benefits are not. *See* 29 U.S.C. § 1053(a) (providing that "an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age").

Finally, Plaintiffs urge that specific durational limits for certain benefits, and the absence of a comparable limit for retiree health benefits, creates an ambiguity suggesting that health benefits may vest for life. Pls. Br. at 22. But *Gallo* flatly rejected that very argument: "The CBA's general durational clauses provide a baseline or default rule, a point at which the agreements expire *absent more specific limits* relevant to a particular term." 813 F.3d at 271–72 (emphasis in original). As is the case here, "[i]n the absence of specific language in

the retiree healthcare provisions, the general durational clause controls." *Id.* at 272.[6]

## B. Plaintiffs' Different Principles of Contract Construction Contravene *Tackett*.

In a direct affront to the Supreme Court's ruling in *Tackett* and this Court's ruling in *Gallo* that "ordinary principles of contract law" must guide the vesting decision, Plaintiffs postulate that, to the contrary, "CBAs are not 'ordinary' contracts," because they must be construed consistently with federal labor policies. Pls. Br. at 25. From this proposition, they urge the Court to consider the "the common law of the shop." *Id.* at 26. In their view, the "common law of the shop" is relevant to any vesting issue, even if the contract language is crystal clear. This notion, which finds no support in the relevant case law, directly contravenes this Court's instruction in *Gallo*: "The first and best way to divine the intent of the parties is from the four corners of their contract and from traditional canons of contract interpretation." 813 F.3d at 273. "Absent ambiguity from this threshold inquiry, no

---

6 The 1993 and 1995 cap letters do not establish vesting for the reasons noted below. *See* Part I.C below.

basis for going beyond the contract's four corners exists." *Id*. at 273–74. Plaintiffs' analysis is simply an end-run around the holdings in *Tackett* and *Gallo*. Beyond that, their analysis fails for several additional reasons.

First, Plaintiffs are egregiously misconstruing *Tackett*'s statement that CBAs must be interpreted "according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy." 135 S.Ct. at 933. The only "federal labor policy" addressed in the *Tackett* decision, or relevant to the issue of vesting, is the Congressional decision not to require vesting of welfare benefits, discussed in the paragraph immediately preceding the quoted statement.

As the Supreme Court pointed out, the Congressional policy governing welfare benefits leaves employers "large leeway to design disability and other welfare plans as they see fit." *Id.* The Court further noted that "focus[ing] on the written terms of the plan" and enforcing contractual provisions "as written" is critical to limiting administrative burdens and litigation risks that would otherwise "unduly discourage employers from offering [welfare benefit] plans in

the first place." *Id. Gallo* explained that "*Tackett* … directed us to treat collectively and noncollectively bargained contracts about retiree healthcare benefits similarly—to apply the same basic set rules of contract interpretation to both sets of contracts." 813 F.3d at 268.[7] Plaintiffs' only rejoinder to this clear principle is that the *Gallo* "analysis is fatally flawed." Pls. Br. 41. Yet, their diversion into "the law of the shop" was never hinted at by the unanimous Court in *Tackett*, by Justice Ginsburg's concurrence, by *Tackett III*, or by *Gallo*. It is a creative but meritless reading of the *Tackett* decision.

Second, the sole basis for Plaintiffs' effort to interject the "common law of the shop" into the vesting inquiry is the half-century-old decision in *United Steelworkers of America v. Warrior Gulf & Navigation Co.*, 363 U.S. 574 (1960). *Warrior Gulf* enforced an arbitration clause in a dispute about the employer's decision to contract out maintenance

---

[7] In the same passage, *Gallo* noted that "[a]t the same time [the *Tackett* Court] rejected *Yard-Man*, it endorsed our decision in *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998) (en banc)." 813 F.3d at 268. This Court made clear that CBAs are subject to the same rules of interpretation as non-collectively bargained agreements. Non-collectively-bargained plans, like the one in *Sprague*, have no "common  law of the shop."

work.  Plaintiffs concede that *Warrior Gulf* involved arbitration, Pls. Br. at 26 n.7, where "common law of the shop" has meaning.  *Warrior Gulf* does not address an issue of judicial contract interpretation, but rather notes that "the considerations [such as the law of the shop] which help [a labor arbitrator] fashion judgments *may indeed be foreign to the competence of courts*."  363 U.S. at 581 (emphasis added).  Because a "collective-bargaining agreement cannot define every minute aspect of the complex and continuing relationship between the parties," "[a]rbitration provides a method for resolving the unforeseen disagreements that inevitably arise."  *Gateway Coal Co. v. United Mine Workers of America*, 414 U.S. 368, 378 (1974).  Within this context, "the labor arbitrator necessarily and appropriately has resort to considerations foreign to the courts," *Gateway Coal Co.*, 414 U.S. at 378, such that the arbitrator — unlike a court — "is not confined to the express provisions of the contract" but may give consideration to "the industrial common law" as well.  *Id.* (citing *Warrior Gulf*, 363 U.S. at 581–82).  These "considerations foreign to the courts" have no bearing on the vesting issues before this Court.[8]

---

8   When the *Tackett* Court referred to "affirmative evidentiary support"

Finally, Plaintiffs completely ignore the rules of contract law actually embraced by *Tackett*.  Nowhere in their argument do they even acknowledge the precepts that neither silence nor ambiguity can support vested benefits.  *See Tackett*, 135 S.Ct. at 936-37.  Their only acknowledgement that "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement," *id*. at 937 (internal quotation marks and citation omitted), is to claim that a general durational clause need not *always* limit retiree health benefits. Pls. Br. at 34.

Thus, the terms of the CBAs here, and the rules of contract law set forth in *Tackett*, not the creative rules of construction devised by Plaintiffs, control this case.

## C.    The Extrinsic Evidence Cited by Plaintiffs Does Not Establish Vesting.

As shown (Part I.A. above), the contract at issue here is not ambiguous.  Even if it were, *Tackett* made clear that ambiguity in the

---

(not present here) of "known customs or usages in a particular industry," 135 S.Ct. at 935, it was criticizing *Yard-Man*, which "relied on no record evidence indicating that employers and unions in that industry customarily vest benefits." *Id*.  The Court was not mandating a full trial on custom and usage in every vesting case, especially when (as here) the contract language is unambiguous.

contract cannot support vesting.  135 S.Ct. at 936.  But even assuming (contrary to fact) that this contract were ambiguous, and even assuming (contrary to *Tackett*) that ambiguity could support vesting, the extrinsic evidence cited by Plaintiffs does not prove vesting.

As an initial matter, Plaintiffs ignore the integration clause in the 1998 CBA which excludes consideration of extrinsic evidence altogether. *See* CNH Br. at 48–49 (citing R.439-4:16757) ("This Agreement disposes of any and all bargaining issues, whether or not presented during negotiations, except with respect to the processing of grievances as provided in Article VII").  Nor do Plaintiffs acknowledge this Court's ruling in *Reese I* that the extrinsic evidence is insufficient to support lifetime, unalterable benefits.  574 F.3d at 326.

Even more fundamentally, the extrinsic evidence cited is simply irrelevant.  Plaintiffs assert nine items of extrinsic evidence, Pls. Br. at 26-29, to support their view that, notwithstanding what the CBAs actually say, the benefits are vested.  Eight of those nine items predated the seminal 1995 CBA which for the first time covered existing retirees as well as all future retirees.  *See id.* at 26–29, 36–38.  What might have been true in the 1970s, 1980s, or early 1990s is not true for the class

19

period here.  The contracts fundamentally changed in July 1994 when CNH became Plaintiffs' employer as a part of a corporate reorganization.  *See* CNH Br. at 7–8.  As described above, health benefits for post-July 1, 1994 retirees were renegotiated and granted anew under the 1995 and 1998 agreements. As a matter of fact and contract, the benefits did not vest upon retirement, but remained subject to renegotiation.  *See* Section I.A.1 above.  This undisputed practice in the 1995 and 1998 contracts of renegotiating all retiree benefits in each collective bargaining cycle is inconsistent with vesting because "[t]here would be no need to 'continue' such benefits if prior CBAs had created vested rights to such benefits."  *Gallo*, 813 F.3d at 270.

The only extrinsic evidence from the relevant time period is the 1993 and 1995 cap letters, which Plaintiffs claim contravene the plain language of the 1998 CBA and support vesting.  Not so.  These letters stated that if the cost of health benefits exceeded a certain dollar amount, Plaintiffs would be required to pay the excess portion of the costs after a certain date.  *See* CNH Br. at 39 n.13.  The mere fact that these caps were scheduled to go into effect after the expiration of the

particular CBA's does not show vesting. As this Court recognized in *Witmer v. Acument Global Techs., Inc.*, 694 F.3d 774, 777 (6th Cir. 2012), a stated intention to continue benefits beyond the term of the CBA does not equate to lifetime vesting, particularly where the company "reserve[s] the right to modify or end that coverage." *See also Gallo*, 813 F.3d at 273–74 (holding that continuation of benefits five years after the plant closing agreement expired did not establish vesting).

Moreover, in the 1998 CBA, CNH and UAW agreed to delete the cap letters and replace them with the Cost of Healthcare Coverage Letter. Thus, the cap letters were deleted and of no effect for the 1998 CBA and GBP at issue here. The governing Cost of Healthcare Coverage Letter that replaced the cap letters states that retirees would not "pay any additional employee contributions" only "over the term of the 1998 labor agreement." *See Reese I*, 574 F.3d at 325 (quoting letter, quotation marks omitted). This letter showed unmistakably that the benefits were not a permanent obligation under the CBA. In addition, the letter regarding "National and State Health Insurance Initiatives" appended to the 1998 GBP specifying that benefits would change in the

event of enhanced federal or state benefits further underscored that

benefits under the 1998 agreement were neither "fixed" nor

"unalterable." *Reese II*, 694 F.3d at 684 (referring to the letter).

Accordingly, the plain language of the 1998 CBA defeats vesting,

and Plaintiffs' effort to undermine this result through "the law of the

shop" is inconsistent with *Tackett* and *Gallo*. CNH respectfully urges

this Court to reverse the district court's judgment and order entry of

judgment in favor of CNH on the vesting issue, so "[t]his long-running

dispute [may] come to an end." *Reese II*, 694 F.3d at 685.

## II.    THE CHANGES TO THE PLAN PROPOSED BY CNH COMPLY WITH THE CRITERIA SET FORTH IN *REESE I* AND *REESE II.*

Even if, notwithstanding *Tackett* and *Gallo*, this Court were to

deem the healthcare benefits vested, CNH's proposed plan is consistent

with the criteria set forth in *Reese I* and *Reese II*. CNH Br. at 49–66;

*Reese II*, 694 F.3d at 685. As shown, CNH Br. at 49-64, CNH's proposed

plan allows Plaintiffs to continue receiving health benefits, including

the improvements and technological advances in the care, so long as

they pay a reasonably commensurate share of the increasing costs.

Both the district court and Plaintiffs have misread *Reese I* and *II* by

22

assuming that Plaintiffs should be entitled to ever-improving health care at little or no additional cost.  Moreover, the proposed plan is qualitatively identical to but significantly less expensive for Plaintiffs than the plan the UAW has twice agreed to for more recent retirees. These undisputed facts by themselves demonstrate that the proposed plan is "reasonably commensurate" with the current plan, is "reasonable in light of changes in healthcare," and is "roughly consistent"—equivalent to but at less cost than—"the kinds of benefits provided to current employees."  *Reese II*, 694 F.3d at 685.

## A.    The Proposed Benefits Are Reasonably Commensurate with the Current Benefits.

Plaintiffs are simply wrong when they repeatedly claim that the proposed plan will provide the class with "the benefits it already has." *E.g.,* Pls. Br. at 52.  From this false premise, Plaintiffs complain that the proposed plan would require them to pay more for the same benefits.  *See id.* at 46–50.

Plaintiffs' premise that they will continue to receive the same care is at odds with the undisputed record.  Plaintiffs are the beneficiaries of vast improvements in medical technology and practice.  *See Reese II*, 694 F.3d at 683-84 ("remarkable growth in modern life-saving and

23

comfort-improving medical procedures, devices and drugs").  Indeed, by 2012 nearly a third of their overall prescription drug costs — $4.7 million out of $15 million — were for drugs that did not even exist in 1998 when CNH and the UAW agreed to and implemented the current plan.  R. 423-14:14873.  Plaintiffs cannot deny that improvements in the medical care they receive are a main driver of increasing costs.  *E.g.*, Pls. Br. at 52.

Instead, Plaintiffs claim that they have "debunked CNH's analysis" showing improvements to their care.  Pls. Br. 52 at n.23. They are incorrect.[9]  They also ignore the 2008 Congressional Budget Office Report, cited by CNH's expert, attributing "roughly half" of the rising cost of healthcare to the availability of new technologies and treatments.  *See* CNH Br. at 54 (also citing 2013 CBO report calling

---

[9]   One of CNH's experts examined medical procedure codes to conclude that many of the procedures used by the class did not exist in 1998. In their motion to exclude CNH's experts, which the district court did not decide, Plaintiffs challenged that analysis of medical procedures, contending that analysis of those codes could not reliably show a change in available procedures because many of the procedure codes had changed over the years.  But a separate analysis of actual prescription drug usage — which Plaintiffs did *not* challenge — showed that over 30% of prescription drug costs incurred by the class were for drugs not even available in 1998.  CNH Br. 13, 53.

"new medical technologies and services" a "key" factor in increased healthcare costs). Put simply, Plaintiffs have better benefits now than they had in 1998, and they will have better benefits in the future than they have now. Those benefits come at a cost, and the parties agreed in the Cost of Healthcare Coverage Letter that the Plaintiffs could bear some of that cost at the end of the 1998 CBA. *See* R.439-3:16702 (limiting retirees contributions only "over the term of the 1998 labor agreement"); *see also Reese I*, 574 F.3d at 325 (citing letter). Through this twelve-year-old litigation, Plaintiffs avoided paying any of the costs envisioned in the Cost of Healthcare Letter, but have nonetheless received constantly improving benefits.

Plaintiffs also make broad accusations about the proposed plan that neglect critical details. For example, they assert that the proposed plan eliminates prescription drug coverage for the Medicare-eligible Plaintiffs, Pls. Br. at 44, but fail to acknowledge that those Plaintiffs will have access to Medicare Part D, which did not exist in 1998. They assert that Plaintiffs not yet eligible for Medicare will see "an eight to twelve fold increase in the copays for a 30-day supply of *retail brand name drugs*," *id.* (emphasis added), but neglect to say that the copay for

*generic drugs* will increase minimally, from $5 to $10; this is a common copay structure intended to encourage use of equivalent but less expensive generic drugs. *Compare* R.439-02:16660 ($5 under 1998 GBP), *with* R.423-03:14784 ($10 under proposed plan). They claim that Medicare participants will be responsible for 74.9% of costs in 2032 (with CNH paying 25.1%), Pls. Br. at 49, but neglect the large share of Medicare costs paid on behalf of Plaintiffs by *the federal government*. And they claim repeatedly that CNH will save over $192 million over ten years by implementing the changes, Pls. Br. at 2, 50, suggesting that the Plaintiffs will shoulder those costs. To the contrary, the great bulk of those costs will be borne by Medicare Part D, and other costs will be saved by plan design changes such as by encouraging greater use of generic drugs. R.419-2:14080 (showing relative per-capita costs of prescription drug benefits under current and proposed plans).

Plaintiff's primary effort to show the proposed plan is unreasonable is based on projected costs many years from now. Pls. Br. at 47–49. These figures are unpersuasive and misleading for two reasons. *First,* in every instance — every one — Plaintiffs will pay *less* than the similarly situated (Medicare or pre-Medicare) recent retirees.

The UAW agreed to those greater charges for the more recent retirees, and they are reasonable in today's healthcare market. *Second*, the projections in the record assumed that Plaintiffs would begin paying premiums in 2013; they did not. After the district court granted CNH's summary judgment motion of September 28, 2015, R.445, CNH began to implement the proposed plan to take effect on January 1, 2016. It proposed that Plaintiffs pay *no premium* in the first year. CNH Br. at 18 n.8. If Plaintiffs pay only 60% of the cost increase starting from a zero-dollar base, the impact on Plaintiffs would be substantially moderated.

More specifically, Plaintiffs, like the district court, focus on the proposed plan's projected costs for non-Medicare participants in 2032. *See* Pls. Br. at 49; R.450:17021. But only thirteen young spouses of retirees are projected to be less than 65 years old, and thus ineligible for Medicare by 2032. CNH Br. at 55. Since they will not be 65 in 2032, the oldest of those spouses is *now* no older than 49 years old, and some of them may still be in the workforce today and for years to come.

Also important, although the district court placed no weight on it, the current plan imposes increasingly onerous costs on CNH. Under

the current plan, CNH is projected to pay $39,749 per pre-Medicare retiree in 2032, R.419-2:14081; Pls. Br. at 50, while the Plaintiffs would benefit from improving healthcare at *no* cost.  Even under the proposed plan, CNH is projected to pay $24,570 per pre-Medicare eligible participant in 2032.  R.419-2:14081; *see* CNH Br. at 56.

Similarly, Plaintiffs complain that the "availability of [Medicare] Part D coverage is not a substitute for vested, contractual coverage." Pls. Br. at 49 n.18.  But in the 1998 letter regarding "National and State Health Insurance Initiatives," Plaintiffs *agreed* to participate in new government programs, like Medicare Part D:  Plaintiffs' benefits "will be modified so as to integrate or eliminate the duplication of such benefits with the benefits provided by [the new] Federal ... law."  R.439-3:16701.  Further, the UAW agreed — twice — that recent retirees would look to Medicare Part D for their prescription drug coverage.

Plaintiffs cannot deny the undisputed facts that the proposed cost shift is reasonably commensurate with the enhanced benefits they will receive.  Accordingly, the district court erred as a matter of law in interpreting and applying this factor.  *See Reese II*, 694 F.3d at 685.

### B.    The Proposed Changes Are "Reasonable in Light of Changes in Healthcare."

The undisputed material facts show that the proposed plan is reasonable in light of changes to health care.  As this Court has summarized, "healthcare benefits — what is provided and what it costs — have not been remotely static in modern memory."  *Id.* at 683.  Indeed, the record confirms that healthcare costs have increased at a rate far higher than general inflation, driven in large part by advances in healthcare technology.  *See* CNH Br. at 54 (citing 2008 and 2013 CBO Reports).  The record shows that employers have responded to these increasing costs by implementing premiums, increased deductibles, and increased copayments for their employees.  CNH Br. at 60–61; R.423-22:14926 (Towers Watson analysis of 900 employer plans showing CNH proposal better than 75% of those offered).

More important, the record shows that the Plaintiffs' union has agreed — twice, first in 2005 and again in 2010 — to cost sharing for workers and recent retirees, and those groups are paying costs greater than what CNH proposes for Plaintiffs.  CNH Br. at 61-63.  The record further shows that one of CNH's principal competitors, Caterpillar, has adopted a plan similar to the one proposed here.  R.423-22:14920–

29

21.  None of this is disputed, and it is sufficient to show that the proposed changes are reasonable in light of changes to health care.

Plaintiffs respond in two ways.  First they contest the value of looking at what other employers have done, and second they submit a single comparator — the John Deere Company — that has a plan more to their liking.  Plaintiffs cannot deny, however, is that their union agreed that all retirees since 2005 must participate in a plan that parallels the one proposed by CNH for Plaintiffs, or that those more recent retirees will always pay more for their coverage.  If a more expensive plan is reasonable for their later-retiring colleagues, the proposed plan is reasonable for Plaintiffs.

Struggling for something to say about the 2005 and 2010 plans, Plaintiffs dismiss them, as well as the plan the UAW agreed to with Caterpillar, Inc., as products of unfavorable bargaining cycles.  *See* Pls. Br. at 37, 55 n.26.  But in many respects that is exactly the point: employers in the current era consider gold-plated health plans like the ones at issue here so unnecessarily generous that they will risk labor peace to get them changed.  And plaintiffs' union has twice agreed to

these very changes, recognizing that the changes reflect the current state of the healthcare market.  *See* CNH Br. at 61-63.

Plaintiffs nevertheless complain that approval of CNH's proposed changes would mean that "every vested plan w[ill] be subject to change due to medical inflation."  Pls. Br. at 53.  But that argument seeks to relitigate an issue already decided in this case; regardless of whether "every" plan is subject to changes, this Court has held that *this one* is. *See Reese II*, 694 F.3d at 684 (allowing "changes to the healthcare plan covering eligible retirees" when those changes are "reasonable in light of changes in health care") (quotation marks omitted).

The 2005 plan, along with the plans provided by other employers, demonstrate that the changes proposed by CNH are reasonable in light of the changes in healthcare since 1998.  *Id.* at 685.

### C.   The Proposed Changes Are "Roughly Consistent With the Kinds of Benefits Provided to Current Employees."

Plaintiffs cannot deny that the plan they now reject as unreasonable is a better version of the plan their union twice negotiated and agreed to for current employees and recent retirees.  *See* CNH Br. at 59.  Instead, Plaintiffs rest their argument on other financial benefits

received by the more recent retirees. Pls. Br. at 55–57. But CNH fully addressed that argument in its opening brief. CNH Br. at 62–64.[10] Plaintiffs will receive the same benefits, enhanced by technological improvements, under the current plan as would be available under the proposed plan. Plaintiffs concede that the quality of care would be unchanged. *See id.* CNH's proposal easily meets this third requirement. *See Reese II*, 694 F.3d at 685.

## D. The Plan's Components Are Severable.

CNH has put forward a sensible, integrated plan that was carefully negotiated over the last decade with the UAW. The plan meets the requirements set forth in *Reese I* and *Reese II*. Even if the Court determines that some components of the plan do not meet the

---

10 Plaintiffs assert, as they did before the district court, that it would be hypothetically possible for a recent retiree with 30 years of seniority to collect an additional $135,000 over his lifetime. They fail to show, however, whether any such person actually exists, how many of those persons there might be, or the methodology for this calculation. On the other hand, CNH has shown that a Plaintiff would pay about $5,000 per year *less* in premiums than a post-2005 retiree (CNH Br. at 62, citing DE423-2:14747 (Coogan Decl.)), meaning that the savings by each of these Plaintiffs compared to the more recent retirees will exceed $150,000 over 30 years, not counting Plaintiffs' savings over the twelve years since the 1998 CBA expired.

reasonableness criteria, however, the Court can approve some but not all components.

The language of the CBA, the law of the case, and the law in this Circuit all point to the conclusion that the district court could have severed any portion of the plan it deemed unreasonable, as may this Court.  *See* CNH Br. at 64–66; *Tackett v. M & G Polymers USA, LLC*, 733 F.3d 589, 600–01 (6th Cir. 2013), abrogated on other grounds by *Tackett II*, 135 S.Ct. 926 (considering individual benefits and costs separately); R.450:17039–40 (declining to sever plan but not ruling that district court lacked authority to do so); R.439-4:16756 (severability provision in 1998 plan); *see also* R.125-17:4478 (severability provision in 2005 plan). On de novo review, this Court has that same power. This twelve-year-old case must come to an end.

## CONCLUSION

For the foregoing reasons, CNH respectfully urges the Court to reverse the district court's grant of summary judgment and remand for entry of judgment for CNH.

Dated: April 8, 2016                    Respectfully submitted,

                                        /s/ Bobby R. Burchfield
                                        Bobby R. Burchfield
                                          Counsel of Record
                                        Nikesh Jindal
                                        Joshua N. Mitchell
                                        KING & SPALDING LLP
                                        1700 Pennsylvania Ave., NW
                                        Washington, DC  20006
                                        Telephone:  (202) 737-0500
                                        Facsimile:  (202) 626-3737
                                        bburchfield@kslaw.com
                                        njindal@kslaw.com
                                        jmitchell@kslaw.com

*Counsel for CNH Industrial N.V. and CNH Industrial America, LLC*

34

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 6,809 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. (32)(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in fourteen-point Century Schoolbook.

Dated: April 8, 2016                    Respectfully submitted,

                                        /s/ Bobby R. Burchfield
                                        Bobby R. Burchfield
                                          Counsel of Record
                                        Nikesh Jindal
                                        Joshua Mitchell
                                        KING & SPALDING LLP
                                        1700 Pennsylvania Ave., NW
                                        Washington, DC  20006
                                        Telephone:  (202) 737-0500
                                        Facsimile:  (202) 626-3737
                                        bburchfield@kslaw.com
                                        njindal@kslaw.com
                                        jmitchell@kslaw.com

*Counsel for CNH Industrial N.V. and CNH Industrial America, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of April, 2016, I caused the foregoing Brief to be filed with the Court electronically using the CM/ECF system, which will send a notification to all counsel of record, effecting service on them. *See* 6th Cir. R. 25(f)(1)(A).

/s/ Bobby R. Burchfield
Bobby R. Burchfield
 Counsel of Record
KING & SPALDING LLP
1700 Pennsylvania Ave., NW
Washington, DC  20006
Telephone:  (202) 737-0500
Facsimile:  (202) 626-3737
bburchfield@kslaw.com